IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00349-REB-CBS

SAFE STREETS ALLIANCE,
PHILLIS WINDY HOPE REILLY, and
MICHAEL P. REILLY,
        Plaintiffs,
v.

ALTERNATIVE HOLISTIC HEALING, LLC, d/b/a Rocky Mountain Organic,
JOSEPH R. LICATA,
JASON M. LICATA,
6480 PICKNEY, LLC,
PARKER WALTON,
CAMP FEEL GOOD, LLC,
ROGER GUZMAN,
BLACKHAWK DEVELOPMENT CORP., and
WASHINGTON INTERNATIONAL INSURANCE CO.
        Defendants.

---

## RECOMMENDATION REGARDING DEFENDANTS'
## MOTIONS TO DISMISS

---

Magistrate Judge Shaffer

THIS MATTER comes before the court on the following motions:  (1) Defendants

Blackhawk Development Corporation and Roger Guzman's (collectively, the "Blackhawk

Defendants") Motion to Dismiss (doc. #77); (2) Defendant Washington International Insurance

Company's Motion to Dismiss First Amended Complaint (doc. #81); and (3) Defendants

Alternative Holistic Healing, LLC, Camp Feel Good, LLC, 6480 Pickney, LLC, Jason Licata,

Joseph Licata, and Parker Walton's (collectively, the "Alternative Holistic Healing Defendants")

Motion to Dismiss (doc. #86).  The Plaintiffs, Safe Streets Alliance, Phillis Windy Hope Reilly

and Michael P. Reilly, filed a Consolidated Response to Defendants' Motions (doc. #97), which

1

was followed by Defendants' reply briefs (doc. #98, #108, and #112).

Pursuant to the Order of Reference (doc. #8) dated February 20, 2015 and separate memoranda dated April 28, 2015 (doc. #79), April 30, 2015 (doc. #84), and May 1, 2015 (doc. #87), the instant motions were referred to this Magistrate Judge.  The court has reviewed the motions to dismiss and related briefing, the pleadings, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the following reasons, I recommend that Defendants' motions to dismiss be granted.

## PROCEDURAL HISTORY

This action commenced on February 19, 2015 with filing of Plaintiffs' original Complaint (doc. #1).  On April 13, 2015, Safe Streets Alliance and the Reillys filed their First Amended Complaint (doc. #66).  That 54-page pleading expressed Plaintiffs' over-arching goal "to vindicate the federal laws prohibiting the cultivation and sale of recreational marijuana and their rights under the Racketeer Influenced and Corrupt Organizations Act ('RICO')."  More particularly,

> Plaintiffs seek redress under RICO, which requires those who engage in racketeering activity - including the commercial production of marijuana - to pay those they injure treble damages, costs, and attorneys' fees.  Plaintiffs also seek an injunction under RICO directing the marijuana operations affecting their land to stop violating the federal drug laws.  In addition to their RICO claims, Plaintiffs are also suing the state and local officials who are facilitating and encouraging Colorado's recreational marijuana trade, including the racketeering activity that is injuring their property, through a licensing regime that purports to authorize federal drug crimes.  Because state and local government actions that promote the marijuana industry directly conflict with the federal Controlled Substances Act ("CSA"), those actions are preempted under the Supremacy Clause of the U.S. Constitution and must be set aside.

See Complaint, at p. 1.

The First Amended Complaint named as defendants Alternative Holistic Healing, LLC,

2

Joseph Licata, Jason Licata, 6480 Pickney, LLC, Parker Walton, Camp Feel Good, LLC, Roger Guzman, Blackhawk Development Corporation and Washington International Insurance Co. (hereinafter collectively identified as the "Individual Defendants").  Plaintiffs also asserted claims against John W. Hickenlooper in his official capacity as Governor of Colorado, Barbara J. Brohl, in her official capacity as Executive Director of the Colorado Department of Revenue, W. Lewis Koski, in his official capacity as Director of the Colorado Marijuana Enforcement Division (hereinafter collectively identified as the "State Defendants"), as well as the Board of County Commissioners of the County of Pueblo, and the Pueblo County Liquor and Marijuana Licensing Board (hereinafter collectively identified as the "Pueblo Defendants").[1]  Counts I through VI asserted RICO claims against all or some of the Individual Defendants and the Pueblo Defendants.  Counts VII and VIII presented claims for federal preemption of state and local marijuana licensing against the State and Pueblo Defendants, respectively.

In their Prayer for Relief, Plaintiffs seek to recover on behalf of the Reillys "three times the damages to their property that was caused by the Individual and Pueblo Defendants' racketeering activities."  In addition, the Reillys and Safe Streets Alliance seek to enjoin the Individual and Pueblo Defendants from continuing to engage in racketeering activities, stop "the State Defendants from issuing additional marijuana business and occupational licenses," prevent

---

[1]The First Amended Complaint also named as defendants David Patch and Patch Construction.  Plaintiffs voluntarily dismissed those defendants from this action on April 30, 2015.  Plaintiffs have also named as a RICO defendant John Doe 1.  *But see Coe v. United States District Court*, 676 F.2d 411, 415 (10th Cir. 1982) ("There is no provision in the Federal Rules of Civil Procedure for suit against persons under fictitious names, and there is likewise no provisions for anonymous plaintiffs.").  *Cf. Mott v. Officer John Does I*, No. 07-cv-00280-REB-CBS, 2008 WL 648993, at *6 (D. Colo. Mar. 4, 2008) (Blackburn, J.) (dismissing John Doe defendants after concluding that "anonymous parties are not permitted by the Federal Rules").

"the Pueblo Defendants from issuing additional marijuana business licenses," and vacate and set aside "the marijuana business licenses issued by the Pueblo Defendants."  Plaintiffs also seek a judicial declaration "that the State Defendants' issuance of marijuana business and occupational licenses is preempted by federal law," that the "Pueblo Defendants' issuance of marijuana business licenses is preempted by federal law," "that those portions of the Colorado Constitution and the Retail Marijuana Code that purport to authorize or facilitate violations of the federal drug laws are preempted by federal law," and that "those portions of the Pueblo County Code that purport to authorize or facilitate violations of the federal drug laws are preempted by federal law."  Finally, Plaintiffs wish to recover "their reasonable costs, including attorneys' fees, incurred in bringing this litigation."[2]

On July 14, 2015, Judge Blackburn granted the State and Pueblo Defendants' motion to sever Plaintiffs' preemption claims from their RICO claims.  On January 19, 2016, the district court entered an Order (doc. #118) granting the motions to dismiss filed by the State and Pueblo Defendants, which challenged Counts VII and VII (the "Preemption Counts") of the First Amended Complaint, as well as the RICO claims asserted against the Pueblo Defendants.  In his Order, Judge Blackburn concluded that the Preemption Counts failed to state viable claims for relief against the State and Pueblo Defendants as there "is no private right of action under the Supremacy Clause itself" and no private right of action for legal or equitable relief under the Controlled Substances Act.  Judge Blackburn further held that Counts I through VI of the First Amended Complaint did not state viable RICO claims against the Pueblo Defendants because governmental entities are either incapable of forming a specific criminal intent or because

---

[2]This same relief is sought in Plaintiffs' Second Amended Complaint (doc. #126).

exemplary damages are not available against municipal corporations.  In light of Judge Blackburn's Order, this case is proceeding only against the Individual Defendants and only as to their own alleged RICO violations.

The Individual Defendants have moved to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) and (B)(6).  With slight variation, the pending motions argue that Plaintiffs' allegations fail to demonstrate a "case and controversy" under Article III and do not satisfy the standing and proximate cause requirements for viable claims under RICO.  In sum, the Individual Defendants contend that the injuries described in the First Amended Complaint are limited to alleged interference with the Reilly's use and enjoyment of their property, as well as an adverse impact on the fair market value of that property.  Defendants argue that these injuries are too speculative or intangible to sustain private claims under RICO.  The Individual Defendants further assert that the First Amended Complaint does not allege any facts that plausibly demonstrate that Plaintiff Safe Streets Alliance has suffered any harm from their marijuana-related activities.

Plaintiffs' Consolidated Response argues, to the contrary, that "[t]his is an action by landowners whose property is being damaged by a neighboring criminal conspiracy" and that the court "should refuse to hold that Defendants can diminish the value of Plaintiffs' property by openly manufacturing illegal drugs nearby without being the legal cause of any injury."  *See* Plaintiffs' Consolidated Response, at 1 and 2.

More recently, Plaintiffs filed a Second Amended Complaint (doc. #126) that purports to amplify on the injuries allegedly caused by the Individual Defendants' marijuana cultivation and distribution activities.  More specifically, Plaintiffs asserts that the Reillys "are now experiencing an unpleasant odor on their land caused by Defendants' conduct" and that "the

smell that now burdens [the Reillys'] property is not in any sense premised on contingent future events." Plaintiffs insist that they "are entitled to proceed based on [that unpleasant odor and resulting] injury to [the Reillys'] property without regard to whether their other alleged injuries are actionable." *See* Plaintiffs' Motion for Leave to File Supplemental Complaint (doc. #117), at 5.

Although this court allowed Plaintiffs to filed their Second Amended Complaint, I did not strike the pending motions to dismiss as the Individual Defendants' arguments for dismissal have not changed. I did, however, allow the parties to file supplemental briefs to address the legal implications, if any, of the new factual allegations in the Second Amended Complaint. Plaintiffs filed their Supplemental Response to The Private Rico Defendants' Motions to Dismiss (doc. #127) on February 5, 2016. The Second Amended Complaint is the operative pleading and the parties' arguments are fully briefed.

## ANALYSIS

Rule 12(b)(1) empowers a court to dismiss a complaint for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

> Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. A court lacking jurisdiction must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking. A Rule 12(b)(1) motion to dismiss must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction. The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.

*Stine v. Wiley*, No. 07-cv-01250-WYD-KMT, 2008 WL 4277748, at *3 (D. Colo. Sept. 16, 2008) (internal quotation marks and citations omitted).

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim

6

upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6).  In deciding a motion under

Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view

these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d

1120, 1124-25 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir.

2009)).  However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic

recitations of the elements of a cause of action will not do." *See Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  Rather, the court's analysis is two-fold.

> First, the court identifies "the allegations in the complaint that are not entitled to
> the assumption of truth," that is those allegations that are legal conclusions, bare
> assertions, or merely conclusory.  Second, the court considers the factual
> allegations "to determine if they plausibly suggest an entitlement to relief."  If the
> allegations state a plausible claim for relief, such claim survives the motion to
> dismiss.  Notwithstanding, the court need not accept conclusory allegations
> without supporting factual averments.

*Wood v. Wells Fargo Bank, N.A.*, No. 13-cv-01731-CMA-KMT, 2013 WL 5763101, at *2 (D.

Colo. Oct. 23, 2013) (internal citations omitted).

As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d

1174, 1177 (10th Cir. 2007),

> the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts
> in support of the pleaded claims is insufficient; the complaint must give the court
> reason to believe that *this* plaintiff has a reasonable likelihood of mustering
> factual support for *these* claims.

"The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true)

to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th

Cir. 2008) (quoting *Bell Atlantic Corp*., 555 U.S. at 556).  A plaintiff must allege sufficient facts

to elevate their claims above the level of mere speculation.  *Id.*  The ultimate duty of the court is

to "determine whether the complaint sufficiently alleges facts supporting all the elements

necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

Before addressing the substance of the parties' arguments, it may be useful to briefly describe the statutory and regulatory regimes underlying this case.

In 2012, Colorado voters approved Amendment 64 which legalized the cultivation, manufacture, and possession of recreational marijuana within this state. Amendment 64 states, in pertinent part, that "[i]n the interest of the efficient use of law enforcement resources, enhancing revenue for public purposes, and individual freedom, the people of the state of Colorado find and declare that the use of marijuana shall be legal for persons twenty-one years of age or older and taxed in a manner similar to alcohol." Colo. Const. Art. XVIII, § 16(1)(a). The Colorado Constitution further provides that "the following acts are lawful and shall not be an offense under Colorado . . . for persons twenty-one years of age or older:"

> (b) Possessing, displaying, or transporting marijuana or marijuana products; purchase of marijuana from a marijuana cultivation facility; purchase of marijuana or marijuana products from a marijuana product manufacturing facility; or sale of marijuana or marijuana products to consumers, if the person conducting the activities described in this paragraph has obtained a current, valid license to operate a retail marijuana store or is acting in his or her capacity as an owner, employee or agent of a licensed retail marijuana store.

> (c) Cultivating, harvesting, processing, packaging, transporting, displaying, or possessing marijuana; delivery or transfer of marijuana to a marijuana testing facility; selling marijuana to a marijuana cultivation facility, a marijuana product manufacturing facility, or a retail marijuana store; or the purchase of marijuana from a marijuana cultivation facility, if the person conducting the activities described in this paragraph has obtained a current, valid license to operate a marijuana cultivation facility or is acting in his or her capacity as an owner, employee, or agent of a licensed marijuana cultivation facility.

> (d) Packaging, processing, transporting, manufacturing, displaying, or possessing marijuana or marijuana products; delivery or transfer of marijuana or marijuana products to a marijuana testing facility; selling marijuana or marijuana products to

a retail marijuana store or a marijuana product manufacturing facility; the purchase of marijuana from a marijuana cultivation facility; or the purchase of marijuana or marijuana products from a marijuana product manufacturing facility, if the person conducting the activities described in this paragraph has obtained a current, valid license to operate a marijuana product manufacturing facility or is acting in his or her capacity as an owner, employee, or agent of a licensed marijuana product manufacturing facility.

(e) Possessing, cultivating, processing, repackaging, storing, transporting, displaying, transferring or delivering marijuana or marijuana products if the person has obtained a current, valid license to operate a marijuana testing facility or is acting in his or her capacity as an owner, employee, or agent of a licensed marijuana testing facility.

(f) Leasing or otherwise allowing the use of property owned, occupied or controlled by any person, corporation or other entity for any of the activities conducted lawfully in accordance with paragraphs (a) through (e) of this subsection.

*See* Colo. Const. Art. XVIII, § 16(4)(b) - (f).[3]

At the federal level, the Controlled Substances Act, 21 U.S.C. §§ 801-904, continues to classify marijuana as a schedule I drug, which makes the manufacture, distribution or possession of marijuana a crime under federal law.  That statute explicitly states that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," including marijuana."  21 U.S.C. § 841(a)(1), (b)(1)(A)(vii) and (b)(1)(B)(vii).[4]  *Cf. United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 493

---

[3] By statute, local governments also have the authority to enact ordinances or regulations governing the "time, place, manner, and number of marijuana establishments."  *See* C.R.S. §§ 12-43.4-301, *et seq.*

[4]The Controlled Substances Act provides a limited exception for government-approved research projects involving schedule I controlled substances.  *See* 21 U.S.C. § 823(f).  There is nothing in the available record to suggest the Individual Defendants' activities fall within this narrow exception.

(2001) (concluding that as a schedule I controlled substance, marijuana "should not be treated any less restrictively than other schedule I drugs").  *See also Gonzales v. Raich*, 545 U.S. 1 (2005) (holding that the Controlled Substances Act does not violate the Commerce Clause by criminalizing the manufacture, distribution, or possession of marijuana by intrastate growers and users of marijuana); *James v. City of Costa Mesa*, 700 F.3d 394, 398 (9th Cir. 2012) (acknowledging that the possession and distribution of marijuana, even for medical purposes, is generally unlawful under the Controlled Substances Act).

The United States Department of Justice's position on marijuana enforcement adds a further gloss on the competing state and federal regulatory regimes.  Authority to enforce the Controlled Substances Act "rests entirely with the United States Attorney General and, by her delegation, the Department of Justice."  *See* Order re: Motions to Dismiss (doc. #118), at 10.

> The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to take Care that the Laws be faithfully executed. . . . In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.

*Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citations and internal quotation marks omitted).  Consistent with the Justice Department's prosecutorial discretion, on August 29, 2013, Deputy Attorney General James M. Cole issued a guidance memorandum indicating that the Department will continue to enforce the Controlled Substances Act by "using its limited investigative and prosecutorial resources to address the most significant threats in the

most effective, consistent, and rational way."[5]  The Cole Memorandum declares that

> In jurisdictions that have enacted laws legalizing marijuana in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale and possession of marijuana, conduct in compliance with those laws and regulations is less likely to threaten the federal priorities [identified in the Cole Memorandum]. . . . In those circumstances, consistent with the traditional allocation of federal-state efforts in this area, enforcement of state law by state and local law enforcement and regulatory bodies will remain the primary means of addressing marijuana-related activity.

*But see United States v. Canori*, 737 F.3d 181, 185 (2d Cir. 2013) ("That the Department of Justice has chosen to prioritize certain types of prosecutions unequivocally does not mean that some types of marijuana use are now legal under the [Controlled Substances Act]. . . . The Attorney General's exercise of that discretion . . . neither legalizes marijuana nor creates a constitutional crisis.").

The inherent conflict between the Controlled Substances Act and Colorado's marijuana regulatory regime lies at the heart of the RICO claims brought against the Individual Defendants. Under federal law, it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[6]  *See* 18 U.S.C. § 1962(c).  It is also "unlawful for any person to

---

[5]*See* James M. Cole, Deputy Attorney General, United States Department of Justice, *Guidance Regarding Marijuana Enforcement* (August 29, 2013) (available at www.justice.gov/iso/opa/resources/3052013829132756857467.pdf) (accessed on February 2, 2016)..

[6]Under RICO, a "'pattern of racketeering activity' requires at least two acts of racketeering activity" occurring within the span of ten years.  *See* 18 U.S.C. § 1961(5).  *But see Dewey v. Lauer*, No. 08-cv-01734-WYD-KLM, 2009 WL 3234276, at *5 (D. Colo. Sept. 30, 2009) ("[P]roof of two or more predicate acts [is] not sufficient to prove pattern unless there is a relationship between the predicate acts and a threat of continuing activity.") (quoting *Tal v.*

conspire" with others to engage in a pattern of racketeering activity.  *See* 18 U.S.C. § 1962(d).

The RICO statute defines "racketeering activity" to include, *inter alia*, "dealing in a controlled

substances or listed chemical (as defined in section 102 of the Controlled Substances Act) which

is chargeable under State law and punishable by imprisonment for more than one year" *or* "the

felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise

dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled

Substances Act)."  *See* 18 U.S.C. §1961(1).  *See also United States v. Eiland*, 738 F.3d 338, 371

(D.C. Cir. 2013) (upholding the defendants' RICO convictions where the evidence supported the

jury's finding of an enterprise formed to distribute drugs for profit and an enterprise in which the

defendants organized themselves so each would carry out a separate role in the distribution

chain).  It necessarily follows that marijuana-related activities that may be lawful under the

Colorado Constitution and related regulatory provisions are not immune from criminal

prosecution under the Controlled Substances Act or beyond the reach of a private civil action

under 18 U.S.C. § 1964.[7]  *Cf. Coats v. Dish Network, LLC*, 303 P.3d 147, 150-51(Colo. App.

2013) ("[B]ecause activities conducted in Colorado, including medical marijuana use, are subject

to both state and federal law, for an activity to be 'lawful' in Colorado, it must be permitted by,

and not contrary to, both state and federal law."), *aff'd* 350 P.3d 4849 (Colo. 2015).

    Finally, this court acknowledges that "[t]he object of civil RICO is . . . not merely to

---

*Hogan*, 453 F.3d 1244, 1268 (10th Cir. 2006)).

    [7]"[O]nce a case or controversy properly comes before a court, judges are bound by
federal law." *Armstrong v. Exceptional Child Center, Inc.*, __U.S. __, 135 S.Ct. 1378, 1384
(2015)

compensate victims but to turn them into 'private attorneys general' dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557 (2000). *Cf. Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987) (noting that RICO "bring[s] to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate"). *But see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, (2006) (Thomas, J., concurring in part and dissenting in part) (noting that "[judicial sentiment that civil RICO's evolution is undesirable is widespread"). *Cf. Stephens v. Marino White O'Farrell & Gonzalez*, No. C10-5820BHS, 2011 WL 3516082, at *4 (W.D. Wash. Aug. 11, 2011) (suggesting that RICO should not expand "to provide 'a federal cause of action and treble damages to every tort plaintiff'"); *Purchase Real Estate Grp. Inc. v. Jones*, No. 05–CV-10859, 2010 WL 3377504, at *6 (S.D.N.Y. Aug.24, 2010) ("'In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants.' Accordingly, courts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress.") (internal citations omitted).

Against the backdrop of the forgoing discussion, the court turns to the arguments raised in support of and in opposition to the pending motions to dismiss.

A.       *Article III Standing*

Under Article III of the Constitution, a federal district court only has subject matter

jurisdiction over "cases and controversies," *United States v. Wilson*, 244 F.3d 1208, 12313 (10th

Cir. 2001, and the requirement of standing "serves to identify" those cases that are justiciable

under Article III.  *West v. Holder*, 60 F. Supp. 3d 197, 200 (D.D.C. 2015).  "'[T]he irreducible

constitutional minimum of standing' has three elements: (1) the plaintiff must have suffered an

injury in fact; (2) there must be a causal connection between the injury and the conduct

complained of; and (3) it must be likely that a favorable decision on the merits will redress the

injury."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Article III

standing requires a harm that is "both 'concrete' and 'actual or imminent, not conjectural or

hypothetical.'" *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S.

765, 771 (2000), *abrogation recognized on other grounds, Robinson-Hill v. Nurses' Registry and

Home Health Corp.*, No. 5:08-145-KKC, 2015 WL 3403054, at * 3 (E.D. Ky. May 27, 2015).

As one court has explained,

> The requirement that a plaintiff have standing to sue is rooted in the
> Constitution's "Cases" and "Controversies" limitation, which restricts federal
> courts to answering questions that are presented "in an adversary context and in a
> form historically viewed as capable of resolution through the judicial process" in
> order to "assure that the federal courts will not intrude into areas committed to the
> other branches of government."[8]

*American Federation of Government Employees, AFL-CIO v. Vilsack*, __ F. Supp. 3d. __, No.

---

[8]Notably, the Supreme Court has opined that conflicts between federal and state laws
regulating marijuana might best be resolved not by protracted litigation, but rather through "the
democratic process, in which the voices of voters . . . may one day be heard in the halls of
Congress."  *Gonzales v. Raich*, 545 U.S. 1, 33 (2005).

2015 WL 4602956, at *3 (D.D.C. Jul. 321, 2015).

The Individual Defendants argue that the Plaintiffs, and particularly Safe Streets Alliance, lack standing under Article III because they have failed to properly allege an injury in fact.  In particular, the Alternative Holistic Healing Defendants insist that the Safe Streets Alliance "[has] no standing against the defendants" since they have claimed "no injury related to the captioned defendants" and "because essentially as a nameless, faceless, locationless entity, they could bring Civil RICO claims against every marijuana business in Colorado."  *See* Alternative Holistic Defendants' Motion to Dismiss (doc. #86), at 10 of 14.  I am not persuaded by this argument.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000).  So, for example, in *Friends of the Black Forest Regional Park, Inc. v. Board of County Commissioners of County of El Paso*, 80 P.3d 871, 877 (Colo. App. 2003) the court held that a non-profit corporation organized to preserve and enhance a park, and owners of property adjoining that park, had standing to seek judicial review of a county decision to approve a road easement across the subject property.  The Colorado Court of Appeals concluded that harm to intangible aesthetic and ecological interests resulting from construction of the disputed road was sufficient to give the plaintiffs standing.

When Article III standing is challenged in a motion to dismiss for lack of subject matter jurisdiction, the court must treat the plaintiff's factual allegations as true and give the plaintiff

the benefit of all reasonable inferences that can be drawn from the well-pled facts. *Cf. Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"). *But see Enders v. Florida*, 535 Fed. Appx. 799, 801 (11th Cir. 2013) (recognizing that "[i]t is not enough that the [plaintiff's] complaint sets forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements" because the court "should not speculate concerning the existence of standing" and should not "create jurisdiction by embellishing a deficient allegation of injury").

While the parties' briefs address the issue of Article III standing as a prerequisite for subject matter jurisdiction, I need not resolve that question because the pending motions can be decided on the narrower issue of "statutory standing." As the Tenth Circuit explained in addressing antitrust and RICO claims, although a plaintiff can establish standing under Article III by alleging an injury-in-fact, the standing requirements in the antitrust and RICO context "are more rigorous than that of the Constitution." *Tal*, 453 F.3d at 1253. "[H]arm to the antitrust [or RICO] plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring an private antitrust [or RICO] action." *Id.* at 1253. In that respect, statutory standing under RICO is better analyzed, not from a jurisdictional perspective under Rule 12(b)(1), but rather under Rule 12(b)(6).

> [L]ack of RICO standing does not divest the district court of jurisdiction over the action, but RICO standing, unlike other standing doctrines, is sufficiently intertwined with the merits of the RICO claim that such a rule would turn the underlying merits questions into jurisdictional issues.

16

*Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 116-17 (2d Cir. 2003) (Sotomayor, J.).  If the allegations in the Second Amended Complaint fail to demonstrate statutory standing under RICO, the claims against the Individual Defendants should be dismissed pursuant to Rule 12(b)(6).

> B.     *Plaintiffs' Standing Under RICO*

The Racketeer Influenced and Corrupt Organizations Act provides a civil remedy for "[a]ny person injured in his business or property by reason" of a violation of that statute's substantive provisions.  *See* 18 U.S.C. §1964(c).  The Tenth Circuit has held that "a plaintiff has standing to bring a RICO claim only if he was injured in his business or property by reason of the defendant's violation of § 1962."  *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Circ. 2003).  *Cf. Stanissis v. Dyncorp. International, LLC*, No. 3:14-CV-2737-D, 2015 WL 1931417, at *3 (N.D. Tex. Apr. 29, 2015) ("Under RICO, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property" and "to prevail in a RICO suit, a plaintiff must demonstrate an injury to business or property.") (internal citations omitted); *Marlow v. Allianz Life Insurance Co. of North America,* No. 08-cv-00752-CMA-MJW, 2009 WL 1328636, at *3 (D. Colo. May 12, 2009) ("In order for a private plaintiff to have standing to bring a RICO claim, he or she must sufficiently allege (1) one or more violations of § 1962; (2) an injury to 'business or property;' and (3) a causal connection – both factual and proximate – between the two.") (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992)).  Limiting a private action under RICO to injuries "to business or property" provides some assurance "that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff[,] and focuses the inquiry of injury to the plaintiff's

financial position." *Township of Marlboro v. Scannapieco*, 545 F. Supp. 2d 452, 458 (D. N.J. 2008) (internal citations omitted).

To sustain a claim under § 1964(c), the alleged injury to plaintiff's business or property must be based on "a concrete financial loss, and not merely injury to a valuable intangible property interest." *Ivar v. Elk River Partners, LLC,* 705 F. Supp. 2d 1220, 1232 (D. Colo. 2010) (quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3rd Cir. 2000)). "The logical corollary to the rule that RICO injury must be concrete and tangible is that it cannot be speculative." *Ivar,* 705 F. Supp. 2d at 1235. *Cf. McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008) ("A plaintiff asserting a claim under 18 U.S.C. § 1964(c) must allege *actual,* quantifiable injury.") (emphasis in original), *abrogated in part on other grounds*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Regions Bank v. J.R. Oil Company, LLC*, 387 F.3d 721, 728 (8th Cir. 2004) (holding that to have standing under RICO there must be a showing of injury which "requires proof of concrete financial loss, and not mere injury to valuable tangible property interest"); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing."); *Steele v. Hospital Corporation of America*, 36 F.3d 69, 70 (9th Cir. 1994) (finding that the plaintiffs lacked standing under RICO because they did not show any proof of concrete financial loss; "speculative injuries do not confer standing under RICO unless they become concrete and actual").

Some injuries clearly fall outside the scope of § 1964(a).  So, for example, the phrase "business or property" has been construed to preclude recovery under RICO for personal injuries and any attendant financial losses.  *See, e.g., Evans v. City of Chicago*, 434 F.3d 916, 925 (7th

Cir. 2006), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Damages for emotional distress also are not recoverable under RICO.  *See, e.g.*, *Spinale v.*

*United States*, No. 03Civ.1704KMWJCF, 2004 WL 50873, at *10 (S.D.N.Y. Jan. 9, 2004)

("Courts have uniformly held that damages for personal injuries and emotional distress are not

recoverable under RICO.")

A careful reading of the Second Amended Complaint finds no well-pled factual

allegations that plausibly demonstrate that the Reillys, or any other Safe Streets Alliance

members, have suffered "business" injuries as a result of the Individual Defendants' marijuana-

related activities.  Thus, Plaintiffs' RICO standing turns on whether they have adequately alleged

injuries to their "property."

The Second Amended Complaint generally alleges that Safe Street Alliance members,

other than the Reillys, have suffered injuries "caused by the operations of the Colorado-licensed

marijuana industry" and "the State and Pueblo Defendants' efforts to license and promote the

commercial marijuana industry."  *Id.* at ¶¶ 8 and 91.  However the only description of those

injuries is contained in Paragraph 92 of the Second Amended Complaint.

> Safe Streets members live near the [state]-licensed marijuana businesses located
> at 2000 S. Dahlia Street, Denver, CO 90222.  Among those businesses is a
> recreational marijuana-infused products manufacturer that has attracted an
> undesirable, criminal element into the neighborhood and caused traffic
> congestion.  By causing those problems, [the state's] decision to license the
> recreational marijuana infused products manufacturer has substantially damaged
> the value of surrounding properties.[9]

*Id.* at ¶ 92.  The foregoing allegation is remarkable for its lack of specificity.  The first sentence

---

[9]There are no allegations in the Second Amended Complaint linking any of the Individual
Defendants to marijuana-related businesses at 2000 S. Dahlia Street in Denver, Colorado.

19

claims that Safe Street members live "near" state-licensed marijuana businesses at 2000 S.

Dahlia Street in Denver, then generalizes about "the neighborhood," and concludes with a

sweeping assertion regarding the value of "surrounding properties."  These "bare assertions" and

"conclusory statements" are devoid of any supporting factual averments and, therefore, will not

suffice to meet the pleading requirements under *Bell Atlantic* or the standing requirements under

§ 1964(c).

The Second Amended Complaint alleges generally that "[m]arijuana businesses make

bad neighbors" because "[t]hey emit pungent, foul odors, attract undesirable visitors, increase

criminal activity, increase traffic, and drive down property values."  *See* Second Amended

Complaint at ¶ 3.  Beyond that broad generalization, the Reillys attribute, in whole or in part, the

following injuries to the Individuals Defendants:

> The 6480 Pickney Road marijuana grow is west and immediately adjacent to the
> Reillys' property. . . .  The building has marred the mountain views from the
> Reillys' property, thus making it less suitable for hiking and horseback riding.
> The building's purpose – the manufacture of illegal drugs – exacerbates this
> injury, for when the Reillys and their children visit the property they are reminded
> of the racketeering enterprise next door every time they look to the west.[10]
>
> Marijuana is an extremely odorous plant that emits a distinctive, skunk-like smell
> that is particularly strong when the plant is harvested.  Since construction of the
> facility was completed, its operation has repeatedly caused a distinctive and
> unpleasant marijuana smell to waft onto the Reillys' property, with the smell
> strongest on the portion of the Reillys' property that is closest to Defendants'
> marijuana cultivation facility. This noxious odor makes the Reillys' property less
> suitable for recreational and residential purposes, interferes with the Reillys' use
> and enjoyment of their property, and diminishes the property's value.

---

[10]The Reillys' property in Rye, Colorado is located at the "Meadows at Legacy Ranch"
and consists of "approximately 105 acres of beautifully rolling pasture with sweeping mountain
vistas that include views of Pike's Peak."  While the Reillys do not reside on this property, they
"often visit on weekends with their children to ride horses, hike, and visit with friends in the
closely-knit neighborhood."  *See* Second Amended Complaint, at ¶ 83.

> The Individual and Pueblo Defendants' publicly disclosed drug conspiracy has also injured the value of the Reillys' property. People buy lots at the Meadows at Legacy Ranch because they want to keep horses or build houses in a pleasant residential area, and the Reillys' land is less suitable for those uses due to the 6480 Pickney Road marijuana grow. Furthermore, the large quantity of drugs at marijuana grows makes them targets for theft, and a prospective buyer of the Reillys' land would reasonably worry that the 6480 Pickney Road marijuana grow increases crime in the area. Prospective buyers would also object to the 6480 Pickney Road marijuana grow because it emits pungent odors, thus further interfering with the use and enjoyment of the Reillys' land. As a result, the 6480 Pickney Road marijuana grow has directly and proximately cause a decline in the market value of the Reillys' land and made it more difficult to sell at any price.

*Id.* at ¶¶ 84, 85 and 89. Each of the RICO counts closes by asserting that the alleged racketeering activities have "directly and proximately injured the Reillys' property by causing noxious smells to travel onto that property, interfering with its use and enjoyment, diminishing its market value, and making it more difficult to sell." *Id.* at ¶¶ 100, 106, 115, 122, 131 and 138.

Upon closer examination, the Reillys claim the following discrete injuries in their property. First, they insist that the Individual Defendants' cultivation facility "has marred the mountain views from [their] property, thus making it less suitable for hiking and horseback riding." Colorado courts have held that while a property owner has a procedural right to challenge decisions by a local planning or zoning commission, he or she does not have a constitutionally recognized property interest in the preservation of scenic views. *See, e.g., JJR 1, LLC v. Mt. Crested Butte,* 160 P.3d 365, 371 (Colo. App. 2007). More to the point, any adverse effect on the Reillys' scenic views constitutes an intangible harm that falls outside the scope of § 1964(c). *Oscar v. University Students Co-Operative Ass'n*, 965 F.2d 783, 787 (9th Cir. 1992) (noting that personal discomfort and annoyance are not actionable "injuries" under RICO, even when they flow from a valuable property interest), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005).

The Reillys also assert that when they and their children visit their property "they are reminded of the racketeering enterprise next door every time they look to the west" and see the cultivation facility on the adjoining property.  This is best characterized as a form of emotional distress that is not recoverable through a RICO private action.  *Cf. Webster v. Boone*, 992 P.2d 1183, 1185 (Colo. App. 1999) ("In the absence of fraud, malice, or other willful and wanton conduct, there is generally no recovery in tort for mental suffering resulting from injury to property.").

The Reillys aver that the Individual Defendants' actions have "directly and proximately cause[d] a decline in the market value of [their] land and made it more difficult to sell at any price," because their property is "less suitable" for keeping horses or building homes.  Plaintiffs insist that prospective purchasers would "reasonably worry that the 6480 Pickney Road marijuana grow increases crime in the area" and "also object to the 6480 Pickney Road marijuana grow because it emits pungent odors."  These particular allegations are based on conjecture and hardly equate to concrete financial losses.  *Cf. Amaya v. Bregman*, No. 14-cv-0599 WJ/SMV, 2015 WL 8954958, at *5 (D. N.M. Dec. 16, 2015) ("A cause of action under RICO is not ripe for adjudication until damages become clear and definite.") (citing *Kaplan v. Reed*, 28 F. Supp. 2d 1191, 1205 (D. Colo. 1998)).[11]  More to the point, these sweeping conclusions are devoid of any factual support.  Indeed, the Second Amended Complaint does not allege that the Reillys or any other resident of the Meadows at Legacy Ranch have made any effort to sell their property since marijuana cultivation activities commenced at 6480 Pickney

[11]My research found no Colorado court decision holding that stigma damages are recoverable where there is no physical injury to real property and no actual showing of diminished market value.

Road.  *Cf. In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 155 F. Supp. 2d 1069, 1090 (S.D. Ind. 2001) (noting that "[a]n injury that is speculative or contingent on future events that may or may not occur is insufficient to satisfy the injury requirement" under § 1964(c)).  *See also Heaton v. American Brokers Conduit*, 496 Fed. Appx. 873, 876 (10th Cir. 2012) (holding that to withstand a Rule 12(b)(6) motion to dismiss, "[i]t is not enough that *some* plaintiff could prove *some* set of facts in support of the pleaded claims[;] the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims") (emphasis in original).

Plaintiffs' Consolidated Response argues that the Tenth Circuit's decision in *Gillmor v. Thomas*, 490 F.3d 791 (10th Cir. 2007) "flatly forecloses" the Individual Defendants' challenge to the Reillys' standing to bring their RICO claims.  I believe that Plaintiffs' reliance on *Gillmor* is misplaced as the facts in that case are materially different from the allegations in the Second Amended Complaint.  In *Gillmor*, the landowner plaintiffs challenged the administration of certain zoning ordinances, claiming that the defendant county officials were using those ordinances to extort certain public benefits, such as conservation easements, school funding, new public trails, increased open space, wetlands preservation, and new public parks, as a *quid pro quo* for the right to build at densities otherwise precluded by the zoning plan.  In bringing their RICO claims, the landowner plaintiffs alleged racketeering activity, *i.e.,* extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951(a).[12]  While the landowners in *Gillmor* alleged that the country officials' extortionate conduct had "damaged them by reducing the development potential (and

---

[12]The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right."  *See* 18 U.S.C. § 1951(b)(2).

23

thus the value) of their properties," that harm was both concrete and incontrovertible since the landowners' proposed development plans had been disapproved and could not proceed unless the defendants' demands for "additional community and neighborhood benefits" were met.  Here, the Reillys simply postulate that the value of their property may be diminished at some unspecified time in the future if they elect to sell.

Finally, the Reillys insist that their property has been injured because the Individual Defendants' cultivation "operation has repeatedly caused a distinctive and unpleasant marijuana smell to waft onto the Reillys' property" which makes their land "less suitable for recreational and residential purposes [and] interferes with the Reillys' use and enjoyment of their property." While the court does not discount the very real possibility that Defendants' cultivation facility generates odors that some might find unpleasant, that allegation alone does not suggest an actual monetary loss or translate into a quantifiable financial injury.  *Cf. Maio,* 221 F.3d at 483.

In *AMA Realty LLC v. 9440 Fairview Avenue LLC,* No. 13-457 (KM)(MCA), 2014 WL 1783099, at *2-5 (D.N.J. May 2, 2014), the plaintiff claimed to have RICO standing because the defendants had rendered its property "un-rentable and/or unsaleable with little value, no value, or negative value until lengthy and costly remediation upon the land and affixed structure are complete."  As in this case, the defendants in *AMA Realty* moved to dismiss, arguing that the plaintiff had failed to allege a "concrete financial loss" sufficient to satisfy the standing requirement in § 1964(c).  However, the facts in that case are striking different from those presented in the Second Amended Complaint here.  In *AMA Realty*, after leasing the plaintiff's subject property, the defendants over a four-year period unlawfully dumped contaminated or hazardous materials on the site, which also changed the grade of the property and caused an

affixed structure to flood whenever it rained.  The defendants also wrongfully installed storm drains on the leased property.  Defendants argued that the plaintiff's claim was deficient because the plaintiff had not "set out concrete allegations of quantifiable financial injury."  In rejecting that argument, the district court noted that the complaint asserted that the plaintiff had "incurred several million dollars of damage and will continue to suffer substantial damages unless and until extensive environmental remediation is performed upon the property and the affixed structure."  *Id*.  Given the defendants' prolonged  history of illegal dumping and the resulting tangible contamination and property damage, the complaint in *AMA Realty* unquestionably asserted a fact-based and plausible claim of injury to property.

In contrast, the RICO plaintiff in *Oscar* alleged that drug dealing by students in a neighboring cooperative building had caused injury to her own apartment.  *Oscar v. University Students Co-Operative Ass'n*, 965 F.2d at 785.  The plaintiff claimed that her neighbors' drug dealing had resulted in "filth, risk of disease, and noise," as well as "violence, throwing of garbage on property, urinating on cars, and vandalism," all of which impaired the use and enjoyment of her rental interest.  In affirming the dismissal of the plaintiff's RICO claim for lack of standing, the Ninth Circuit noted that to claim standing under RICO, "a showing of 'injury' requires proof of concrete financial loss, and not mere 'injury to a valuable intangible property interest.'"  *Id.*  In that case, the plaintiff had not identified any out-of-pocket expenses or financial losses that she had incurred as a direct or indirect result of the alleged racketeering activity.  That plaintiff, like the Reillys, claimed that the racketeering activity next door had caused her property to decrease in value.  *Id.* at 786.  While the appellate court conceded that loss could be measured by an actual diminution in the fair market value of real property, it noted

that the plaintiff had made no attempt to sub-let her apartment so any claim of financial loss was "purely speculative." *Id.* at 787.  The court concluded that "[w]hat Oscar is really complaining about is the 'personal discomfort and annoyance to which [she] has been subjected to by a nuisance on adjoining property."  That "injury," the court concluded, would present " a perfectly cognizable claim for nuisance under California law," but not under RICO.  *Id.  Cf. Price*, 138 F.3d at 607 (noting that an injury that might be actionable under state law may not necessarily suffice to satisfy the standing requirement under RICO).

Indeed, Colorado recognizes the common law tort of nuisance which is predicated upon a "substantial invasion of a plaintiff's interest in the use and enjoyment of his property." *Public Service Co. of Colorado v. Van Wyk*, 27 P.3d 377, 391 (Colo. 2001).[13]  To bring a claim for nuisance, the "substantial invasion, must be either "(1) intentional and unreasonable; (2) unintentional and otherwise actionable under the rules of negligent or reckless conduct; or (3) so abnormal or out-of-place in its surroundings as to fall within the principle of strict liability." *Id.* "Stated differently, the elements of a claim of nuisance are an intentional, negligent, or unreasonably dangerous activity resulting in the unreasonable and substantial interference with a plaintiff's use and enjoyment of her property."  In *Van Wyk*, the Colorado Supreme Court

---

[13]In *Van Wyk*, the plaintiff property owners alleged that a electrical transmission line on an adjoining property was noisy, particularly during times of high humidity, rain and snow, and that noise, radiation, and electromagnetic particles had entered the plaintiff's property, thus constituting a nuisance and a trespass.  The Colorado Supreme Court rejected the plaintiff's claim of trespass, holding that such a claim required a physical intrusion upon the property of another without permission.  Because an "intangible invasion upon property involves something that is impalpable or incapable of being felt by touch," the Colorado Supreme Court concluded that "noise, despite being perceptible through hearing, is impalpable, and thus intangible."  To assert a trespass claim based upon an intangible intrusion onto property, the intrusion must cause "physical damage to the property." *Van Wyk*, 27 P.3d at 390.

observed that the "reasonableness" of the private defendant's action should be considered in light of the authorization previously granted by the Public Utilities Commission and the standards imposed by that regulatory body.  Here, as well, the marijuana cultivation operation had been  approved by the State and Pueblo Defendants.[14]

## CONCLUSION

In closing, this Recommendation should not be read to preclude the possibility that some plaintiff could assert a fact-based, plausible RICO claim against a Colorado marijuana business based upon violations of the Controlled Substances Act.[15]  I simply find that Safe Streets Alliance and the Reillys have not come forward with sufficient well-pled facts to assert plausible claims that cross the RICO standing threshold.  Accordingly, I recommend that the motions to dismiss filed by Defendants Blackhawk Development Corporation and Roger Guzman (doc. #77),  Defendant Washington International Insurance Company (doc. #81), and  Defendants Alternative Holistic Healing, LLC, Camp Feel Good, LLC, 6480 Pickney, LLC, Jason Licata, Joseph Licata, and Parker Walton (doc #86) be granted, and that Plaintiffs' Second Amended Complaint be dismissed with prejudice.[16]  I also recommend that any claims against Defendant

---

[14]It is not clear that the Reillys have an actionable claim for common law nuisance and this court is not expressing any views at to the ultimate merits of a claim that has not been asserted in this action.  However, if the Reillys desire immediate relief for harms allegedly caused by the neighboring marijuana cultivation operation, a nuisance action in the Colorado state courts might well provide a more efficacious line of attack.

[15]See Robert A. Mikos, A Critical Appraisal of the Department of Justice's New Approach to Medical Marijuana, 22 Stan. L. & Poliy Review 633, 649-657 (2011) (postulating that the threat of civil RICO litigation poses an ongoing concern for marijuana dispensaries).

[16]Given Plaintiffs' failure to meet the statutory standing requirement under RICO, this court need not address the other issues raised in the pending motions to dismiss.

John Doe I be dismissed.

DATED this 8th day of February, 2016.

BY THE COURT:


s/ Craig B. Shaffer
United States Magistrate Judge