**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 7, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SAFE STREETS ALLIANCE; PHILLIS
WINDY HOPE REILLY; MICHAEL P.
REILLY,

      Plaintiffs - Appellants,

v.

JOHN W. HICKENLOOPER, in his
official capacity as Governor of Colorado;
BARBARA J. BROHL, in her official
capacity as Executive Director of the
Colorado Department of Revenue;
JAMES BURACK, in his official capacity
as Director of the Colorado Marijuana
Enforcement Division; THE BOARD OF
COUNTY COMMISSIONERS OF THE
COUNTY OF PUEBLO; PUEBLO
COUNTY LIQUOR & MARIJUANA
LICENSING BOARD,

      Defendants - Appellees,

and

ALTERNATIVE HOLISTIC HEALING,
LLC, d/b/a Rocky Mountain Organic;
JOSEPH R. LICATA; JASON M.
LICATA; 6480 PICKNEY, LLC;
PARKER WALTON; CAMP FEEL
GOOD, LLC; ROGER GUZMAN;
BLACKHAWK DEVELOPMENT
CORPORATION; WASHINGTON
INTERNATIONAL INSURANCE CO.;
JOHN DOE 1,

No. 16-1048

Defendants.

----------------------------------

STATE OF NEBRASKA; STATE OF
OKLAHOMA,

    Intervenors.

----------------------------------

STATE OF WASHINGTON; STATE OF
OREGON; ROBERT A. MIKOS; SAM
KAMIN; DOUGLAS A. BERMAN;
ROBERT J. WATKINS; ALEX KREIT,

    Amici Curiae.

_____

JUSTIN E. SMITH; CHAD DAY;
SHAYNE HEAP; RONALD B. BRUCE;
CASEY SHERIDAN; FREDERICK D.
McKEE; JOHN D. JENSON; MARK L.
OVERMAN; BURTON PIANALTO;
CHARLES F. MOSER; PAUL B.
SCHAUB; SCOTT DeCOSTE,

    Plaintiffs-Appellants,

v.                                                    No. 16-1095

JOHN W. HICKENLOOPER, Governor
of the State of Colorado,

    Defendant - Appellee.

----------------------------------

STATE OF WASHINGTON; STATE OF
OREGON; ROBERT A. MIKOS; SAM
KAMIN; DOUGLAS A. BERMAN;
ROBERT J. WATKINS; ALEX KREIT,

Amici Curiae.
_____

SAFE STREETS ALLIANCE; PHILLIS
WINDY HOPE REILLY; MICHAEL P.
REILLY,

       Plaintiffs - Appellants,

v.

ALTERNATIVE HOLISTIC HEALING,
LLC, d/b/a Rocky Mountain Organic;
JOSEPH R. LICATA; JASON M.
LICATA; 6480 PICKNEY, LLC;
PARKER WALTON; CAMP FEEL
GOOD, LLC,

       Defendants - Appellees,

and

ROGER GUZMAN; BLACKHAWK
DEVELOPMENT CORPORATION;
WASHINGTON INTERNATIONAL
INSURANCE CO.; THE BOARD OF
COUNTY COMMISSIONERS OF THE
COUNTY OF PUEBLO; PUEBLO
COUNTY LIQUOR & MARIJUANA
LICENSING BOARD; JOHN DOE 1,

       Defendants.

No. 16-1266

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. Nos. 1:15-CV-00349-REB-CBS and
1:15-CV-00462-WYD-NYW)**

Brian W. Barnes and David H. Thompson (Charles J. Cooper, Howard C. Nielson, Jr., and Peter A. Patterson, with them on the briefs), of Cooper & Kirk, PLLC, Washington D.C., for Plaintiffs-Appellants in Nos. 16-1048 and 16-1266.

Patrick R. Wyrick, Solicitor General of Oklahoma (E. Scott Pruitt, Attorney General of Oklahoma, and Mithun Mansinghani, Deputy Solicitor General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma, Douglas J. Peterson, Attorney General of Nebraska, Ryan S. Post and David A. Lopez, Assistant Attorneys General, Office of the Nebraska Attorney General, Lincoln, Nebraska, with him on the briefs), for Intervenors, State of Oklahoma and State of Nebraska.

Matthew D. Grove, Assistant Solicitor General of Colorado (Cynthia H. Coffman, Attorney General, Claudia Brett Goldin, First Assistant Attorney General, Scott R. Bauer, Senior Assistant Attorney General, Sueanna P. Johnson, Assistant Attorney General, and Frederick R. Yarger, Solicitor General, with him on the brief), all of the Office of the Attorney General, Denver, Colorado, for Defendants-Appellees, John W. Hickenlooper, Barbara J. Brohl, and James Burack.

Matthew W. Buck, of The Cannabis Law Firm, Denver, Colorado, for Alternative Holistic Healing, LLC, d/b/a Rocky Mountain Organic, Joseph R. Licata, Jason M. Licata, 6480 Pickney, LLC, Parker Walton, and Camp Feel Good, LLC, Defendants-Appellees in No. 16-1266.

Paul V. Kelly, John J. Commisso, and Anne E. Selinger, of Jackson Lewis P.C., Boston, Massachusetts, filed a brief on behalf of Plaintiffs-Appellants in No. 16-1095.

Josh A. Marks and Melanie B. Lewis, of Berg Hill Greenleaf Ruscitti LLP, Boulder, Colorado, and Gregory J. Styduhar, Pueblo County Attorney, Pueblo, Colorado, filed a brief on behalf of Defendants-Appellees, Pueblo County Liquor & Marijuana Licensing Board and the Board of County Commissioners of the County of Pueblo, Colorado.

Robert W. Ferguson, Attorney General, Jeffrey T. Even, Deputy Solicitor General, and Bruce L. Turcott, Assistant Attorney General, State of Washington, Olympia, Washington, filed a brief on behalf of Amici Curiae, State of Washington and State of Oregon.

Michael Francisco, of MRDLaw, Denver, Colorado, and Robert A. Mikos, Professor of Law, Vanderbilt University Law School, Nashville, Tennessee, filed a brief on behalf of Amici Curiae, Law Professors in Support of the Respondent State of Colorado.

Before **BRISCOE**, **HARTZ** and **HOLMES**, Circuit Judges.

**BRISCOE**, Circuit Judge.

These three appeals arise from two cases that concern the passage, implementation, and alleged effects of Amendment 64 to the Colorado Constitution, Colo. Const. art. XVIII, § 16. Amendment 64 repealed many of the State's criminal and civil proscriptions on "recreational marijuana,"[1] and created a regulatory regime designed to ensure that marijuana is unadulterated and taxed, and that those operating marijuana-related enterprises are, from the State's perspective, licensed and qualified to do so. Of course, what Amendment 64 did not and could not do was amend the United States Constitution or the Controlled Substances Act (CSA), 21 U.S.C. §§ 801–904, under which manufacturing, distributing, selling, and possessing with intent to distribute marijuana *remains illegal* in Colorado. See U.S. Const. art. VI, cl. 2. The three appeals at issue and two related motions to intervene raise four principal disputes stemming from the alleged conflict between the CSA and Colorado's new regime.

Two of the appeals were brought in Safe Streets Alliance v. Alternative Holistic Healing, LLC. First, in No. 16-1266, two Colorado landowners challenge the district court's dismissal of their claims brought under the citizen-suit provision of the Racketeer

---

[1] Amendment 64 addresses a host of substances derived from plants of the Cannabis genus. Id. § 16(2)(f). The parties do not suggest any distinction between Cannabis derivatives is of import here. So we refer to these substances collectively as "marijuana." The parties also agree that Colorado's "medical marijuana" regime is not at issue in these suits. Id. § 16(7) (capitalization omitted). We therefore confine our discussion to what the parties term "recreational marijuana"—i.e., marijuana grown, processed, distributed, sold, possessed, or used other than for purportedly "medicinal" purposes.

Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c), against certain affiliates of a State- and county-licensed marijuana manufactory that allegedly has injured the landowners' adjacent property. We conclude that the landowners have plausibly alleged at least one § 1964(c) claim against each of those defendants. We therefore reverse, in part, the dismissal of those claims and remand for further proceedings.

Second, in No. 16-1048, those landowners and an interest group to which they belong appeal the district court's dismissal of their purported causes of action "in equity" against Colorado and one of its counties for ostensibly also having injured the landowners' property by licensing that manufactory. The landowners and the interest group allege that Amendment 64's regime is preempted by the CSA, pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the CSA's preemption provision, 21 U.S.C. § 903.[2] We conclude that neither the landowners nor the interest group purport to have any *federal substantive rights* that have been injured by Colorado or the county's actions. And because they have no substantive rights in the CSA to vindicate, it follows inexorably that they cannot enforce § 903 "in equity" to remedy their claimed injuries. We therefore affirm the dismissal of their preemption claims.

---

[2] Section 903 of Title 21 of the United States Code states:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

The third appeal, No. 16-1095, was filed in Smith v. Hickenlooper.  In that case, a group of Colorado, Kansas, and Nebraska sheriffs and county attorneys sued Colorado on similar theories that Amendment 64's regime is preempted by the CSA.  The district court dismissed their claims, and we consolidated the appeal with No. 16-1048.  Because those plaintiffs also do not claim injuries to their federal substantive rights, we likewise affirm.

Finally, the States of Nebraska and Oklahoma moved to intervene in Safe Streets Alliance and Smith while they were pending on appeal.  Those States claim that Amendment 64 injures their sovereign interests and those of their citizens, and that its enforcement is preempted by the CSA.  We granted their motion in No. 16-1048 and heard their arguments, which confirmed that their controversy is with Colorado.  Given that fact, we must confront 28 U.S.C. § 1251(a), which forbids us from exercising jurisdiction over controversies between the States.  We therefore cannot permit Nebraska and Oklahoma to intervene, or even confirm that they have a justiciable controversy that may be sufficient for intervention.  Consequently, we vacate the order granting intervention in Safe Streets Alliance and deny the States' motions in both cases.

## I. Standards of Review

Before addressing each of those issues, we first discuss the applicable standards of review.  The district court dismissed the claims before it on the basis of Federal Rules of Civil Procedure 12(b)(1) and (6).  Rule 12(b)(1) "allows a court to dismiss a complaint for lack of subject matter jurisdiction.  If the district court did so without taking evidence, as the court did here, our review is de novo."  Pueblo of Jemez v. United States, 790 F.3d 1143, 1151 (10th Cir. 2015) (citing Becker v. Ute Indian Tribe, 770 F.3d 944, 946 (10th

Cir. 2014)).  Such a "facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint," and the "district court must accept the allegations in the complaint as true." Id. at 1148 n.4 (citation omitted).  We also accept those factual allegations as true in conducting our de novo review.  Id.

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." Id. at 1151 (quoting Gunn v. Minton, __ U.S. __, 133 S. Ct. 1059, 1064 (2013)).  "[F]ederal subject matter jurisdiction is elemental," and "must be established in every cause under review in the federal courts." Id. (quoting Firstenberg v. City of Santa Fe, 696 F.3d 1018, 1022 (10th Cir. 2012)).  The "burden of establishing" a federal court's subject matter jurisdiction "rests upon the party asserting jurisdiction." Id. (citation omitted).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." Id. (quoting Full Life Hospice, LLC v. Sebelius, 709 F.3d 1012, 1016 (10th Cir. 2013)).  For that reason, "[w]e also review" a district court's rulings on Article III "standing de novo." Niemi v. Lasshofer, 770 F.3d 1331, 1344 (10th Cir. 2014) (citation omitted).

Further, "[w]e review a Rule 12(b)(6) dismissal de novo." George v. Urban Settlement Servs., 833 F.3d 1242, 1247 (10th Cir. 2016) (citation omitted).  "A pleading is required to contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" SEC v. Shields, 744 F.3d 633, 640 (10th Cir. 2014) (quoting Fed. R. Civ. P. 8(a)(2)).  "We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the" plaintiff.  Id. (quoting Burnett v. Mortg.

Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013)).  We then "determine whether the plaintiff has provided 'enough facts to state a claim to relief that is plausible on its face.'"  George, 833 F.3d at 1247 (quoting Hogan v. Winder, 762 F.3d 1096, 1104 (10th Cir. 2014)).

"In determining the plausibility of a claim, we look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard [does not] require a plaintiff to 'set forth a prima facie case for each element.'"  Id. (quoting Khalik v. United Air Lines, 671 F.3d 1188, 1192–93 (10th Cir. 2012)).  "The nature and specificity of the allegations required to state a plausible claim will vary based on context."  Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011).  But "mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."  Id. at 1214 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Thus, a "claim is facially plausible if the plaintiff has pled 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  George, 833 F.3d at 1247 (quoting Hogan, 762 F.3d at 1104, which in turn quotes Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

However, "when legal conclusions are involved in the complaint[,] 'the tenet that'" we accept the allegations as true "is inapplicable to [those] conclusions."  Shields, 744 F.3d at 640 (second alteration in original) (citation omitted).  We likewise "review de novo a district court's determination of state law."  Elwell v. Byers, 699 F.3d 1208, 1214 n.4 (10th Cir. 2012) (quoting Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991)).

Finally, in reviewing orders issued under Rules 12(b)(1) and (6), as in other contexts, we of course "can affirm a lower court's ruling on any grounds adequately supported by the record, even grounds not relied upon by the district court." Id. at 1213 (citation omitted).

## II. Safe Streets Alliance

In Safe Streets Alliance, the plaintiffs are Michael P. Reilly, Phillis Windy Hope Reilly, and Safe Streets Alliance ("Safe Streets"). Safe Streets is a "nonprofit organization devoted to reducing crime and illegal drug dealing," No. 16-1048, Aplt. App. at 51,[3] "whose members are interested in law enforcement issues, particularly the enforcement of federal law prohibiting the cultivation, distribution, and possession of marijuana." Id. at 52. The Reillys are the only identified members of Safe Streets, and neither they nor their interest group asserted class or other claims on behalf of any other Coloradans. We address their RICO claims first and then turn to their preemption claims.

### The RICO claims

The Reillys own a parcel of land in Pueblo County, Colorado that is part "of the Meadows at Legacy Ranch, a development on the south side of Pickney Road." Id. at 80. Safe Streets does not hold any property interest in that land. According to the Reillys, their land is a "beautiful rolling pasture with sweeping mountain vistas that include views of Pike's Peak." Id. The "Reillys do not live on their land," and the only known structures there are "two agricultural buildings" of vague description. Id. However, the

---

[3] The Reillys and Safe Streets filed two amended complaints. The First Amended Complaint is the operative pleading with respect to their preemption claims, while the Second Amended Complaint is relevant to their RICO claims. We refer to them as is appropriate to our discussion of the specific issue under consideration.

Reillys "often visit" the property "on weekends with their children to ride horses, hike, and visit with friends in the closely-knit neighborhood." Id.

<u>The allegations</u>

To the "west and immediately adjacent to the Reillys' property" is 6480 Pickney Road, <u>id.</u>, the site of a recreational "marijuana grow" operating out of a newly constructed building located "just a few feet from the Reillys' property line." No. 16-1266, Aplt. App. at 129. The operation of the enterprise and the resultant noxious odors emanating from it are alleged to have caused harms of two general types.

First, the Reillys claim that the "publicly disclosed drug conspiracy" itself has "injured the value of [their] property." <u>Id.</u> at 131. "People buy lots at the Meadows at Legacy Ranch because they want to keep horses or build homes in a pleasant residential area, and the Reillys' land" allegedly "is less suitable for those uses due to the 6480 Pickney Road marijuana grow." <u>Id.</u> For example, "the large quantity of drugs at marijuana grows" purportedly "makes them targets for theft, and a prospective buyer of the Reillys' land would reasonably worry that the 6480 Pickney Road marijuana grow increases crime in the area." <u>Id.</u>

Second, the Reillys aver that "[s]ince construction of the facility was completed, its operation has repeatedly caused a distinctive and unpleasant marijuana smell to waft onto the Reillys' property, with the smell strongest on the portion of [their] property that is closest to [the] marijuana cultivation facility." <u>Id.</u> at 130. "This noxious odor" allegedly "makes the Reillys' property less suitable for recreational and residential

purposes, interferes with the Reillys' use and enjoyment of their property, and diminishes the property's value." Id.

The Reillys thus contend that the recreational marijuana facility adjacent to their land has *both* interfered with their present use and enjoyment of the land and caused a diminution in its market value—e.g., by subjecting the land to the operation's noxious emissions and by commencing that criminal enterprise nearby.

In Counts I through VI of their Second Amended Complaint, the Reillys brought civil RICO claims under § 1964(c) against a host of individuals and entities purportedly affiliated with that neighboring marijuana enterprise. On appeal, the remaining defendants to those claims are 6480 Pickney, LLC, Alternative Holistic Healing, LLC, Camp Feel Good, LLC, Jason M. Licata, Joseph R. Licata, and Parker Walton. We refer to them collectively as the "Marijuana Growers."

According to the Reillys, the Marijuana Growers "all understood and agreed that the property" adjacent to the Reillys' land "would be used to grow recreational marijuana for sale at Alternative Holistic Healing's Black Hawk store, among other places." Id. at 119. The Reillys therefore claim that 6480 Pickney, LLC and Alternative Holistic Healing, LLC are each unlawful enterprises. In addition, the Reillys allege that the Marijuana Growers "pooled their resources, knowledge, skills, and labor to achieve through [an] enterprise efficiencies in the cultivation and distribution of marijuana that none of them could have achieved individually." Id. at 126. On that basis, the Reillys claim that the Marijuana Growers also formed a distinct "association-in-fact enterprise for the purpose of cultivating marijuana at 6480 Pickney Road." Id.

Consequently, the Reillys allege that the Marijuana Growers are each subject to civil liability under § 1964(c) for the injuries they have caused to the Reillys' property by operating their association-in-fact enterprise, which by definition flouts the CSA, and therefore violates RICO. See 18 U.S.C. § 1962(c). The Reillys note, for example, that "[l]easing or maintaining property for the cultivation of marijuana is a crime under" the CSA "and is racketeering activity" under RICO. No. 16-1266, Aplt. App. at 119. Likewise, "[d]ealing in marijuana is racketeering activity under RICO," as is "conspir[ing] with racketeers by agreeing to assist them" in their unlawful endeavors. Id. at 101. "And because RICO defines most violations of the CSA as 'racketeering activity,'" the Reillys assert, "any business engaged in the commercial cultivation and sale of recreational marijuana is a criminal enterprise for purposes of" RICO. Id. at 108 (citation omitted). They therefore claim that all those who "conduct or conspire to assist such enterprises" are subject to "civil liability" under § 1964(c), such that the Marijuana Growers are liable for harming the Reillys' property. Id.

In moving to dismiss, the Marijuana Growers argued that the "speculative injury to" the Reillys' "property value" was no "proof of a concrete financial loss," and was therefore insufficient "to allege an existing, concrete, financial injury," which, in their view, is an element of a § 1964(c) claim. Id. at 25. They also vaguely suggested that the Reillys had not plausibly alleged that the Marijuana Growers were engaged in a RICO enterprise. Yet the Marijuana Growers also explicitly conceded that they each "agreed to grow marijuana for sale" at 6480 Pickney Road, adjacent to the Reillys' land. Id. at 28.

The district court dismissed these RICO claims with prejudice, concluding that the Reillys had not pled a plausible injury to their property that was proximately caused by the Marijuana Growers' activities in violation of the CSA.  The district court recognized that the Reillys alleged a "noxious order [sic] emanat[es] from the" Marijuana Growers' adjacent enterprise, which "permit[s] a reasonable inference that the value of their property is negatively impacted."  Id. at 207.  Yet the district court rejected that argument on the basis that the Reillys had "provide[d] no factual support to quantify or otherwise substantiate their inchoate concerns as to the diminution in value of their property."  Id.

The district court underscored the Reillys' purported failure to plead that their "land has been appraised for" less "than before the grow operation opened."  Id.  And the district court remarked that the Reillys had "point[ed] to no concrete evidence (as opposed to mere inchoate fears) that potential purchasers have expressed concern about living near such a facility, much less declined to buy lots . . . nearby."  Id.  Continuing that theme, the district court determined that the complaint was deficient because the Reillys failed to "cite to any study or statistics that might demonstrate a causal relationship between the operation of such businesses and decreased property values" nearby.  Id.  According to the district court, the Reillys therefore failed to make the "showing of damages that are clear and definite" required for "RICO standing," counseling dismissal of their "wholly speculative" claims.  Id. at 207–08.

The Reillys timely appealed, which is before us as No. 16-1266.[4]

_____

[4] Safe Streets is no longer appealing the dismissal of its RICO claims.

<u>Analysis</u>

"RICO is to be read broadly." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 497 (1985). It "created a new civil cause of action for '[a]ny person injured in his business or property by reason of a violation of [its] prohibitions.'" <u>RJR Nabisco, Inc. v. European Cmty.</u>, __ U.S. __, 136 S. Ct. 2090, 2096 (2016) (alteration in original) (quoting 18 U.S.C. § 1964(c)). That is, RICO vests a private citizen with substantive rights to avoid "injur[ies]" to "his business or property" caused by a pattern of racketeering activity, and it explicitly creates a federal cause of action to vindicate those federal rights. 18 U.S.C. § 1964(c). To maintain a cause of action under § 1964(c), a plaintiff must plead and ultimately prove: (1) that the defendant violated § 1962; (2) that the plaintiff's business or property was injured; and (3) that the defendant's violation is the cause of that injury. <u>Id.</u>; see <u>RJR</u>, 136 S. Ct. at 2096–97.

The Reillys assert several theories under which the Marijuana Growers individually and collectively have violated § 1962, to the injury of the Reillys' adjacent land. Here, we need only address one. The Reillys allege that the Marijuana Growers formed an association-in-fact enterprise that has and will continue to engage in a pattern of contravening the CSA through the manufacture of marijuana for distribution, an organizational mission that is a flagrant violation of § 1962(c). The Reillys also claim, *inter alia*, that neighboring illegal enterprise directly reduces the present value of their land by openly operating a criminal initiative; directly causes noxious odors to infiltrate their property, interfering with their present use and enjoyment of the land; and directly reduces the property's present value by burdening it with those emissions. As we will

explain, those alleged violations of § 1962(c) and direct injuries are sufficient for the Reillys to proceed on their RICO claims.

## A. *Violation of § 1962(c)*

Congress has determined that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Said more succinctly, § 1962(c) "makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity." RJR, 136 S. Ct. at 2097.  We have held that a plaintiff asserting a § 1964(c) claim for a violation of § 1962(c) "must plausibly allege that" the defendants "each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity." George, 833 F.3d at 1248 (citing 18 U.S.C. § 1962(c); Robbins v. Wilkie, 300 F.3d 1208, 1210 (10th Cir. 2002)).

The Marijuana Growers forfeited any challenge to several of those elements here by failing to raise and argue them in the district court.  See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1127–30 (10th Cir. 2011).  We nevertheless address each element because the factual allegations plausibly demonstrating them significantly overlap.  See Boyle v. United States, 556 U.S. 938, 947 (2009) (explaining that "evidence used to prove" the elements of a RICO claim may "coalesce" (citation omitted)).  We also address the elements out of order because it better frames our discussion.

### 1. Racketeering activity

"RICO is founded on the concept of racketeering activity.  The statute defines 'racketeering activity' to encompass dozens of state and federal offenses, known in RICO parlance as predicates.  These predicates include any act 'indictable' under specified federal statutes," and among them is "drug-related activity that is 'punishable' under federal law." RJR, 136 S. Ct. at 2096 (quoting 18 U.S.C. § 1961(1)(D)).  As relevant here, "racketeering activity" includes "dealing in a controlled substance or listed chemical []as defined in" the CSA.  18 U.S.C. § 1961(1)(A).  Racketeering activity also includes "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical," as defined in the CSA, that is "punishable under any law of the United States . . . ." Id. § 1961(1)(D).

It follows, therefore, that operating a marijuana cultivation facility of the type the Reillys described in their Second Amended Complaint necessarily would involve *some* racketeering activity.  As just one example, cultivating marijuana for sale—which the Marijuana Growers admit they agreed to do and they allegedly began and are continuing to do—is by definition racketeering activity.  See id.  We conclude the Reillys have adequately alleged that the Marijuana Growers are each engaged in racketeering activity.

### 2. Association-in-fact enterprise

Turning to the alleged affiliates of the facility at issue here, "RICO broadly defines 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"

George, 833 F.3d at 1248 (quoting 18 U.S.C. § 1961(4)).  Among other theories, the Reillys relied on "the latter part of this definition, alleging that" the Marijuana Growers "formed an association-in-fact enterprise."  Id. (citation omitted).  An "association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  Boyle, 556 U.S. at 946 (citation omitted).  Such an entity "need not have a hierarchical structure or a 'chain of command . . . .'"  Id. at 948.  For it to exist requires only "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Id. at 946.

Here, the Reillys alleged that for over a year the Marijuana Growers formed "an association-in-fact enterprise for the purpose of cultivating marijuana at 6480 Pickney Road and selling it at Alternative Holistic Healing's Black Hawk store, among other places."  No. 16-1266, Aplt. App. at 126.  To advance their aims, the Marijuana Growers purportedly "pooled their resources, knowledge, skills, and labor to achieve through th[at] enterprise efficiencies in the cultivation and distribution of marijuana that none of them could have achieved individually."  Id.  The Reillys' allegations of purpose, relationship, and longevity are sufficient for them to proceed on the basis that the Marijuana Growers together created an association-in-fact enterprise.

The Marijuana Growers appear to suggest that these allegations are insufficient because the Reillys also alleged that the corporate defendants were separate, smaller RICO enterprises.  So far as it goes, they are correct that RICO "requires that the 'person' conducting the enterprise's affairs be distinct from the 'enterprise.'"  George, 833 F.3d

at 1249 (citing <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 160 (2001)).

That is, "a single person cannot be both the RICO enterprise and the RICO defendant."

<u>RJR</u>, 136 S. Ct. at 2104 (citing <u>Cedric</u>, 533 U.S. at 162).  But that is irrelevant in this

instance.

Specifically, the Reillys' alternative enterprise theories do not undermine their

well-supported allegations that the Marijuana Growers are each participating in a distinct,

larger, association-in-fact enterprise.  <u>See</u> <u>Boyle</u>, 556 U.S. at 946; <u>George</u>, 833 F.3d

at 1250.  The Marijuana Growers allegedly have long worked in concert to achieve

market efficiencies toward their common aim of cultivating, distributing, and selling

marijuana, which undisputedly affects interstate commerce.  <u>See</u> <u>RJR</u>, 136 S. Ct. at 2106

(explaining that the enterprise must affect interstate commerce).  The Reillys have

adequately alleged that the Marijuana Growers formed an association-in-fact enterprise.

### 3. Conducting the enterprise's affairs

We now turn to each of the Marijuana Growers' conduct in furtherance of their

common goals.  To maintain a § 1964(c) claim against any particular defendant, the

Reillys need only to have alleged facts plausibly demonstrating that the defendant

"conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's

affairs."  18 U.S.C. § 1962(c).  "This, in turn, requires a showing that the defendant

'participate[d] in the operation or management of the enterprise itself.'"  <u>George</u>, 833

F.3d at 1251 (quoting <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185 (1993)).  "Under

<u>Reves</u>' operation or management test, the defendant must have 'some part in directing'

the enterprise's affairs."  <u>Id.</u> (quoting <u>Reves</u>, 507 U.S. at 179).

However, "the defendant need not have 'primary responsibility for the enterprise's affairs,' 'a formal position in the enterprise,' or 'significant control over or within [the] enterprise'" to be liable under RICO.  Id. (citation omitted).  The defendant's actions also need not have advanced an "economic motive."  Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 252 (1994).  "Nevertheless, a defendant must do more than simply provide, through its regular course of business, goods and services that ultimately benefit the enterprise."  George, 833 F.3d at 1251 (citation omitted).  For example, the Reillys at one time alleged that a contractor violated § 1962 by delivering water to the Marijuana Growers' operation.  Without more, that would be insufficient to establish that the contractor was part of the enterprise.  See id.

But "a plaintiff can easily satisfy Reves' operation and management test by showing that an enterprise member played some part—even a bit part—in conducting the enterprise's affairs."  Id. at 1252.  The Marijuana Growers admit that they all "agreed to grow marijuana for sale" at the facility adjacent to the Reillys' property, a facility at which they allegedly have been doing just that.  No. 16-1266, Aplt. App. at 28.  This plausibly alleges that the Marijuana Growers each conducted the enterprise's affairs.

### 4. Pattern

For the first time on appeal, the Marijuana Growers suggest that the Reillys failed to plead sufficient facts to demonstrate that they engaged in a pattern of racketeering activity.  "A predicate offense implicates RICO when it is part of a 'pattern of racketeering activity'—a series of related predicates that together demonstrate the existence or threat of continued criminal activity."  RJR, 136 S. Ct. at 2096–97 (quoting

18 U.S.C. § 1961(5), which requires at least two predicate acts committed within ten years of each other). However, "a RICO victim need not have actual knowledge of exactly who committed the RICO predicate act resulting in the injury for a civil RICO claim to accrue." Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer, 764 F.3d 1268, 1278 (10th Cir. 2014). "[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 249 (1989).

As discussed, the Marijuana Growers admit that they all agreed to work together to cultivate marijuana for distribution and sale. The Reillys also allege that the Marijuana Growers began cultivating marijuana at their neighboring facility. Marijuana is a controlled substance under the CSA. 21 U.S.C. § 802(16). So the manufacture, distribution, and sale of that substance is, by definition, racketeering activity under RICO. 18 U.S.C. § 1961(1)(A), (D).

We need not decide whether the Marijuana Growers' admitted agreement to take the related steps necessary to grow marijuana for distribution and sale is itself sufficient to establish a pattern of predicates that presents a threat of continuing criminal activity. Rather, we note that the Reillys alleged various actions each of the Marijuana Growers took to establish and operate the enterprise, an entity that is now purportedly pursuing those illegal ends. When coupled with the Reillys' assertion that the Marijuana Growers began cultivating marijuana at their facility, we conclude these allegations plausibly state the requisite pattern of predicate acts that present a threat of ongoing criminal activity. As we will discuss, moreover, this pattern of illegal acts is the direct cause of the Reillys'

plausibly alleged injuries to their property.

> 5. The Reillys plausibly pled that the Marijuana Growers violated § 1962(c)

We conclude that the Reillys plausibly pled that the Marijuana Growers violated § 1962(c).  Having reached that conclusion, we must now determine whether the Reillys have plausibly alleged an injury to their property caused by that violation, the issue that the district court thought was dispositive.  We therefore need not address the Reillys' other theories regarding how the Marijuana Growers injured their property by violating § 1962, theories the district court also did not specifically discuss.  Consequently, the Reillys' § 1964(c) claims against the Marijuana Growers premised on other purported violations of § 1962 remain for adjudication by the district court on remand.

> B. *Proximately caused injuries to the Reillys' property*

In light of our conclusion that the Reillys plausibly established that the Marijuana Growers violated § 1962(c), we must now determine whether they plausibly pled (1) injuries to their property (2) that were caused by those violations.  Id. § 1964(c); see RJR, 136 S. Ct. at 2096.  The district court dismissed all of the Reillys' RICO claims because, in its view, the Reillys failed to plausibly plead either of these elements.  Specifically, relying on out-of-circuit authorities, the district court determined that hidden within § 1964(c)'s text is a heightened *pleading* requirement.  According to the district court, a plaintiff must submit *evidence* of a "concrete financial loss" (e.g., an appraisal quantifying the diminution in property value or comparator results of attempts to sell predating and postdating a RICO violation) to *plausibly allege* an injury to his property caused by a defendant's § 1962 violation.  No. 16-1266, Aplt. App. at 206–07 (citation

omitted).

We conclude, however, that neither § 1964(c)'s text nor any ruling by the Supreme Court or this court establishes the novel statistical evidentiary pleading standard that the district court applied. In fact, the statute and applicable precedents compel the opposite conclusion with respect to the Reillys' allegations that their property has been directly injured by their neighbors' odorous and publicly-operating criminal enterprise.

### 1. Injuries

Section 1964(c)'s "reference to injury to 'business or property' . . . cabin[s] RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—[by which] Congress signaled that the civil remedy is not coextensive with § 1962's substantive [criminal] prohibitions," which do not require proof of such injuries. RJR, 136 S. Ct. at 2108. The Reillys do not claim to have any business-related rights at issue. So we only need to determine whether the Reillys plausibly alleged injuries to their *property rights*. The district court thought not, describing their claims as based on mere emotional or personal injuries. We disagree.

Among other things, the Reillys alleged that the noxious odors emanating from the Marijuana Growers' criminal enterprise presently interfere with the use and enjoyment of their land. And they claimed that those odors are a direct result of the Marijuana Growers' criminal cultivation of marijuana. They also averred that this ongoing, direct interference with their property diminishes its present market value—that property that smells foul is worth less than property that does not. The Reillys further claimed that their property has declined in value due to the Marijuana Growers' publicly disclosed

operation—in short, that when a crime syndicate openly sets up shop adjacent to one's land, it reduces the value of that property.  We address the alleged present nuisance and alleged diminished property value separately, though one stems in part from the other.

### a. Odorous nuisance injury

We have little difficulty concluding that the Reillys plausibly pled an injury to their property rights caused by the stench that the enterprise's operations allegedly produce.  "Congress meant to incorporate common-law principles when it adopted RICO."  Beck v. Prupis, 529 U.S. 494, 504 (2000).  In Colorado, "a property owner whose land is diminished in value by the acquisition and use of adjoining land by a private party" has a cause of action "in the law of nuisance."  Pub. Serv. Co. of Colo. v. Van Wyk, 27 P.3d 377, 388 (Colo. 2001) (citation omitted).  But Colorado also has long recognized that invasion of one's property by noxious odors itself gives rise to a nuisance claim and is a direct injury to property.  See Hobbs v. Smith, 493 P.2d 1352, 1353–54 (Colo. 1972) (explaining that where the facts evidenced "noxious odors" wafting onto the plaintiffs' adjoining property, they had "suffered a substantial interference with the use and enjoyment of their property"); Webster v. Boone, 992 P.2d 1183, 1185–86 (Colo. App. 1999) (holding that "damages may be recovered" for "nuisance and trespass" to property, which "generally refers to distress arising out of physical discomfort, irritation, [and] inconvenience caused by *odors*, pests, noise, and the like" (emphasis added)).

Under Colorado law, "the elements of a claim of nuisance are an intentional, negligent, or unreasonably dangerous activity resulting in the unreasonable and substantial interference with a plaintiff's use and enjoyment of her property."  Van Wyk,

24

27 P.3d at 391.  Thus, "a plaintiff must establish that the defendant has unreasonably interfered with the use and enjoyment of her property," which is "an issue of fact" determined by "weigh[ing] the gravity of the harm and the utility of the conduct causing that harm."  Id. (citations omitted).  "Generally, to be unreasonable, an interference must be significant enough that a normal person in the community would find it offensive, annoying, or inconvenient."  Id. (citations omitted).

The Marijuana Growers have not pointed us to any authority suggesting that a landowner's complaints about a neighbor's recurrent emissions of foul odors are conceptually unmoored from the owner's property rights.  Nor do they contend that Colorado's recognition of odorous nuisances is any novel departure from the common law of property rights, which Congress incorporated into § 1964(c).  See Beck, 529 U.S. at 504.  They instead suggest that we ought to disbelieve the Reillys' claims or recast them as mere emotional injuries, expressions of frustration with either the odors or the enterprise's actions.

The district court adopted that approach.  But that was error, *inter alia*, because the Reillys' claims were only at the pleading stage.  See George, 833 F.3d at 1247 (requiring that courts accept all factual allegations as true and draw reasonable inferences in a plaintiff's favor at the pleading stage); Shields, 744 F.3d at 640 (same).  We conclude that the Reillys have plausibly pled an injury to their property in the form of a present interference with their use and enjoyment of that land, an interference that is caused by the enterprise's recurring emissions of foul odors.

b. Diminished property value

We now turn to the Reillys' allegations that the market value of their property has declined because the Marijuana Growers are publicly operating a criminal enterprise adjacent to their land, a venture that also emits noxious odors.  In Gillmor v. Thomas, 490 F.3d 791 (10th Cir. 2007), we held that landowners could proceed on § 1964(c) claims against an extortion racket because they had pled plausible injuries to their property caused by that alleged racket, though we subsequently affirmed summary judgment against the landowners.  Id. at 797–98.  As relevant here, the landowners pled that the racket's activities "damaged them by reducing the development potential (and thus the value) of their properties."  Id. at 797.  We held that the "allegations [we]re not conclusory" and were "sufficient" to proceed under § 1964(c).  Id. (referring to "RICO standing" and "jurisdiction").

Of course, what we once called "RICO standing" or "statutory standing" we now properly characterize as the usual pleading-stage inquiry: whether the plaintiff has plausibly pled a cause of action under RICO.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., __ U.S. __, 134 S. Ct. 1377, 1394 n.4 (2014) (clarifying that "statutory standing" and "prudential standing" are "misleading" terms because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case" (citation omitted)).  To answer that question, moreover, we also now adhere to different rules than those in force when we decided Gillmor.  See Twombly, 550 U.S. at 555.  But neither of those sea changes even implicates, let alone undermines, our relevant holding

in Gillmor: a plausibly alleged diminution in the *present* development potential of land is a property injury under § 1964(c).  490 F.3d at 797.  That is also true of our underlying premise—i.e., that plausibly alleging a reduction in land value is one method of pleading a property injury under RICO.  Id.  Colorado's recognition of that property interest fortifies our conclusion that RICO incorporates this common view of property rights.  See Van Wyk, 27 P.3d at 388.

We are therefore puzzled by the district court's suggestion that Gillmor's relevant holding is distinguishable.  That is, according to the district court, the Gillmor developers' plans for their land were—in some unspecified fashion—more concrete than are the Reillys' allegations here.  But the Reillys aver that *today* their land is worth less than it was before, and that this diminution in value occurred because their new neighbors began their endeavors.  Our holding in Gillmor plainly applies here; in fact, it does double duty.

First, as we have discussed, the Reillys pled ample facts to plausibly establish that the enterprise's foul emissions interfere with the use and enjoyment of their property.  We need only draw an eminently reasonable inference to conclude that it is plausible that activities that interfere with one's use and enjoyment of property diminish the value of that property.  See George, 833 F.3d at 1247.  For example, it is reasonable to think that a potential buyer would be less inclined to purchase land that is burdened by a nuisance—such as recurrent foul odors—than she would be to purchase the identical property if it were unencumbered.  See, e.g., Van Wyk, 27 P.3d at 388.  Contrary to the district court's suggestion, moreover, the Reillys were not required to allege that they had attempted to sell their land or had appraised it.  It remains a commonsense pleading-stage

27

inference that nuisances diminish the value of land, exactly as the Reillys alleged.  See George, 833 F.3d at 1247.  Consequently, we conclude that the Reillys plausibly pled that their property has declined in value due to the recurrent noxious odors emanating from the Marijuana Growers' facility.  See Gillmor, 490 F.3d at 797.

Second, the Reillys claim that the open operation of the Marijuana Growers' criminal enterprise has caused the value of their land to decline, independent of the harms attending the nuisance.  Specifically, they allege that, because a crime syndicate is publicly violating federal law adjacent to their property, that land is now less valuable.  They suggest, for example, that if they were to attempt to sell their land today, it would be less attractive to a potential buyer—and is therefore presently worth less—because of the crimes being openly committed on the adjoining parcel.  We conclude this is plausible.

We cannot countenance the district court's digression that the Reillys' claim was "speculative" and based on mere "inchoate fears" because they did not cite statistics, appraisals, attempts to sell, or other "concrete evidence" to "quantify" their "concrete financial loss" with "actual facts."  No. 16-1266, Aplt. App. at 206–08 & n.3 (citation omitted).  Nor are we at liberty to disbelieve the Reillys by ratifying the Marijuana Growers' speculation that the value of the Reillys' land has, perhaps, increased because of the now-booming market in Colorado for land on which to cultivate marijuana.  See George, 833 F.3d at 1247.

Moreover, the district court and the Marijuana Growers were mistaken to rely on Oscar v. University Students Co-operative Association and the cases citing it.  965 F.2d 783 (9th Cir. 1992) (en banc), overruled in part by Diaz v. Gates, 420 F.3d 897 (9th Cir.

2005) (en banc).  Among the many reasons we refuse to follow <u>Oscar</u>'s unsupported announcement that a plaintiff must plead a "concrete financial loss" to maintain a RICO claim for an injury to her property is that those words do not appear in § 1964(c).  <u>Id.</u> at 785.  The Supreme Court repeatedly has warned that courts "are not at liberty to rewrite RICO to reflect their . . . views of good policy."  <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639, 660 (2008); <u>Sedima</u>, 473 U.S. at 499–500 ("It is not for the judiciary to eliminate the private action in situations where Congress has provided it.").  We also easily distinguish <u>Oscar</u> from the present case on its facts.  The <u>Oscar</u> plaintiffs were renters, whereas the Reillys are landowners, and <u>Oscar</u> itself explicitly disclaims application to property owners.  965 F.2d at 787 n.2.

At this stage in the litigation, we conclude that it is reasonable to infer that a potential buyer would be less inclined to purchase land abutting an openly operating criminal enterprise than she would be if that adjacent land were empty or occupied by a lawfully-operating retailer.  Based on the Reillys' assertion that the Marijuana Growers' operation is anything but clandestine, the Reillys' land plausibly is worth less now than it was before those operations began.  Therefore, we conclude that the Reillys pled a plausible diminution in the value of their property caused by the public operation of the Marijuana Growers' enterprise.  <u>See</u> <u>Gillmor</u>, 490 F.3d at 797.

### c. The Reillys' other alleged "injuries"

In contrast, however, the Reillys claim to have suffered several other injuries that are not cognizable.  For example, they claim to be injured each time they look to the west and observe the Marijuana Growers' facility because the structure itself is a constant

reminder of the crimes occurring therein.  They also speculate that their land might further diminish in value in the future.  But a plaintiff cannot recover for emotional, personal, or speculative future injuries under § 1964(c).  See RJR, 136 S. Ct. at 2108.

The scope of the Reillys' presently plausible claims under § 1964(c) is therefore limited to the alleged injuries the Reillys have suffered or are suffering to their property rights from the Marijuana Growers' violations of § 1962.  See id. at 2096.  We therefore conclude that the Reillys can, at most, presently recover only for three types of property injuries that were plausibly pled in their Second Amended Complaint: (1) the interference with the Reillys' use and enjoyment of their land caused by the noxious odors emanating from the Marijuana Growers' operation; (2) the diminution in the land's value presently caused by those odors; and (3) the diminution in the land's value presently caused by the existence of that publicly disclosed, ongoing criminal enterprise adjacent to the Reillys' land.  Consequently, we affirm the district court's order dismissing the Reillys' RICO claims premised on any other type of injury.

## 2. Proximate cause

We last turn to whether the Reillys plausibly alleged that any of the three classes of property injuries they sufficiently pled occurred or are occurring "by reason of" the Marijuana Growers' purported violations of the CSA, and thus § 1962(c).  18 U.S.C. § 1964(c); see RJR, 136 S. Ct. at 2096.  Much of the groundwork for our analysis lies in our discussion of how the Reillys' property plausibly was injured in each of those three ways.  We now focus more closely on causation—the nexus between act and injury.

"[T]o establish the requisite element of causation" to maintain a § 1964(c) claim, a

plaintiff must plausibly plead "that the defendant's violation not only was a but for cause of his injury, but was the proximate cause as well . . . ." Bridge, 553 U.S. at 654 (quoting Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992)). "Proximate cause," Bridge explains, "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" Id. (citation omitted). It is a way of "'label[ing] generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts,' with a particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.'" Id. (first quoting Holmes, 503 U.S. at 268; then citing Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006)).

In turn, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza, 547 U.S. at 461. Contrariwise, Anza explains, "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." Id. at 460. Whether the Reillys alleged any direct or only indirect injuries attributable to the Marijuana Growers' violations of § 1962 was a point of some dispute before the district court. It is easily resolved in the Reillys' favor by the Supreme Court's cases emphasizing the distinctions between direct and indirect injuries.

### a. Direct vs. indirect injuries

In Holmes, the Court confronted RICO claims premised on the alleged manipulation of stocks. 503 U.S. at 261. The plaintiff was an investor protection corporation claiming to have subrogated rights to sue on behalf of the customers of

injured broker-dealers. Id. at 270–71.  Discussing the proximate cause element, the Court held that "the link [was] too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers," to sustain a § 1964(c) claim. Id. at 271.  Thus, § 1964(c)'s bar to recovery for "indirect" injuries sometimes is shorthand for a well-recognized principle of proximate causation: "[A] plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [i]s generally said to stand at too remote a distance to recover." Id. at 268–69 (citation omitted).

In Anza, the Court recognized two additional but related iterations of § 1964(c)'s bar to recovering for indirect injuries.  547 U.S. at 458–59.  The defendants in Anza allegedly defrauded New York's tax authority by committing mail and wire fraud, in violation of § 1962(c). Id. at 457–59.  However, the plaintiff sought to recover for its lost sales, the result of the defendants' distinct scheme of artificially lowering prices by not charging customers required sales taxes. Id. at 458.  The plaintiff's RICO claims first failed to meet the proximate cause element because "[t]he cause of [the] asserted harms" was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." Id.  "[A] second discontinuity between the RICO violation and the asserted injury" was that the plaintiff's "lost sales could have resulted from factors other than [the] alleged acts of fraud." Id. at 459.  The Court explained: "Businesses lose and gain customers for many reasons, and it would" have "require[d] a complex assessment to establish what portion of" the plaintiff's "lost sales were the product of" the defendant's "decreased prices." Id.

On the other hand, in <u>Bridge</u>, the Court considered whether "a plaintiff asserting a RICO claim predicated on mail fraud must plead and prove that it relied on the defendant's alleged misrepresentations." 553 U.S. at 641–42. The Court held that the plaintiffs could proceed on their § 1964(c) claims premised on direct injuries from the "los[s of] valuable liens they otherwise would have been awarded," even though other direct victims of the criminal scheme also could have sued. <u>Id.</u> at 649–50. The Court relatedly held that a plaintiff is not required to plead that he is a victim of the defendant's underlying crime (e.g., that he relied on the fraudulent mailings) to establish a direct injury. <u>Id.</u> Rather, a plaintiff may establish proximate causation by plausibly pleading that his business or property has been directly injured as a result of the defendant's § 1962 violation. <u>Id.</u> The Court also refused to foreclose a plaintiff's RICO claim even where "traditional state-law remedies" are available, explaining that courts cannot "adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe." <u>Id.</u> at 659–60.

b. The Reillys' injuries plausibly were proximately caused by the § 1962(c) violations

None of the Supreme Court's formulations of the term "indirect injury" bears any resemblance to the Reillys' three plausibly alleged injuries caused by the Marijuana Growers' violations of § 1962(c). The Reillys are suing to recover for injuries to their own land, not harms to third parties. <u>See</u> <u>Holmes</u>, 503 U.S. at 268–69. No intermediary breaks the causal chain, for example, between the enterprise's foul emissions and the Reillys' nuisance injury. <u>See id.</u> All three plausibly alleged injuries—the nuisance, the resultant decline in property value, and the further decline in property value stemming

from the enterprise's open pursuit of its goals—were also caused by the Marijuana

Growers' criminal cultivation of marijuana *itself*.  See Anza, 547 U.S. at 458.

Further, no complex, external factors are at play, as the enterprise is the direct

source of all of the alleged injuries to the Reillys' land.  See id. at 459.  For example, the

Reillys have plausibly alleged that the Marijuana Growers' violations of § 1962(c)

distinctly affect the land's value, including how prospective buyers would evaluate it

today.  Moreover, contrary to the district court and the Marijuana Growers' suggestions,

whether the Reillys might have pursued separate nuisance claims is irrelevant to whether

their § 1964(c) claims are viable.  See Bridge, 553 U.S. at 659–60.  It is also of no

moment whether the Reillys are victims of the alleged § 1962 violations.  See id. at 650.

Rather, it is sufficient that the property injuries that the Reillys allege are *direct*

byproducts of the location and manner in which the Marijuana Growers are conducting

their operations that purportedly violate the CSA.  Therefore, we conclude that the Reillys

have plausibly alleged that the Marijuana Growers' violations of the CSA, and thus

§ 1962(c), proximately caused each of those three property injuries to the Reillys' land.

Consequently, we conclude that the Reillys have plausibly stated § 1964(c) claims against

each of the Marijuana Growers for those three types of injuries.

## Conclusions

In No. 16-1266, we reverse the district court's order and its judgment dismissing

the Reillys' § 1964(c) claims against the Marijuana Growers, as pled in Counts I through

VI of their Second Amended Complaint.  We remand Safe Streets Alliance to the district

court for further proceedings on the Reillys' three plausibly alleged property injuries

against each of the Marijuana Growers for conducting their association-in-fact enterprise in a manner that violates the CSA, and thus § 1962(c).

We also remand to the district court the balance of the Reillys' RICO claims against the Marijuana Growers premised on other alleged violations of § 1962, but only to the extent that such violations are alleged to have caused one or more of those three types of injuries. Consequently, we do not decide what remedies are or are not available under RICO. We affirm the district court's order and its judgment dismissing the RICO claims in all other respects.

Finally, we emphasize that our narrow holdings today do no more than apply the heavily fact-dependent standard Congress enumerated in § 1964(c) to the allegations in this case. We are not suggesting that every private citizen purportedly aggrieved by another person, a group, or an enterprise that is manufacturing, distributing, selling, or using marijuana may pursue a claim under RICO. Nor are we implying that every person tangentially injured in his business or property by such activities has a viable RICO claim. Rather, we hold only that the Reillys alleged sufficient facts to plausibly establish the requisite elements of their claims against the Marijuana Growers here. The Reillys therefore must be permitted to attempt to prove their RICO claims.

### *The preemption claims*

We now turn to the Reillys and Safe Streets' asserted injuries and purported causes of action "in equity" against Colorado and Pueblo County for a declaratory judgment abrogating Amendment 64 as preempted by the CSA, and for concomitant injunctive relief blocking statewide enforcement of that Amendment. Careful parsing is in order:

These private plaintiffs allege property injuries and assert (a) causes of action

(b) invoking our equitable powers (c) to grant injunctive relief (d) against Colorado and

Pueblo County, (e) in response to the State and County's purported violations of federal

law, and (f) by operation of the Supremacy Clause and the CSA's preemption provision,

21 U.S.C. § 903.  Conspicuously absent from these alleged causes of action are any

jurisprudential bases for them.

We first describe those putative causes of action, under which these plaintiffs

neither claim that the State or the County is regulating their conduct, nor assert that the

Supremacy Clause or the CSA explicitly recognizes their property rights or, in fact, grants

them any substantive rights.  We then recount Supreme Court precedents explaining

precisely why, in such circumstances, the conceded absence of any *private substantive*

*right* in the CSA forecloses federal relief based on alleged violations of the CSA, in

equity or otherwise.[5]

---

[5] The Concurrence states that we "declare[] that even if state and local law is preempted
by the" CSA, "the plaintiffs cannot seek injunctive relief against those laws under the
federal courts' equity powers because neither the CSA nor any other federal law bestows
on them a substantive private right."  Concurrence at 1.  That is not the full import of our
ruling.  As we will explain, the Supreme Court has repeatedly recognized that the
Constitution itself forbids private plaintiffs from enforcing federal statutes in which they
have no substantive rights.  See, e.g., Va. Office for Prot. & Advocacy v. Stewart, 563
U.S. 247, 260–61 & n.8 (2011).  The Concurrence could also be understood to suggest
that we conclude this is the only avenue to obtain relief under a federal court's equitable
powers.  As we will also discuss, however, preemption-based affirmative defenses to
enforcement actions exist.  See, e.g., Armstrong v. Exceptional Child Ctr., Inc., __ U.S.
__, 135 S. Ct. 1378, 1384 (2015) (noting these defenses).  But, like Armstrong, we devote
comparatively little of our analysis to such defenses because, we easily conclude, they are
not at issue here—e.g., Colorado is not *forcing* the Reillys to grow or distribute
marijuana, and they have not expressed any fear that the State will do so.  See infra

(continued...)

The allegations

The Reillys and Safe Streets allege that Colorado and its municipalities have "facilitated the emergence of a billion dollar industry built upon the brazen commission of federal drug crimes." No. 16-1048, Aplt. App. at 66. The Reillys and Safe Streets thus seek "to vindicate their" purported "federal rights under . . . the Supremacy Clause." Id. at 51. To that end, in Counts VII and VIII of their First Amended Complaint, the Reillys and Safe Streets assert that Amendment 64 conflicts with and is therefore preempted by the CSA, pursuant to the Supremacy Clause and § 903. They aver that "[f]ederal courts sitting in equity have the power to set aside actions of state [and local] officials that are preempted under the Supremacy Clause," and under § 903 as well. Id. at 96.

Specifically, in the first of their "preemption counts," the Reillys and Safe Streets seek "federal preemption of" Colorado's "marijuana licensing" regime. Id. at 95 (emphasis and capitalization omitted). They named as defendants the following State officers in their official capacities: John W. Hickenlooper, Jr., the Governor of Colorado; Barbara J. Brohl, the Executive Director of the Colorado Department of Revenue; and W. Lewis Koski, the Director of the Colorado Marijuana Enforcement Division (MED). James Burack succeeded Koski in office and was "automatically substituted as a party." Fed. R. App. P. 43(c)(2). We refer to these defendants collectively as "Colorado."

In their second "preemption count[]," the Reillys and Safe Streets raised

_____

(...continued)
note 19. Our discussion should not be understood to suggest that we have failed to account for this entirely separate species of claims.

substantively identical claims with respect to Pueblo County, Colorado's "local marijuana licensing" regime.  No. 16-1048, Aplt. App. at 97 (emphasis and capitalization omitted).  They named as defendants to those claims the Board of County Commissioners of the County of Pueblo and the Pueblo County Liquor and Marijuana Licensing Board.  We refer to these defendants collectively as "Pueblo County."

In support of those claims, Safe Streets referred to "injuries caused by the operation[] of the Colorado-licensed marijuana industry."  Id. at 52.  However, it did not allege any particular injury that it or its other, unidentified members have suffered from Colorado's "efforts to license and promote the commercial marijuana industry."  Id. at 82.  For example, although Safe Streets claimed that the "MED's decision to license [a] recreational marijuana infused products manufacturer" in Denver "has substantially damaged the value of surrounding properties," it did not assert that its members' properties "near" that facility have been damaged.  Id. at 82–83.

In contrast, the Reillys alleged that Colorado and Pueblo County caused them to suffer specific, but discrete, injuries.  In particular, the Reillys alleged that the Marijuana Growers "applied for both state and local licenses to cultivate marijuana at 6480 Pickney Road."  Id. at 71.  "On October 1, 2014, MED granted" the Marijuana Growers "a state license, conditioned on [them] also obtaining a local license," which they later were issued by Pueblo County.  Id. at 71–72.  The Reillys thus claim that Colorado and Pueblo County's "decisions to license those operations injure the Reillys' property."  Id. at 80 (emphasis and some capitalization omitted).

More specifically, the Reillys contend that the Marijuana Growers "could not have located their marijuana grow operation at 6480 Pickney Road if they had not received authorization from" Colorado and Pueblo County "to do so." Id. at 82. This is exemplified, the Reillys aver, by the fact that the Marijuana Growers "did not begin construction on the facilities at 6480 Pickney Road until the State" and the County issued the licenses that "authorized them to grow marijuana at that location." Id. "Thus," the Reillys claim that Colorado and Pueblo County "also caused the[m] to suffer injuries" to their property. Id.

For example, they claim that the "MED's licenses . . . affirmatively assist and promote the commercial cultivation and distribution of recreational marijuana by functioning as a state endorsement of licensed businesses and employees." Id. at 96–97. In turn, those "endorsement[s]" purportedly "assist[] potential recreational marijuana investors and customers by assuring them that [the] licensees have been investigated and approved by the State" and the County. Id. at 97. The Reillys and Safe Streets also claim that the United States has "adopted a policy of not bringing criminal charges against those who commit marijuana-related drug crimes in a manner that is consistent with state and local law." Id. at 73. Thus, the Reillys and Safe Streets suggest that the licenses Colorado and Pueblo County issued to the Marijuana Growers were, and are, "essential to" that enterprise's "ability to openly violate the federal drug laws through large-scale cultivation and storefront sale of recreational marijuana." Id.

The Reillys and Safe Streets also claim that Colorado and Pueblo County's "issuance of recreational marijuana licenses directly conflicts with the CSA," such that

the "licensing regime is preempted by federal law and cannot stand." Id. at 97.  Absent

from the Reillys and Safe Streets' pleadings, however, are any facts purporting to link

Colorado's statewide licensing regime, its effects, or the benefits Colorado allegedly

accrues from it to any specifically alleged injury to the Reillys, their land, Safe Streets, or

its unidentified members.  This is also true of Pueblo County's countywide regime.

Nevertheless, the Reillys and Safe Streets demand sweeping relief.  They seek an

"order" directing Colorado and Pueblo County "to withdraw" all of "the recreational

marijuana licenses" they have "issued so far and not to issue any additional such licenses

in the future." Id. at 51–52.  In similar fashion, the Reillys and Safe Streets request a

declaratory judgment that Colorado and Pueblo County's "issuance of marijuana business

and occupational licenses is preempted by federal law." Id. at 99.  Accordingly, they also

request an order "[v]acating" all of the "marijuana business and occupational licenses

issued by" the State and the County, and an order "enjoining" Colorado and Pueblo

County "from issuing additional" licenses.  Id.

Finally, they demand an even more comprehensive declaratory judgment "that

those portions of the Colorado Constitution and the [Colorado] Retail Marijuana Code

that purport to authorize or facilitate violations of the federal drug laws are preempted by

federal law." Id.  But we apparently are to discern for ourselves precisely which

offending words are to be stricken from, inter alia, the Colorado Constitution.  For the

Reillys and Safe Streets did not plead—and they have never identified—precisely which

provisions of the Colorado Constitution, the Colorado Retail Marijuana Code, the Pueblo

County Code, or those alluded-to regulations conflict with specific provisions of the CSA and are therefore preempted by operation of § 903 and the Supremacy Clause.

In any event, at Colorado and Pueblo County's request, the district court severed the preemption claims from the RICO claims. Colorado and Pueblo County then moved to dismiss the preemption claims. The Reillys and Safe Streets' response advanced the same novel concepts that we will discuss below. It suffices here to make only two points.

First, the Reillys and Safe Streets confirmed that they were seeking "a decision invalidating the State's [and the County's] marijuana licensing and regulatory laws" in their entirety, untethered to any specifically alleged injuries. Id. at 182.

Second, relatedly, they did not directly address Colorado and Pueblo County's argument that they cannot enforce the CSA because that federal statute does not grant private citizens any relevant *substantive rights*. Indeed, the Reillys and Safe Streets did not contend that § 903 or any other provision of the CSA, in fact, vests private citizens with any relevant substantive rights. Nor did they purport to identify any substantive rights recognized in the Constitution or established by any federal statute that serve as the foundation for their alleged causes of action in equity for sweeping injunctive relief. Rather, according to the Reillys and Safe Streets, they are simply "invoking [the Article III courts'] equitable authority to enjoin actions by state officers that are preempted by the" CSA "and thus violate the Supremacy Clause . . . ." Id. at 149.

The district court was unpersuaded. It determined—for reasons similar to but not the same as those undergirding our conclusions—that the Reillys and Safe Streets had not alleged viable causes of action, and it dismissed their preemption claims. The Reillys and

41

Safe Streets timely appealed, which is before us as No. 16-1048.

## Analysis

The Reillys and Safe Streets assert that they do not need any constitutional or federal substantive rights to be entitled to remedy a State's, a municipality's, or any government officer's violation of federal law.  Rather, they claim to be able to enforce the CSA's preemptive effects "in equity" so long as they have been injured—in any way—by official conduct that *also* violates a federal statute.  Under their theory of equitably derived federal substantive rights, all such injuries give rise to causes of action to enforce federal law against any government officer, and for plenary injunctive relief.

More specifically, the Reillys and Safe Streets do not assert that their putative causes of action are based on any substantive rights created or even protected by the Constitution, § 903, any other provision of the CSA, or any federal statute.[6]  They instead hypothesize that a private plaintiff may enforce any provision of any federal statute "in equity" whenever: (a) a State, a municipality, or one of their officers violates that statute; and (b) that private citizen suffers any alleged injury as a result.

For example, the Reillys claim that their property has been injured by Colorado

_____

[6] If somewhere lurking in the record on appeal or the briefs is any reference to a relevant substantive right that Congress bestowed on private citizens or incorporated by reference in the CSA, we have not found it.  In any event, the failure to adequately develop such an argument in the district court forfeited it, and it is waived, moreover, because no such argument was raised and developed on appeal.  See Holmes v. Colo. Coal. for Homeless Long Term Disability Plan, 762 F.3d 1195, 1199 (10th Cir. 2014) (declining to consider arguments on appeal that were inadequately briefed); Murrell v. Shalala, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994) (declining to consider "a few scattered statements" and "perfunctory" arguments that failed to develop an issue).

and Pueblo County's activities.  But they do not assert that the CSA refers to a private citizen's real property rights, let alone protects those rights.[7]  The Reillys similarly claim to have suffered grievous emotional injuries at the State's and the County's hands—when they look upon the Marijuana Growers' government-licensed facility, they are reminded that criminal activity is afoot.  But the Reillys do not direct us to the provision of the CSA aimed at safeguarding a citizen's psyche.  This is no oversight; there is none.  Nevertheless, the Reillys claim to be able to enforce § 903 (and, through it, the entire CSA) on a statewide basis.

Their remarkable vision of federal equitable relief in the absence of federal substantive rights is, apparently, premised on the notion that free-floating causes of action in equity exist unless "Congress has restricted the courts' preexisting equitable authority to enjoin violations of federal law."  No. 16-1048, Aplt. Reply Br. at 5 n.1 (emphasis omitted).  According to the Reillys and Safe Streets, "equity" is "a standalone source of legal rights," the "origin of a host of substantive rights not recognized at common law," by which they argue that *equity itself* creates a substantive right permitting them to enforce the entire CSA against Colorado and Pueblo County.  Id. at 18 (citations omitted).  Employing a clever turn of phrase, they thus "seek to enforce the *substantive federal rule* that States may not authorize, promote, or facilitate violations of the federal drug laws,"

_____

[7] Of course, we are aware that the CSA bestows specific substantive rights on particular classes of private citizens for certain types of activities.  But those rights have not been invoked in these cases, and, in any event, none of them are even arguably relevant here.  E.g., 21 U.S.C. § 830(c)(4) ("Any person who is aggrieved by a disclosure of" certain prescription records "may bring a civil action against the violator for appropriate relief.").

including the CSA.  Id. at 6–7 (emphasis added).  The Reillys and Safe Streets can do this, they claim, because "nothing in the CSA suggests that Congress intended for this rule to be enforced by some means other than private suits in equity against state officers."  Id. at 7.  So we are asked to pay no mind to Article II.

The Reillys and Safe Streets next inform us that no principle holds "a plaintiff may not sue state officers who are injuring him by implementing a policy that conflicts with federal law unless a federal statute confers 'enforceable legal rights' or the suit is brought in anticipation of a state enforcement action."  Id. at 14–15.  The heart of their argument is that there is no "rationale for limiting suits in equity" in this way.  Id. at 17.  That is, "other types of injuries, such as those [they] allege here"—i.e., not based on any federal substantive rights—"should be an equally valid basis for invoking the federal courts' equitable powers."  Id.  We are thus urged to ignore Article I.

Finally, the Reillys and Safe Streets hypothesize that once a private citizen has been injured by such an act, she or he has an equitable cause of action to enjoin the State's or its officers' conduct to the full extent of the statutory violation, without regard to the scope of the plaintiff's alleged injuries.  For example, the Reillys request that we issue a declaratory judgment and an injunction barring enforcement of Amendment 64 statewide, *inter alia*, by invalidating not just the Marijuana Growers' licenses, but all such licenses.  The Reillys seek this far-flung relief even though their only alleged injuries concern property damage and emotional harms.  Having cavalierly dispensed with Articles I and II, they at last encourage us to cast aside Article III.

A. *Subject matter jurisdiction*

These circumstances—plaintiffs purportedly bringing causes of action for federal "relief," but failing to invoke federal rights—raise a threshold question whether we have subject matter jurisdiction over Safe Streets Alliance.  See United States v. Ruiz, 536 U.S. 622, 628 (2002); Shepherd v. Holder, 678 F.3d 1171, 1180 (10th Cir. 2012).  We must decide that issue, which we can do because we "always ha[ve] jurisdiction to determine [our] own jurisdiction."  Ruiz, 536 U.S. at 628.

The Reillys pled well-defined federal causes of action to vindicate federal substantive rights Congress enumerated in RICO.  "[W]hen federal law creates a private right of action and furnishes the substantive rules of decision, the claim arises under federal law, and district courts possess federal-question jurisdiction under § 1331."  Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 378–79 (2012); see 28 U.S.C. § 1331.  Regardless of the nature of the Reillys and Safe Streets' preemption claims, therefore, the district court necessarily had subject matter jurisdiction over those claims at the time the suit commenced, adjudicative power it retained after the preemption claims were severed.  See 28 U.S.C. § 1367(a).

To the extent that the disparate nature of these claims vis-à-vis the RICO claims raises any doubts about this, cf. Fed. R. Civ. P. 20(a)(1), we conclude that the district court had an independent basis of subject matter jurisdiction over the preemption claims under 28 U.S.C. § 1331 for at least two distinct, but related, reasons.

First, whether the Reillys and Safe Streets' preemption claims are viable turns, as a threshold merits matter, on whether (as alleged) the federal courts possess the inherent

power in equity to countenance private enforcement of a federal statute under which those plaintiffs admittedly possess no federal substantive rights that they are seeking to vindicate.  This necessarily raises a question of federal common law:  Do the Article III courts' equitable powers include authority to grant injunctive relief of this type?  It is axiomatic that the district court had jurisdiction under § 1331 to answer this question. Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 850 (1985) ("It is well settled that [§ 1331's] statutory grant of 'jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.'  Federal common law as articulated in rules that are fashioned by court decisions are 'laws' as that term is used in § 1331." (footnotes omitted) (quoting Illinois v. City of Milwaukee, 406 U.S. 91, 100 (1972))).

Second, and only with that question answered, the Reillys and Safe Streets' attempts to privately enforce the CSA in this manner raise, at minimum, "substantial question[s] of federal law" on the merits that were sufficient for the district court to have exercised jurisdiction over the preemption claims in their entirety under § 1331. Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 13 (1983); see Bolivarian Rep. of Venez. v. Helmerich & Payne Int'l Drilling Co., __ U.S. __, 137 S. Ct. 1312, 1322 (2017) ("[T]his Court [has] held that the 'arising under' statute confers jurisdiction if a plaintiff can make a nonfrivolous argument that a federal law provides the relief he seeks—even if, in fact, it does not."); Gunn, 133 S. Ct. at 1065 ("[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting

the federal-state balance approved by Congress."); Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 697 (2006); Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005); see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" (citation omitted)).

It follows, therefore, that in No. 16-1048 we have appellate jurisdiction over the preemption claims in Safe Streets Alliance.  28 U.S.C. § 1291; see, e.g., Lexmark, 134 S. Ct. at 1387 n.4 ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case." (quoting Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 642–43 (2002))).

## B. *Background issues*

We pause to note three related issues that frame our discussion.

First, none of the claims before us today are asserted on behalf of others similarly situated or on an alleged class-wide basis.  Recall, for example, that the Reillys are the only identified members of Safe Streets.

Second, no facial or as-applied challenge to Amendment 64 was asserted in the complaints, argued to the district court, or presented to us.  Cf. United States v. Stevens, 559 U.S. 460, 472–75 (2010); United States v. Salerno, 481 U.S. 739, 745 (1987).

Finally, the Reillys and Safe Streets argue that they must be able to enforce § 903

because if they cannot, then neither can the Attorney General. That follows, they claim, because just as private citizens are not mentioned in § 903, neither is the Attorney General. And they surmise that if private citizens lack the power to enforce § 903, that means the *United States* also must not be able to enforce *federal* law. We will highlight only two of the most glaring reasons why that notion is specious.

For one, the "assumption that if" the Reillys or Safe Streets "ha[d] no standing to sue, no one would have standing, [would] not [be] a reason to find standing." Clapper v. Amnesty Int'l USA, __ U.S. __, 133 S. Ct. 1138, 1154 (2013). For another, the Reillys and Safe Streets are obviously incorrect that the Attorney General's authority to enforce § 903 is related in any way to a private citizen's inability to do so. See United States v. Armstrong, 517 U.S. 456, 464 (1996) ("The Attorney General and United States Attorneys 'retain broad discretion' to enforce the Nation's criminal laws." (citations omitted)). The Supreme "Court has implied causes of action in favor of the United States in cases where the statute creates a duty in favor of the public at large," as does the CSA. Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n.13 (1979) (citation omitted).

The Supreme Court has reaffirmed time and again that the United States is empowered to enforce the supremacy of federal law against preempted State action, and that it may obtain an injunction to that effect. See, e.g., Arizona v. United States, __ U.S. __, 132 S. Ct. 2492, 2497 (2012); 21 U.S.C. § 882(a) (authorizing injunctions). Regardless of the outcome of any of the claims here, therefore, the Attorney General remains empowered to enforce the CSA to the extent Congress so authorized. See Gonzales v. Oregon, 546 U.S. 243, 258 (2006). Of course, the Supreme Court also "has

recognized on several occasions over many years that an agency's decision not to

prosecute or enforce, whether through civil or criminal process, is a decision generally

committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831

(1985).  But where the Attorney General chooses to exercise that delegated authority, her

or his power plainly is not coextensive with that possessed by a private citizen.  See

United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483 (2001).  Our analysis

does not implicate the Attorney General's authority over the CSA.

 C. *Private citizens without injuries to rights enumerated in the CSA cannot enforce § 903*

The Reillys and Safe Streets rely on Armstrong v. Exceptional Child Center, Inc.,

__ U.S. __, 135 S. Ct. 1378 (2015), and its progenitors for the contention that Congress

has not *foreclosed* equitable *relief* to remedy Colorado and Pueblo County's purported

violations of the CSA.  See id. at 1385–87 (discussing that issue).  They argue that they

can maintain causes of action in equity to enjoin Colorado and Pueblo County's

enforcement of Amendment 64.  The district court indulged that inquiry.  But the Reillys

and Safe Streets critically misread Armstrong and relatedly either ignore or, at best,

misunderstand the threshold, dispositive issue here.[8]

_____

[8] As described in our analysis of the Reillys' RICO claims, they have alleged redressable injuries purportedly caused in part by Colorado and Pueblo County's recreational marijuana licensing regime.  This gives them Article III standing to assert at least some of their claims seeking to remedy their injuries by enforcing the CSA, in turn requiring us to reach whether any such claim is viable.  See Spokeo, Inc. v. Robins, __ U.S. __, 136 S. Ct. 1540, 1547 (2016); Lexmark, 134 S. Ct. at 1386, 1394.  For the same reasons, we need not separately address Safe Streets' Article III standing to raise substantively identical putative causes of action.  See Horne v. Flores, 557 U.S. 433, 446–47 (2009) ("Because the superintendent clearly has standing to challenge the lower courts'

(continued...)

In <u>Armstrong</u>, the Supreme Court conducted a familiar three-step analysis of whether the plaintiffs' claims were viable.  The Court: (1) discerned what alleged substantive rights the plaintiffs were seeking to vindicate; (2) decided what putative causes of action the plaintiffs were raising based on those rights; and (3) determined which, if any, of those causes of action were viable, and specifically with respect to the equitable relief requested.  <u>See</u> <u>id.</u> at 1382–87; <u>Davis v. Passman</u>, 442 U.S. 228, 239–41 & n.18 (1979) (detailing that order of battle).

At the first step, the Court succinctly remarked that the plaintiffs were "providers of habilitation services to persons covered by Idaho's Medicaid plan" who "claim[ed] that Idaho violates § 30(A)" of Medicaid "by reimbursing [them] at rates lower than § 30(A) permits."  <u>Armstrong</u>, 135 S. Ct. at 1382.  That is, the providers brought causes of action in equity under § 30(A), by which they sought to enjoin Idaho and its officers to fully remunerate them for their services.  <u>Id.</u>  They thus attempted to vindicate their averred *federal property rights* to those funds, rights allegedly bestowed on them *by § 30(A)*.[9]  <u>Id.</u>

---

(...continued)
decisions, we need not consider whether the Legislators also have standing to do so."); <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 264 & n.9 (1977) ("[W]e have at least one individual plaintiff who has demonstrated standing . . . . Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.").

[9] The Concurrence quotes this statement and responds that "no language in" <u>Armstrong</u> "stat[es] that the Court should 'first' (or ever, when examining the federal courts' equity power) concern itself with whether the party seeking injunctive relief alleged any federal substantive right."  Concurrence at 6.  According to the Concurrence, <u>Armstrong</u> did not "ever say that the providers possessed or even asserted such a right."  <u>Id.</u>  These are two separate issues, and <u>Armstrong</u> addresses both of them.  <u>See</u> <u>Armstrong</u>, 135 S. Ct. at 1382 ("Respondents . . . *claim*[] that Idaho *violates* § 30(A) by reimbursing [them] at

(continued...)

At the second step, the Court decided that the providers were pleading two supposed causes of action to vindicate those rights. Id. at 1383–85. Their first claim was purportedly based on a right of action under the Supremacy Clause itself. Id. at 1383–84. Their second claim was against the State "in equity." Id. at 1385. They sought the same prospective injunctive relief—higher rates of compensation—on both claims. Id. at 1382.

At the third step, the Court determined whether each of those putative causes of action stated a viable claim for the equitable relief requested—i.e., an injunction requiring Idaho to compensate them with those federal funds at a higher rate. Id. at 1383–87.

With respect to the providers' first claim, the Court reiterated that "the Supremacy Clause is not the 'source of any federal rights,'" and held that the Clause "certainly does not create a cause of action."[10] Id. at 1383 (quoting Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107 (1989)). The Clause "instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court,

---------------------------------------

(...continued)

rates lower than § 30(A) *permits*." (emphasis added)); id. at 1387 ("Their *relief* must be sought initially through the" federal agency "rather than through the courts." (emphasis added)). The potential for relief presupposes the existence of a substantive right that has been infringed upon. See, e.g., Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 65–66 (1992); Davis, 442 U.S. at 239–41. The disagreement between the majority and the dissent in Armstrong was over whether the providers could obtain relief for the violation of their claimed rights. See Armstrong, 135 S. Ct. at 1393 (Sotomayor, J., dissenting) (urging relief "[i]f the State has violated § 30(A) by refusing to reimburse" the plaintiffs).

A majority of the Justices in Armstrong at least assumed *arguendo* that the providers had a right to be reimbursed, but denied equitable relief notwithstanding this. Id. at 1387 (majority opinion). Here, however, the Reillys admit they have no such rights.

[10] We note the Court's careful distinction between the "source of [a] federal right[]" and the "creat[ion of] a cause of action." Id. Again, these are separate issues. See, e.g., Franklin, 503 U.S. at 65–66; Davis, 442 U.S. at 239–41.

and in what circumstances they may do so." Id.  The Supremacy Clause does not "give

*affected* parties a constitutional (and hence congressionally unalterable) *right to enforce*

*federal law* against the States." Id. (emphasis added).  Armstrong's analysis of the

Supremacy Clause is particularly relevant here because the Court reiterated—in lockstep

with centuries of precedent—that the "Constitution gave Congress . . . broad discretion

with regard to the enactment of laws," including "power over the manner of their

implementation," such that Congress may "leave the enforcement of federal law to

federal actors."[11] Id. at 1383–84.  We will discuss in detail how the Court's precedents

instruct us to determine if Congress left enforcement of the CSA to federal actors in the

circumstances alleged here.

　　　In Armstrong, the Court last turned to the providers' putative causes of action in

equity to vindicate their professed statutorily-created property rights.  The Court began

this analysis by invoking two related bedrock principles that apply whenever an Article

III court sits in equity, as in law.  "The power of federal courts of equity to enjoin

unlawful executive action is subject to express and implied statutory limitations."[12] Id.

---

[11] The Court's remarks regarding the Supremacy Clause only serves to underscore how odd it is that the Reillys and Safe Streets are suggesting that they have a lingering right in equity to enforce every federal statute if they suffer any injury, and unless Congress withdraws that so-called right.  See id.  In any event, the Reillys and Safe Streets have abandoned any pretense that they raise causes of action *under* the Supremacy Clause.

[12] In Armstrong, these principles animated the Court's discussion of whether, notwithstanding the providers' *claims* of a right to funds, Congress intended that "[t]heir relief must be sought initially through" a federal agency "rather than through the courts." Id. at 1387.  Here, the "statutory limitation[]" at issue, id. at 1385, is a threshold matter: "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is *no basis* for a private suit" to enforce the statute.

(continued...)

at 1385 (citing <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 74 (1996)).  Moreover,

"[c]ourts of equity can no more disregard statutory and constitutional requirements and

provisions than can courts of law."  <u>Id.</u> (quoting <u>INS v. Pangilinan</u>, 486 U.S. 875, 883

(1988)).

Applying those principles, the Court adopted a two-pronged analytical framework

to decide if the providers' claims for injunctive relief were viable.  <u>Id.</u> at 1385–87.

Specifically, the Court concluded that "[t]wo aspects of § 30(A) establish Congress's

'intent to foreclose' equitable relief" for the alleged violations of the providers'

substantive right to federal funds.  <u>Id.</u> at 1385.  "First," the Court explained, "the sole

remedy Congress provided for a State's failure to comply with Medicaid's requirements

. . . is the withholding of Medicaid funds by the Secretary of Health and Human

Services."  <u>Id.</u> (citation omitted).  Second, that narrow available remedy foreclosed

equitable relief "when combined with the judicially unadministrable nature of § 30(A)'s

text."  <u>Id.</u>  The Court thus held that, despite the providers' claim that their federal rights

were infringed, they could not recover.  <u>Id.</u> at 1386–87.

The Reillys and Safe Streets devote near-singular attention to that inquiry: whether

Congress foreclosed equitable relief for Colorado and Pueblo County's purported

violations of the CSA, including § 903.[13]  Unlike the providers in <u>Armstrong</u>, however,

_____

(...continued)
<u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 286 (2002) (emphasis added).

[13] The Concurrence states that we "rel[y] largely on" <u>Armstrong</u> for our analysis of these
preemption claims.  Concurrence at 1.  In fact, we discuss <u>Armstrong</u> in detail because the
plaintiffs primarily rely on it to suggest that a multi-step inquiry is required to determine

(continued...)

53

the Reillys and Safe Streets do not claim to have any substantive rights under § 903, or any rights enumerated elsewhere in the CSA.  But Armstrong itself relied on an initial determination that the providers claimed to be vindicating their federal substantive rights by enforcing the very federal statute that allegedly created those rights, § 30(A).  Id. at 1382.  Moreover, Armstrong expressly stated the foundational principle that an Article III court sitting in equity remains bound to a federal statute's text.  Id. at 1385.

That is, of course, "[t]he elements of, and the defenses to, a federal cause of action are defined by federal law."  Howlett v. Rose, 496 U.S. 356, 375 (1990).  And "substantive federal law itself . . . must be created by Congress."  Alexander v. Sandoval, 532 U.S. 275, 286 (2001) (citing Touche Ross & Co. v. Redington, 442 U.S. 560, 578 (1979)).  The Reillys are undoubtedly correct that "[*o*]*nce a right* and a violation have been shown, the scope of a [federal] court's equitable powers to remedy . . . wrongs is broad, for breadth and flexibility are inherent in equitable remedies."  Rizzo v. Goode, 423 U.S. 362, 376–77 (1976) (emphasis added).  Moreover, "federal courts have jurisdiction over suits to enjoin state officials from *interfering* with *federal rights*."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14 (1983) (emphasis added) (citing Ex parte

---

(...continued)

whether Congress foreclosed private citizens from obtaining relief if a State violates the CSA.  As we explain in detail below, that inquiry is irrelevant here.

As for the analysis of the actual issue before us, we rely largely on the Constitution itself and over thirty Supreme Court cases (a sample), many of which Armstrong cites.  They explain, in short, that "where the text and structure of [the CSA] provide[s] no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit," Gonzaga, 536 U.S. at 286, because Congress has not "mandat[ed] private enforcement" of the CSA.  Armstrong, 135 S. Ct. at 1384.

Young, 209 U.S. 123, 160–62 (1908)).  But, as in law, "in federal equity cases[,] 'the nature of the violation'" of a federal right "determines the scope of the remedy" available. Rizzo, 423 U.S. at 378 (citation omitted).

Critically, the Supreme Court has explained that "to invoke the" Article III courts' equitable powers, a plaintiff asserting a cause of action to enforce a federal statute must have "a federal right that [he or she] possesses against" the defendant.  Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 260 (2011).  "Such litigation *cannot occur* unless the" plaintiff "has been *given* a *federal right of*" his or her "*own* to vindicate . . . under the . . . statute at issue" in the case.  Id. at 261 n.8 (emphasis added).  Therefore, unless a private plaintiff has been given a federal right of her or his own to vindicate *in the CSA*, the plaintiff cannot maintain a cause of action—in law or in equity—against any defendant for violating the CSA.[14]  Id.; see Lexmark, 134 S. Ct. at 1394 n.5.

The Reillys suggest otherwise.  But "[t]his principle has deep roots in our jurisprudence."  Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 66 (1992).  In particular, "the question is which class of litigants may enforce in court legislatively created rights or obligations.  If a litigant is an appropriate party to invoke the power of the courts, . . . he has a 'cause of action' under the statute," which "is a necessary element of his 'claim.'"  Davis, 442 U.S. at 239.  And "the question of what remedies are available under a statute that provides a private right of action is 'analytically distinct'

---

[14] "[T]he question of who may enforce a statutory right is fundamentally different from the question of who may enforce a right that is protected by the Constitution."  Davis, 442 U.S. at 241.  That inquiry is not at issue in these appeals because none of the plaintiffs claim to be vindicating any "right that is protected by the Constitution."  Id.

from the issue of whether such a right exists in the first place." Franklin, 503 U.S. at 65–66 (quoting Davis, 442 U.S. at 239).

In turn, "private rights of action to enforce federal law must be created by Congress." Sandoval, 532 U.S. at 275 (citation omitted). We must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." Id. at 286 (citation omitted). The same threshold inquiry applies when we ask "whether a statutory violation may be enforced through § 1983"—i.e., "we must first determine whether Congress intended to create a federal right." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002).

Most importantly here, this threshold inquiry into whether the plaintiff has a substantive right in the federal statute she or he seeks to enforce transcends the division between law and equity. The Supreme Court has held that a "[c]ourt of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law . . . ." Pangilinan, 486 U.S. at 883 (citations omitted), cited with approval in Armstrong, 135 S. Ct. at 1385. We "will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 145 (1985) (quoting California v. Sierra Club, 451 U.S. 287, 297 (1981)). Rather, "Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity" for injunctive relief to issue. Mitchum v. Foster, 407 U.S. 225, 237 (1972).

The Supreme Court succinctly summarized these well-established principles in Stewart. Again, the Court stated that with respect to a plaintiff's suit in equity to enforce

a federal statute, "[s]uch litigation *cannot occur* unless the" plaintiff "has been *given* a

*federal right of* [their] *own* to vindicate . . . under the . . . statute at issue" in the case.

<u>Stewart</u>, 563 U.S. at 261 n.8 (emphasis added).  <u>Armstrong</u> also invokes these precepts.

Specifically, the Court explained that the Supremacy Clause "is silent regarding who may

enforce federal laws in court, and in what circumstances they may do so."  <u>Armstrong</u>,

135 S. Ct. at 1383.  The Court continued:

> If the Supremacy Clause includes a private right of action, then the
> Constitution *requires* Congress to permit the enforcement of its laws by
> private actors, significantly curtailing its ability to guide the implementation
> of federal law.  It would be strange indeed to give a clause that makes
> federal law supreme a reading that limits Congress's power to enforce that
> law, by imposing mandatory private enforcement . . . .

<u>Id.</u> at 1384.

In sum, Congress, not the courts, creates federal statutory substantive rights, which

are prerequisites to private suits to enforce federal statutes.  Therefore, as these cases all

explain, to determine whether a private plaintiff may enforce the CSA, we must first

determine whether that plaintiff has substantive rights in the CSA that he or she is seeking

to vindicate.  <u>See, e.g.</u>, <u>Stewart</u>, 563 U.S. at 261 n.8; <u>Russell</u>, 473 U.S. at 145; <u>Mitchum</u>,

407 U.S. at 237.  Only if the CSA includes such rights will we have any call to determine

what causes of action are available to enforce those rights, and for what remedies.

Consequently, to determine if the Reillys can enforce the CSA in equity, our

threshold inquiry is whether § 903 creates new federal substantive rights or incorporates

by reference a private citizen's existing substantive rights, elevating them for federal

protection.  <u>Cf., e.g.</u>, 18 U.S.C. § 1964(c) (incorporating private common-law property

rights into RICO).  "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'"  <u>Gonzaga</u>, 536 U.S. at 283 (quoting <u>Cannon</u>, 441 U.S. at 690 n.13).  Contrariwise, "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'"  <u>Sandoval</u>, 532 U.S. at 289 (quoting <u>Sierra Club</u>, 451 U.S. at 294); <u>see also</u> <u>Armstrong</u>, 135 S. Ct. at 1387 (plurality opinion of Scalia, J.) ("doubt[ing] . . . that providers are intended beneficiaries . . . of the Medicaid agreement," which *also* would have foreclosed their claimed "private right of action under federal law").

Here, however, no discerning inquiry is necessary because the Reillys and Safe Streets have *never* alleged that they have any substantive rights in § 903 or elsewhere in the CSA by which they can enforce the CSA's preemptive effects.  Where a federal statute "simply does not create substantive rights," the Supreme Court has explained that it is "unnecessary to address [any] remaining issues" about a private citizen's ability to enforce that statute or obtain relief.  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 451 U.S. 1, 11 (1981).  The Reillys and Safe Streets were thus required to plausibly allege that they are vindicating a federal substantive right to be able to maintain a cause of action in equity of the type they assert here.[15]  But they failed to do so.  This inexorably leads us to conclude that the Reillys and Safe Streets have no viable causes of action against

---

[15] We will discuss in detail below the separate issue of preemption-based defenses to criminal, civil, and regulatory enforcement actions.  See <u>infra</u> note 19; <u>see also</u> <u>Armstrong</u>, 135 S. Ct. at 1384 (noting these defenses, which were not implicated there, either).  It suffices to again remark that neither the Reillys nor Safe Streets have asserted any such claim.

Colorado or Pueblo County.  See, e.g., Stewart, 563 U.S. at 260–61 & n.8.

Finally, we note that Article III courts "will not . . . 'entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws.'" Massachusetts v. EPA, 549 U.S. 497, 516–17 (2007) (citation omitted).  That principle's force is even stronger when a private citizen attempts to vindicate a criminal statute.  See, e.g., Diamond v. Charles, 476 U.S. 54, 64 (1986) (holding a "private citizen lacks a judicially cognizable interest in the prosecution or non[-]prosecution of another").  This further buttresses our conclusion that the Reillys and Safe Streets cannot enforce the CSA.

D. *The Reillys and Safe Streets' calls to equity do not alter this conclusion*

The Reillys and Safe Streets attempt to avoid this result by drawing our attention to numerous cases in which the Supreme Court has held that equitable relief is available. But their fixation on federal equitable relief begs the question whether a private citizen has a federal substantive right to begin with.  Perhaps in antiquity a private citizen could enter a judicial forum and demand equitable relief in the absence of any injury to a protected substantive right.  But such incantations almost certainly ceased to hold any power in 1788.  See U.S. Const. art. III, § 2.

After all, for federal question jurisdiction to exist today, a "right or immunity *created by* the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action."  Franchise Tax Bd., 463 U.S. at 10–11 (emphasis added) (quoting Gully v. First Nat'l Bank, 299 U.S. 109, 112 (1936)); see 28 U.S.C. § 1331.  It therefore appears to be, at best, a highly dubious proposition that

Article III courts have ever provided free-floating injunctive relief under *federal statutes* for violations of individuals' *non-federal* rights, whether sitting in law or in equity.  Cf. Gonzaga, 536 U.S. at 285 (noting that "one cannot go into court and claim a violation of § 1983—for § 1983 by itself does not protect anyone against anything"); see Douglas v. Indep. Living Ctr. of S. Cal., Inc., 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting) ("For a court to reach a contrary conclusion under its general equitable powers would raise the most serious concerns regarding . . . the separation of powers . . . ."), cited with approval in Armstrong, 135 S. Ct. at 1385 (delimiting courts' equitable powers).

In any event, we need not explore the ancient roots of equity to be certain of our conclusion today.  In Pennhurst State School & Hospital v. Halderman (Pennhurst II), 465 U.S. 89 (1984), the Supreme Court held that Article III courts sitting in equity are without authority to remedy a State's or its officers' violations of State law; we may only grant injunctive relief of this type to "vindicate federal *rights* . . . ."  Id. at 105 (emphasis added).  The Reillys and Safe Streets have not cited any Supreme Court case[16] postdating Pennhurst II in which the Court countenanced injunctive relief of the type that they request here for anything but an alleged violation of a private citizen's federal substantive rights recognized in the Constitution or bestowed by a federal statute.

---

[16] To the extent that the lower federal courts occasionally countenanced such putative claims for injunctive relief in the guise of "right[s] of action under the Supremacy Clause," the Supreme Court explicitly rejected such theories when it held in Armstrong that the Supremacy Clause "does not create a cause of action."  135 S. Ct. at 1383 (quoting, and reversing, Exceptional Child Ctr., Inc. v. Armstrong, 567 F. App'x 496, 497 (9th Cir. 2014)), abrogating in part Planned Parenthood of Kan. & Mid-Mo. v. Moser, 747 F.3d 814, 817, 822–38 (10th Cir. 2014) (delineating a "Supremacy Clause claim").

We have examined the cases they cited and numerous others both predating and postdating <u>Pennhurst II</u>.  Many of those precedents explicitly state that an Article III court may vindicate federal rights in equity, with no mention of granting relief in their absence. <u>See</u> <u>id.</u> at 105–06.  And all of the other cases leave no doubt that the federal statutes (or constitutional provisions) in question were the purported sources of the private plaintiffs' substantive rights under consideration.  <u>See, e.g.</u>, <u>Armstrong</u>, 135 S. Ct. at 1382.  No modern authority supports the Reillys and Safe Streets' hypothesis, which is the foundation of their alleged causes of action in equity.[17]  Therefore, we conclude that the Reillys and Safe Streets' preemption claims fail as a matter of law.

Conclusions

In sum, we conclude that the Reillys and Safe Streets' preemption claims against Colorado and Pueblo County fail to state plausible claims upon which relief can be

---

[17] <u>See, e.g.</u>, <u>Michigan v. Bay Mills Indian Cmty.</u>, __ U.S. __, 134 S. Ct. 2024, 2029 (2014) (Native American tribe invoking federal statutory duty to negotiate compact); <u>Haywood v. Drown</u>, 556 U.S. 729, 735 (2009) (explaining that "state courts as well as federal courts are entrusted with providing a forum for the *vindication of federal rights* violated by state or local officials acting under color of state law" (emphasis added)); <u>Verizon</u>, 535 U.S. at 640–46 (telecommunications company subject to State commission's order to pay reciprocal compensation charges seeking to vindicate federally recognized property rights by enjoining order); <u>Alden v. Maine</u>, 527 U.S. 706, 711–12 (1999) (probation officers suing their employer, a State, for allegedly violating federal statutory right to overtime pay); <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 276–77 (1997) ("Our precedents do teach us, nevertheless, that where prospective relief is sought against individual state officers in a federal forum *based on a federal right*, the Eleventh Amendment, in most cases, is not a bar." (emphasis added)); <u>Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.</u>, 467 U.S. 461, 465 n.2 (1984) (holding that a state agricultural act was preempted because it interfered with farmers' "right[s] against economic coercion" provided by federal statute); <u>Edelman v. Jordan</u>, 415 U.S. 651, 673 (1974) (aged, blind, and disabled class suing under Fourteenth Amendment and seeking federal funds to which they claimed entitlement).

granted.  See Shields, 744 F.3d at 640.  Accordingly, in No. 16-1048, we affirm the district court's order and its judgment in Safe Streets Alliance dismissing the Reillys and Safe Streets' preemption claims.

### III. Smith

In Smith, a group of county attorneys and sheriffs from Colorado, Kansas, and Nebraska brought a complaint against Colorado alleging distinct injuries but asserting substantively identical theories why the CSA preempts Amendment 64.[18]  The district court dismissed their claims.  For the reasons just discussed, we likewise affirm.

### *The allegations*

More specifically, the plaintiffs in Smith are Sheriffs Justin E. Smith, Chad Day, Shayne Heap, Ronald B. Bruce, Casey Sheridan, and Frederick D. McKee of Colorado; Sheriff Burton Pianalto of Kansas; Sheriffs Scott DeCoste, John D. Jenson, and Mark L. Overman of Nebraska; County Attorney Charles F. Moser of Kansas; and County Attorney Paul B. Schaub of Nebraska.  The Colorado Sheriffs assert their claims only in their individual capacities, whereas the other plaintiffs all sue in their individual capacities and purportedly on behalf of their respective municipal offices.  We refer to them collectively as the "Law Enforcement Officers."

---

[18] The Law Enforcement Officers also claim that Colorado's actions violate several international agreements, though again without purporting to have any substantive rights under those accords.  See Medellin v. Texas, 552 U.S. 491, 537 n.3 (2008).  We need not discuss those agreements further because the Law Enforcement Officers waived any such claims by failing to brief them here.  See Holmes, 762 F.3d at 1199.

The Colorado Sheriffs claim to have been harmed by the "enactment of Amendment 64" because their "oath[s] of office to uphold the United States Constitution" and the "Colorado Constitution" now "contradict each other."  No. 16-1095, Aplt. App. at 45.  Specifically, where they discover individuals in possession of marijuana—in violation of the CSA but not in violation of Amendment 64—they allegedly must "choose between violating" their oaths to one sovereign or the other.  Id. at 46.  They argue, for example, that they "violate their oath[s] to uphold the" Constitution "when they fail to take steps to enforce the CSA during" those "encounters and instead allow the illegal marijuana to remain in the possession of the holder for use or further distribution."  Id. at 47.

However, they also concede that each of them "is aware that the CSA authorizes him to seize . . . all marijuana he encounters during the course of performing his duties, and to deliver such contraband" to the United States, "thereby both complying with and enforcing the CSA."  Id.  Yet the Colorado Sheriffs claim that if they were to seize that marijuana, they would "be in violation of" their oaths "to uphold the Colorado Constitution," in some unspecified fashion.  Id.  They also allege that doing so would create "legal exposure" for them and their respective counties.  Id. at 48.  Yet they do not point to any feature of the CSA requiring them to seize marijuana they discover.  Nor do they claim that any provision of Amendment 64 requires them to refrain from seizing marijuana, or that any order, policy, practice, or custom operates to similar effect.  Like all of the other Law Enforcement Officers, therefore, the Colorado Sheriffs do not assert—and they certainly have never argued that they are asserting—federal defenses to

enjoin Colorado from *enforcing* Amendment 64 *against them*.[19]

The Kansas and Nebraska Sheriffs assert that when they discover motorists in possession of marijuana, they "frequently learn" that those drivers "purchased the marijuana in Colorado and were at the time of purchase in facial compliance with Amendment 64." Id. at 49.  The Kansas and Nebraska Sheriffs complain of unspecified

---

[19] Of course, a "court may not convict a criminal defendant of violating a state law that federal law prohibits.  Similarly, a court may not hold a civil defendant liable under state law for conduct federal law requires." Armstrong, 135 S. Ct. at 1384 (citations omitted).  "[A]n actor seeking to satisfy both his federal- and state-law *obligations* is not required to cease acting altogether in order to avoid *liability*." Mut. Pharm. Co. v. Bartlett, __ U.S. __, 133 S. Ct. 2466, 2477 (2013) (emphasis added).  Moreover, "if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted." Armstrong, 135 S. Ct. at 1384 (citing Ex parte Young, 209 U.S. at 155–56); see Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 157 (1963).  In such circumstances, a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon, 535 U.S. at 645–46 (citations omitted) (examining a request "that state officials be restrained from enforcing an order" against the plaintiff that was allegedly "in contravention of controlling federal law").

But a person's constitutional defenses to extant or "threatened enforce[ment]" actions, or to regulatory "expos[ure]" or "liability," are all predicated on existing or "threatened action by [the] *government*," not by private actors. MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128–29 (2007) (emphasis added).  It is the official "coercion" at issue (e.g., "putting the challenger to the choice between abandoning his *rights* or risking *prosecution*") that gives rise to such preemption-based *defenses*. Id. at 129 (emphasis added).

None of these doctrines even conceivably applies to the Colorado Sheriffs' claims. See Printz v. United States, 521 U.S. 898, 925–26 (1997) (explaining that the "Oath or Affirmation[] to support this Constitution" required of "state officers," id. at 924 (quoting U.S. Const. art. VI, cl. 3), does not compel those officers to enforce federal statutes).  They do not suggest otherwise: they do not assert that they have a right to enforce the CSA, that they are now required to violate the CSA, or that Colorado is threatening to punish them if they choose to uphold what they perceive to be their oaths to enforce that federal statute.  Like all of the other Law Enforcement Officers, therefore, the Colorado Sheriffs are not attempting to raise preemption-based defenses.

injuries to their individual "professional goals" caused by this alleged influx of

"Colorado-sourced marijuana" into their respective counties. <u>Id.</u> at 51.  They also claim

that their respective offices have experienced "a marked increase in the costs" of

incarcerating "suspected and convicted felons" following "arrests" involving "Colorado-

sourced marijuana," and that they now spend much more time on these particular law

enforcement activities. <u>Id.</u> at 49–50.  The Kansas and Nebraska County Attorneys

likewise claim that they have been forced to alter their individual professional aspirations

and their offices' prosecutorial priorities in light of the increased influx of "Colorado-

sourced marijuana" into their respective counties. <u>Id.</u> at 52.

Finally, although the Attorney General has authority "to deputize state and local

law enforcement officers to" enforce the CSA, <u>id.</u> at 24 (citing 21 U.S.C. § 878), none of

the Law Enforcement Officers allege that they have been deputized by the Attorney

General to enforce § 903 against Colorado, or to enforce the CSA in any other respect.

Therefore, designated authority to enforce the CSA does not bear on these claims.

To remedy their specific putative injuries, the Law Enforcement Officers instead

claim to invoke the federal courts' equitable power to enjoin Governor Hickenlooper, in

his official capacity, from enforcing Amendment 64.  To that end, they allege two "causes

of action" against Colorado. <u>Id.</u> at 54 (emphasis and capitalization omitted).  First, they

assert that "Sections 16(3)[–](5) of Amendment 64, taken in whole and in part," are

"drug-legalization and drug-regulation policies" that "legalize and commercialize"

recreational marijuana. <u>Id.</u> at 54–55.  Because those provisions of Amendment 64

allegedly "conflict with" the CSA, the Law Enforcement Officers claim that they "violate

the Supremacy Clause, and are invalid." Id. at 55.  Second, the Law Enforcement

Officers claim "preemption under federal law," and assert that "Sections 16(3)[–](5) of

Amendment 64 are preempted by federal law, including" the CSA.  Id. (emphasis and

capitalization omitted).  They request a "declaratory judgment stating that Sections 16(3),

(4), and (5) of Article XVIII of the Colorado Constitution are invalid, null, and void," and

a "permanent injunction" barring enforcement of these provisions.  Id.

The district court dismissed those claims for substantively the same reasons as it

did the Reillys and Safe Streets' preemption claims.  The Law Enforcement Officers

timely appealed, which is before us as No. 16-1095.  At the parties' request, we

consolidated that appeal with the Reillys and Safe Streets' appeal in No. 16-1048.

## *Analysis*

The Law Enforcement Officers do not allege any specific substantive rights

bestowed on them by the Supremacy Clause or the CSA that they seek to vindicate.  More

specifically, they concede that the Supremacy Clause creates no substantive rights and

"does not give rise to a private right of action," mooting their first purported claim for

relief.  Id. at 95.  And they do not invoke any substantive right found in the CSA, or

elsewhere, that animates their second alleged cause of action.  For example, the allegedly

beleaguered Kansas and Nebraska Sheriffs do not contend that any provision of the CSA

creates or even references a private citizen's labor rights, professional development

"rights," or financial interests, or those of their respective law enforcement offices.

Instead, like the Reillys and Safe Streets, the Law Enforcement Officers seek to

proceed on their claims merely by emphasizing that "an action may proceed in equity

unless Congress implicitly or expressly excludes such an action." Id. at 96 (citation omitted). They have maintained that theme here, asserting that "a party may seek injunctive relief against a state for its failure to abide by federal law unless Congress implicitly or expressly excludes such an action." No. 16-1095, Aplt. Br. at 25. Thus, they claim that "the enforcement of the CSA is not confined to a governing federal agency," even in the absence of delegated authority to enforce that statute. Id. at 33.

<u>Subject matter jurisdiction</u>

We again face a threshold question of subject matter jurisdiction. See Ruiz, 536 U.S. at 628; Shepherd, 678 F.3d at 1180. Like the Reillys and Safe Streets, the Law Enforcement Officers pled that they have federal causes of action in equity to enforce the CSA, though they also do not claim to be vindicating any substantive rights enumerated in that federal statute. As discussed above, the viability of these claims turns, in part, on a determination of the scope of the Article III courts' equitable power to grant injunctive relief, a question the district court had jurisdiction to answer under § 1331. See Nat'l Farmers Union, 471 U.S. at 850. Relatedly, moreover, the Law Enforcement Officers' "right to relief necessarily depends on resolution of a substantial question of federal law," a question properly addressed by the district court in Smith as within its subject matter jurisdiction under § 1331. Franchise Tax Bd., 463 U.S. at 13; see Bolivarian Rep. of Venez., 137 S. Ct. at 1322; Gunn, 133 S. Ct. at 1065; Empire Healthchoice, 547 U.S. at 697; Grable, 545 U.S. at 314; see also Steel Co., 523 U.S. at 89. In No. 16-1095, therefore, we also have jurisdiction of the Smith appeal. 28 U.S.C. § 1291.

<u>The Law Enforcement Officers' claims fail as a matter of law</u>

Like the Reillys and Safe Streets, the Law Enforcement Officers advance

purported causes of action in equity to enforce the CSA's preemptive effects, but in the

absence of any claimed injury to their federal substantive rights.  "On the merits," the

Law Enforcement Officers' "case raises the same question" that we have already

answered in the negative in <u>Safe Streets Alliance</u>: A private plaintiff has no substantive

rights under, and cannot enforce, § 903.  <u>Norton v. Mathews</u>, 427 U.S. 524, 525 (1976).

The "outcome of" the Law Enforcement Officers' case is thus "foreordained by" our

dismissal of the Reillys' claims in this consolidated appeal.  <u>Steel Co.</u>, 523 U.S. at 98

(explaining that <u>Norton</u> "involv[ed] a merits issue dispositively resolved in a companion

case"); <u>see</u> <u>Horne v. Flores</u>, 557 U.S. 433, 438, 445 (2009) (similarly resolving

"consolidated cases," <u>id.</u> at 438, where "at least one" plaintiff in one of the appeals raising

the same question "ha[d] 'alleged such a personal stake in the outcome of the controversy

as to warrant his invocation of federal-court jurisdiction,'" <u>id.</u> at 445 (citation omitted));

<u>Bowsher v. Synar</u>, 478 U.S. 714, 717–21 (1986) (same).

Accordingly, in No. 16-1095, we affirm the district court's order and its judgment

dismissing the <u>Smith</u> case on the merits and with prejudice.  <u>See</u> <u>Mont.-D. Utils. Co. v.

Nw. Pub. Serv. Co.</u>, 341 U.S. 246, 249 (1951) ("Even a patently frivolous complaint

might be sufficient to confer power to make a final decision that it is of that nature,

binding as res judicata on the parties.").

## IV. Nebraska and Oklahoma

One final wrinkle developed after these cases came before us.  At the same time that the underlying actions were proceeding in the district court, Nebraska and Oklahoma filed an original complaint against Colorado in the Supreme Court of the United States, pursuant to the Court's "original and exclusive jurisdiction of all controversies between two or more States."  28 U.S.C. § 1251(a).  There, Nebraska and Oklahoma conceded that "[t]he Court's jurisdiction" over their "case is exclusive," and the Supreme Court "is the sole forum in which Nebraska and Oklahoma may enforce their rights" against Colorado "under the Supremacy Clause . . . ."  Complaint at 1, Nebraska v. Colorado, __ U.S. __, 136 S. Ct. 1034 (2016) (No. 144, Original), 2014 WL 7474136, at *1.

Like the private plaintiffs here, Nebraska and Oklahoma attempted to enjoin enforcement of Subsections 4 and 5 of Amendment 64.  The States claimed those enactments conflict with the CSA and are therefore preempted by operation of the Supremacy Clause and § 903.  The scope of relief they requested was thus narrower but overlapping with that demanded in the instant cases.  Yet the theories by which the States sought to force Colorado to comply with the CSA were of a distinct order, premised on their alleged rights as separate sovereigns in our federal system.  They claimed to be empowered to enforce federal law both for their own benefit, as sovereigns, and for the good of their citizens, in the States' quasi-sovereign capacities as *parens patriae*.

The Supreme Court exercised *its* discretion to decline to hear such inter-state actions and consequently denied Nebraska and Oklahoma's motion for leave to file their complaint.  Nebraska, 136 S. Ct. at 1034.  Justice Thomas dissented, urging the Court to

revisit its precedent holding that it has discretion to *decline* to hear cases and controversies over which Article III and § 1251(a) vest it with original and *exclusive* jurisdiction. <u>Id.</u> at 1034–36 (Thomas, J., dissenting).  In doing so, Justice Thomas also remarked (presciently, as it turns out) that "Federal law is unambiguous: If there is a controversy between two States, this Court—and only this Court—has jurisdiction over it." <u>Id.</u> at 1034.  "If this Court does not exercise jurisdiction over a *controversy* between two States," Justice Thomas cautioned, "then the complaining State has *no judicial forum* in which to seek relief."  <u>Id.</u> at 1035 (emphasis added) (citation omitted).

### *The allegations*

Justice Thomas' warning and Nebraska and Oklahoma's own prior concessions apparently were soon forgotten.  The States next moved to intervene on appeal in <u>Safe Streets Alliance</u> and <u>Smith</u>, urging us to exercise jurisdiction over their controversy with Colorado stemming from its implementation of Amendment 64.  More specifically, they sought to intervene as of right under Federal Rule of Civil Procedure 24(a), and claimed to meet the additional burdens we have said a party must shoulder to intervene on appeal.

Nebraska and Oklahoma then recapitulated their previous concession that "[t]he Supreme Court is the only court with jurisdiction to hear suits of the sort brought by" them.  Mot. to Intervene by States of Neb. & Okla. at 3.  The "result," they claimed, is "that there is no court with jurisdiction to hear Nebraska and Oklahoma's suit directly against the State of Colorado."  <u>Id.</u>  Yet the States pointed to no statute, rule, or precedent preventing them from refiling their original complaint in the Supreme Court, pursuant to § 1251(a).  We also have found none.

As to the controversy now before us, Nebraska and Oklahoma framed their interests as protective of their rights to "[a]n action" or "suit for declaratory and injunctive relief against the Colorado officials responsible for executing the challenged Colorado laws"—i.e., Amendment 64. Id.  They suggested that they should be permitted to intervene in the appeals because if they were "to initiate such a suit in district court" on their own, we might "have in the interim decided the critical issue of whether there is a cause of action to challenge Colorado's marijuana laws as preempted by the CSA," and in their absence. Id.  In doing so, however, Nebraska and Oklahoma ignored glaring distinctions between their putative causes of action—which are premised on their status as sovereigns—and the private citizens' claims in Safe Streets Alliance and Smith.

Nebraska and Oklahoma next purported to circumvent § 1251(a)'s unambiguous command that this court is forbidden from exercising jurisdiction over their claims by framing their challenge to Amendment 64 as a controversy over Governor Hickenlooper's enforcement of it.  Yet Nebraska and Oklahoma repeatedly stated that the grievances they brought before us and claims they plan to file are exactly the same as those they asserted directly against Colorado in the Supreme Court.  That concession is integral, for example, to their argument that their intervention on appeal is timely.  What they are seeking to challenge is also undisputed: Colorado's authority to enforce its Constitution, laws, and regulations.  Moreover, even as Nebraska and Oklahoma obliquely avoided stating that their *claims* are against their sister sovereign, nowhere in their motions did they purport to deny that their *controversy* is with Colorado, and thus barred here by § 1251(a).

To assure ourselves that we lack jurisdiction to hear Nebraska and Oklahoma's

dispute, we allowed the States to fully ventilate their novel jurisdictional theory in briefing.  The States additionally requested to participate in oral argument.  To accommodate the States' request despite their then neither being appellants, appellees, nor amici curiae, we granted the motion to intervene in No. 16-1048, which permitted them to participate in oral argument.  See Fed. R. App. P. 27(e), 29(a)(8), 34; 10th Cir. R. 34.1(F).

Nebraska and Oklahoma have now said all that they wish to say on the subject of our jurisdiction over their grievances with Amendment 64.  We now must decide whether § 1251(a) bars us from hearing their controversy.  If so, that determination necessarily forbids their continued intervention.  They cannot shoulder their burden under Rule 24(a) if we are barred from determining that they have *any* viable interests adverse to Colorado, nor can they meet the requirements to intervene on appeal.  Moreover, the distinct nature of Nebraska and Oklahoma's putative sovereign causes of action means that we must address these issues separately from our disposition of the private plaintiffs' claims.

### *Analysis*

Nebraska and Oklahoma seek to intervene to protect their avowed interests in enjoining the enforcement of Amendment 64 as allegedly preempted by the CSA.  The States thus come before us positioned analogously to intervening defendants in a declaratory judgment action—requesting to enter the Article III courts for the purposes of defending an interest in an underlying controversy in which they are the plaintiffs.  In turn, the underlying declaratory and injunctive relief the States seek to obtain largely mirrors—though is not as extensive as—the relief that the private plaintiffs demanded.

Yet "States are not normal litigants for the purposes of invoking federal jurisdiction." Massachusetts, 549 U.S. at 518. Here, for example, the theories on which Nebraska and Oklahoma purport to have causes of action arise from their unique powers as sovereigns. See, e.g., Michigan v. Bay Mills Indian Cmty., __ U.S. __, 134 S. Ct. 2024, 2031 (2014) (explaining that "each State at the Constitutional Convention surrendered its immunity from suit by sister States"). The States' alleged injuries also derive from their professed commitments to their citizens as *parens patriae*, as well as various rights they claim to have as sovereigns, including, they aver, to force Colorado to comply with the CSA. See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601–02 (1982) (discussing the States' sovereign, proprietary, and private interests, and their interests as *parens patriae*).

Our disposition of the private citizens' preemption claims therefore does not—indeed, *could not*—affect Nebraska or Oklahoma's putative sovereign claims, their sole stated interests supporting intervention on appeal here. See Mississippi v. Louisiana, 506 U.S. 73, 78 (1992) (explaining that "[t]he States, of course, are not bound by any decision as to the boundary between them which was rendered in a lawsuit between private litigants" (citing Durfee v. Duke, 375 U.S. 106, 115 (1963)). But that also means our conclusion here that the private citizens' preemption claims fail neither resolves nor moots whether Nebraska and Oklahoma actually have such interests.[20]

---

[20] The Concurrence states that it "need not address the jurisdictional issue" because, in its view, Nebraska and Oklahoma's "claims fall with those of the" private plaintiffs. Concurrence at 11. To the contrary, however, these unique claims premised on alleged

(continued...)

All of the officers' conduct with which Nebraska and Oklahoma take issue is allegedly in compliance with and in furtherance of Colorado law.  See Pennhurst II, 465 U.S. at 101 n.11 (holding that "a state officer may be said to act *ultra vires* only when he acts 'without any authority whatever'" (citations omitted)).  This confirms both that the States' putative claims are against Colorado and that their alleged interests here are in supposed vindication of those claims.  That conclusion is buttressed by Nebraska and Oklahoma's grievances aimed at *Governor* Hickenlooper's enforcement of Amendment 64.  "[W]here the chief magistrate of a state is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character," the Supreme Court has long held that "the state itself may be considered as a party on the record."  Governor of Ga. v. Madrazo, 26 U.S. 110, 123–24 (1828).

Further, Nebraska and Oklahoma are mistaken that limiting their putative sovereign claims to demands for prospective injunctive relief obtains a different result.  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," which "is no different from a suit against the State itself."  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citations omitted).  "And the same must be said of a directive to an official in his or her official capacity."  Printz v. United States, 521 U.S. 898, 931 (1997).

---

(...continued)
sovereign rights are not addressed in our discussion of the private citizens' claims and must therefore be addressed separately.

The States invoke the caveat that "official-capacity actions for prospective relief are not *treated as* actions against the State" for the purposes of sovereign immunity. Kentucky v. Graham, 473 U.S. 159, 170 n.14 (1985) (emphasis added) (citing Ex parte Young, 209 U.S. 123). But that "fiction" is inapplicable to the States' charges. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 270 (1997). For in no event could their allegations implicate sovereign immunity, because "the Constitution did not reflect an agreement between the States to respect the sovereign immunity of one another," which is typified here by the States' proceedings directly against Colorado on these same claims in the Supreme Court. Alden v. Maine, 527 U.S. 706, 738 (1999). Thus, our order granting Nebraska and Oklahoma's motion to intervene in No. 16-1048 held that the States were protecting an interest *adverse to* Colorado.

We also note that Rule 24(a)'s provisions cannot remove the Article III hurdle that anyone faces when voluntarily seeking to enter a federal court, see Wittman v. Personhuballah, __ U.S. __, 136 S. Ct. 1732, 1735–37 (2016), a proposition confirmed by the title of the Rule itself: "Intervention of Right." Fed. R. Civ. P. 24(a). The Supreme Court has held, moreover, that Article III's requirements apply to *all* intervenors, whether they intervene to assert a claim or defend an interest. See Wittman, 136 S. Ct. at 1735–37; Hollingsworth v. Perry, __ U.S. __, 133 S. Ct. 2652, 2659–65 (2013) (holding that "any person invoking the power of a federal court must demonstrate standing to do so," id. at 2661, and that a prerequisite to "intervene[] to defend" one's interest is, *inter alia*, "assert[ing] an injury in fact of [one's] own," id. at 2664), abrogating in part San Juan Cty. v. United States, 503 F.3d 1163, 1172 (10th Cir. 2007) (en banc) (which had

stated "that parties seeking to intervene under Rule 24(a) or (b) need not establish Article III standing so long as another party with constitutional standing on the same side as the intervenor remains in the case," but tacitly acknowledged the intervenors had standing).

Consequently, even though the private litigants' preemption claims fail, our still-extant order granting Nebraska and Oklahoma's motion to intervene in <u>Safe Streets Alliance</u> necessarily implies that, at minimum, the States have some concrete, particularized, and redressable claim against Colorado, in turn permitting their intervention in *this court* to defend that interest.  We have given the States exceptional leeway to advance counterarguments to this unavoidable conclusion.  But the only authority the States point to is wholly unavailing.  For the reasons stated in then-Judge Sotomayor's dissent, we reject <u>Connecticut v. Cahill</u>'s unsupported declaration that the lower federal courts are vested with jurisdiction over inter-state disputes naming State officers as defendants.  217 F.3d 93, 105–12 (2d Cir. 2000) (Sotomayor, J., dissenting).  We therefore conclude that Nebraska and Oklahoma's controversy is against Colorado.

However, Section 1251(a) of Title 28 of the United States Code states: "The Supreme Court shall have original and exclusive jurisdiction of all controversies between two or more States."  The Court has held that the "plain meaning" of that "uncompromising language . . . necessarily denies jurisdiction of such cases to any other federal court," regardless of the consequences to a State's claims.  <u>Mississippi</u>, 506 U.S. at 77–78.  Section 1251(a) forbids us from deciding whether Nebraska or Oklahoma have any injuries from, claims against, or controversies with Colorado, which is what our extant order necessarily does.  Therefore, in No. 16-1048, we vacate the order granting

Nebraska and Oklahoma's motion to intervene in <u>Safe Streets Alliance</u>.  Further, and for the same reason, we deny the States' motions to intervene in Nos. 16-1048 and 16-1095.

## V. Conclusions

The parties dispute whether Amendment 64 is preempted by the CSA.  Our conclusions regarding the preemption claims do not require us to reach that question.  We therefore do not decide whether the CSA preempts any aspect of Amendment 64, or Colorado and Pueblo County's laws or regulations.

Rather, in No. 16-1266, the district court's order and its judgment dismissing Counts I through VI of the Second Amended Complaint in <u>Safe Streets Alliance</u> are AFFIRMED in part and REVERSED in part as follows:

- The dismissal of the Reillys' RICO claims against the Marijuana Growers premised on one (or more) of the three types of injuries to the Reillys' property that were plausibly pled is REVERSED, and those claims are reinstated.

- The dismissal of the Reillys' RICO claims against the Marijuana Growers premised on any other injury is AFFIRMED.

- The dismissal of Safe Streets' RICO claims and of the Reillys' RICO claims against every other defendant is AFFIRMED.

In No. 16-1048, the district court's order and its judgment dismissing with prejudice the Reillys and Safe Streets' preemption claims, Counts VII and VIII of the First Amended Complaint in <u>Safe Streets Alliance</u>, are AFFIRMED.

In No. 16-1095, the district court's order dismissing with prejudice the Law Enforcement Officers' claims and its judgment in <u>Smith</u> are AFFIRMED.

Our order granting Nebraska and Oklahoma's motion in No. 16-1048 to intervene

in <u>Safe Streets Alliance</u> is VACATED.  Nebraska and Oklahoma's motions to intervene

in Nos. 16-1048 and 16-1095 are DENIED.

Finally, therefore, Counts I through VI of the Second Amended Complaint in <u>Safe</u>

<u>Streets Alliance</u> are REMANDED for further proceedings consistent with this opinion.

16-1048, *Safe Streets, et al. v. Alternative Holistic*

**HARTZ,** Circuit Judge, concurring:

I join the disposition and discussion of the RICO claims on pages 10–35 of the panel opinion.  It is my hope, however, that the Supreme Court will one day cast aside the confusing and discredited notion of proximate cause.  A much sounder approach to addressing the same issues can be found in the discussions of factual cause and scope of liability in Chapters 5 and 6 of Restatement (Third) of Torts: Liability for Physical and Emotional Harm (2010).

Although I also agree with the panel majority to affirm the denial of injunctive relief, my reasoning is different.

First, I explain why I cannot join the majority's approach.  The majority declares that even if state and local law is preempted by the Controlled Substances Act (CSA), the plaintiffs cannot seek injunctive relief against those laws under the federal courts' equity powers because neither the CSA nor any other federal law bestows on them a substantive private right.  *See* Maj. Op. at 49–61.  To determine whether a statute creates a private right, the majority adopts the same test used by the Supreme Court in determining whether to recognize an implied cause of action under the statute and whether the statute creates a private right necessary for a cause of action under 42 U.S.C. § 1983.  *See id.* at 56 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (federally created right necessary for implied private right of action) and *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002) (federally created right necessary for claim under § 1983)).  For this proposition the majority relies largely on the Supreme Court's recent decision in

*Armstrong v. Exceptional Child Center, Inc.*, 135 S.Ct. 1378 (2015).  *See* Maj. Op. at 49–
58.

In my view, however, *Armstrong* provides no support for the majority's
requirement of a private right created by federal law.  The Court's opinion never states
that there is such a requirement.  And if *Armstrong* itself or any earlier Supreme Court
precedent had imposed that requirement, both the Court's opinion in *Armstrong* and
Justice Sotomayor's dissent would have been written very differently.  The following
discussion of *Armstrong* is lengthy, but I think it shows that the opinions in that case,
rather than adopting a substantive-right requirement, demonstrate its absence.

In *Armstrong* the Supreme Court considered the mandate in § 30(A) of the
Medicaid Act that each State's Medicaid plan "provide such methods and procedures
relating to . . . the payment for . . . care and services . . . as may be necessary . . . to assure
that payments . . . are sufficient to enlist enough providers so that care and services are
available under the plan at least to the extent that such care and services are available to
the general population in the geographic area . . . ."  42 U.S.C. § 1396a(a)(30)(A).
Health-care providers in Idaho contended that the State's plan violated § 30(A) by setting
inadequate reimbursement rates.  To put the issue in *Armstrong* in context, it is helpful to
review the possible forms of relief that the providers could have tried to pursue.

The only remedy explicitly set forth in the Medicaid statute permits the Secretary
of Health and Human Services to withhold Medicaid funds from the State.  *See* 42 U.S.C.
§ 1396c.  Providers seeking more generous payments could try to persuade the Secretary
to exercise that authority, but the Secretary's decision not to take such a step could be

2

successfully challenged in court under the Administrative Procedure Act (APA) "only

when the denial of enforcement [was] 'arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A)." *Pharm. Research &*

*Mfrs. of Am., v. Walsh*, 538 U.S. 644, 675 (Scalia, J., concurring).

   Another possible remedy would be to bring a civil-rights claim against state

officials.  Under the federal civil-rights statute, state officials could be liable to the

providers if they deprived the providers "of any rights, privileges, or immunities secured

by the [federal] Constitution and laws."  42 U.S.C. § 1983.  Relief could be obtained

through "an action at law, suit in equity, or other proper proceeding for redress."  *Id*.

Actions at law under § 1983 typically provide an injured party with damages, so the

providers could sue for payments that should have been made if federal law had been

followed.  But relief under § 1983 is available only if the injured party was deprived of

some personal "right," not just a benefit, conferred by federal law.  *See Gonzaga*, 536

U.S. at 283.  Only "an unambiguously conferred right [can] support a cause of action

brought under § 1983."  *Id*.  "For a statute to create such private rights, its text must be

phrased in terms of the persons benefited."  *Id*. at 284.

   A similar remedy would be a suit under a private right of action implied from a

particular statute.  Damages would also be a potential remedy under such a cause of

action.  But this cause of action, like one under § 1983, is available only if "Congress

*intended* to create a federal right."  *Id.* at 283.

   None of these three potential remedies (a suit under the APA against the Secretary,

a suit under § 1983, or a private right of action implied under the Medicaid Act) was at

issue in *Armstrong*.  Rather, the Idaho providers sought only to enjoin state officials to

increase those rates prospectively.  *See* 135 S.Ct. at 1382.  Of course, the providers might

have obtained much greater relief (damages for payments that should have been made in

the past had reimbursement rates been set in compliance with § 30(A)) if they had

proceeded under § 1983 or an implied statutory cause of action.  But they had no choice,

because (as will be further discussed below) the Medicaid Act does not contain the

necessary rights-creating language and hence had not conferred on them an individual

right.  All that remained was a possible equitable preemption action, which would not

require rights-creating statutory language.  As explained in Justice Sotomayor's dissent:

> [E]quitable preemption actions differ from suits brought by plaintiffs
> invoking 42 U.S.C. § 1983 or an implied right of action to enforce a federal
> statute.  Suits for redress designed to halt or prevent the constitutional
> violation rather than the award of money damages seek traditional forms of
> relief.  By contrast, *a plaintiff invoking § 1983 or an implied statutory
> cause of action* may seek a variety of remedies—including damages—from
> a potentially broad range of parties.  Rather than simply pointing to
> background equitable principles authorizing the action that Congress
> presumably has not overridden, such a plaintiff *must demonstrate specific
> congressional intent to* create *a statutory right to these remedies*.  For these
> reasons, *the principles that we have developed to determine whether a
> statute creates an implied right of action, or is enforceable through § 1983,
> are not transferable to [this] context.*

A*rmstrong*, 135 S.Ct. at 1392 (Sotomayor, J., dissenting) (citations and internal quotation

marks omitted) (emphasis added).

Although the Supreme Court majority denied the providers' claim, it did not

quarrel with this summary by Justice Sotomayor.  Much of the Supreme Court's opinion

was devoted to rejecting the argument that the Constitution's Supremacy Clause gave the

providers a cause of action to enjoin the imposition of state law on the ground that it was

contrary to federal law. *See id.* at 1383–84; *see also Planned Parenthood v. Moser*, 747 F.3d 814, 822–38 (10th Cir. 2014) (rejecting the same argument). The Court then turned to the providers' "contention that, quite apart from any cause of action conferred by the Supremacy Clause, [their] suit can proceed against Idaho in equity." 135 S.Ct. at 1385. Noting that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," the Court proceeded to conclude that "[t]wo aspects of § 30(A) establish Congress's intent to foreclose equitable relief." *Id.* (internal quotation marks omitted). First, it said that the statutory provision of a different remedy for a State's failure to comply with Medicaid requirements (the Secretary can withhold Medicaid funds from the State) suggested that Congress intended to preclude other remedies. *See id.* Second, it thought that the text of § 30(A) provided a "judicially unadministrable" standard. *Id.* at 1394. "Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone," said the Court, "establishes, we think, that Congress wanted to make the agency remedy that it provided exclusive." *Id.* at 1385 (internal quotation marks omitted). The Court concluded, "The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, . . . shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts." *Id.*

The panel opinion describes *Armstrong* somewhat differently. It states that the Supreme Court first "discerned what alleged substantive rights the plaintiffs were seeking to vindicate," and observed that the health-care providers were seeking "to vindicate their averred *federal property rights* to . . . funds [reimbursing them for habilitation services],

5

rights allegedly bestowed on them *by § 30(A).*"  Maj. Op. at 50.  But I can find no

language in *Armstrong* stating that the Court should "first" (or ever, when examining the

federal courts' equity power) concern itself with whether the party seeking injunctive

relief alleged any federal substantive right.  Nor did the opinion ever say that the

providers possessed or even asserted such a right.  According to the panel opinion, the

Supreme Court was engaged in this "first step" in its analysis when it noted that the

plaintiffs were health-care providers "who 'claim[ed] that Idaho violates § 30(A)' of

Medicaid 'by reimbursing [them] at rates lower than § 30(A) permits.'"  *Id*. (quoting

*Armstron*g, 135 S.Ct. at 1382) (brackets in the panel opinion).  But the language quoted

from *Armstrong* was in the fourth paragraph of that opinion, merely setting forth the

factual background before beginning any analysis.  And nothing suggests that the Court

thought that the health-care providers were making the frivolous argument that § 30(A),

which provided the prospect of greater *benefits* for the providers, conferred any *rights* on

them.

Indeed, Justice Scalia, whose opinion was the opinion for the majority of the Court

on the issues I have already discussed, said just the opposite in a portion of his opinion

joined by three other Justices (Justice Breyer, who otherwise joined Justice Scalia's

opinion, did not join this portion of the opinion).  He pointed out that the health-care

providers did not—and could not—claim that they had a statutorily created *right*:

> The last possible source of a cause of action for [the providers, once the
> Supremacy Clause and equity had been rejected as possible sources,] is the
> Medicaid Act itself.  They do not claim that, and rightly so.  *Section 30(A)*
> *lacks the sort of rights-creating language needed to imply a private right of*
> *action.  Sandoval*, [532 U.S.] at 286–287.  It is phrased as a directive to the

> federal agency charged with approving state Medicaid plans, not as a
> conferral of the right to sue upon the beneficiaries of the State's decision to
> participate in Medicaid.  The Act says that the "Secretary shall approve any
> plan which fulfills the conditions specified in subsection (a)," the
> subsection that includes § 30(A).  42 U.S.C. § 1396a(b).  We have held that
> such language "reveals no congressional intent to create a private right of
> action."  *Sandoval, supra* at 289.

135 S.Ct. at 1387 (plurality opinion of J. Scalia) (emphasis added).  The same point is

conveyed, albeit a bit obscurely, in the portion of Justice Scalia's opinion that received

support from the majority of the Court:

> [The providers] do not claim that *Wilder* [*v. Virginia Hospital Assn.*, 496
> U.S. 498 (1990)] establishes precedent for a private cause of action in this
> case.  They do not assert a § 1983 action, since our later opinions plainly
> repudiate the ready implication of a § 1983 action that *Wilder* exemplified.
> *See Gonzaga Univ.  v. Doe*, 536 U.S. 273, 283 (2002) (expressly "rejecting
> the notion," implicit in *Wilder*, "that our cases permit anything short of an
> unambiguously conferred right to support a cause of action brought under
> § 1983").

135 S.Ct. at 1386 n.*(brackets omitted).  I read this footnote as stating that the providers

did not claim a cause of action under § 1983 because they recognized (as they had to) that

such a claim must be based on a federally conferred right.

No Justice expressed any doubt about these statements in Justice Scalia's opinion.

In particular, as previously noted, Justice Sotomayor's dissent on behalf of four Justices

(who would have granted injunctive relief) did not dispute that the providers lacked a

statutorily created private right.  Rather, assuming that this was common ground with the

majority, it explicitly distinguished "equitable preemption actions from suits brought by

plaintiffs invoking 42 U.S.C. § 1983 or an implied right of action to enforce a federal

statute," on the ground that relief under "background equitable principles" is proper even when Congress did not create a statutory right. *Id.* at 1392 (Sotomayor, J., dissenting).

Moreover, if, as the panel opinion asserts, *Armstrong* was following long-standing Supreme Court precedent requiring a statutorily created right, I cannot imagine why the Justices wrote their opinions as they did. No Justice contended that the providers possessed a statutorily created right. Why, then, go through all the rigmarole? At the least, some Justice could be expected to explain why no one simply stopped the analysis after noting that the providers did not claim to have a statutorily created right. In particular, if the dissenters believed that the precedents relied on in the panel opinion required a statutorily created private right to bring an equitable preemption action, surely they would have tried to explain why they thought the providers had a statutorily created right or at least reconcile their disregard of that requirement with those precedents.[1]

Perhaps the Supreme Court one day will impose the same requirement that the majority in this case would impose before a party can obtain equitable injunctive relief on the ground that a state law is preempted by federal law. But that is not the law today.

Nevertheless, I agree with the majority that the plaintiffs are not entitled to an injunction against the Colorado statute.

The plaintiffs and intervenors argue that the licensing schemes of Colorado and Pueblo County must be enjoined because their facilitation and promotion of sales of

---

[1] Because the opinions in *Armstrong* make it clear that current Supreme Court doctrine does not require the plaintiff to have a federally created substantive right in order to bring an equitable preemption action, I think it unnecessary to review the errors in the panel opinion's analysis of earlier Supreme Court opinions.

marijuana are preempted by the Controlled Substances Act (CSA). That argument must be examined, however, in light of the Constitution's anticommandeering principle established in *Printz v. United States*, 521 U.S. 898, 935 (1997), and *New York v. United States,* 505 U.S. 144, 188 (1992). Under that principle, Congress may not "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *New York*, 505 U.S. at 161 (brackets omitted). The Supreme Court in *New York* considered a challenge to a federal statute dictating state regulation of the disposal of low-level radioactive waste. *See id*. at 149–54. It recognized that "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *Id*. at 166. The Court concluded that a portion of the federal statute was unconstitutional because "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id*. The anticommandeering principle was reaffirmed in *Printz*, which concerned a federal statute requiring local law enforcement to conduct background checks on prospective handgun purchasers. *See* 521 U.S. at 902. The Court held that "Congress cannot circumvent [the prohibition of *New York*] by conscripting the State's officers directly." *Id.* at 935. In other words, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.*

The plaintiffs concede, as they must, that under the anticommandeering principle the federal government cannot compel a State to enforce the CSA, much less to pass laws

prohibiting the same conduct prohibited by the CSA.  What if a State decides to control a

drug, but not as forcefully as the CSA?  At what point would the lack of "full

enforcement" constitute encouragement or promotion of federal crimes?  Say state law

imposes only civil penalties, not criminal ones.  One could argue that such legislation

"encourages" the use of the drug because those in the state can be confident that they will

not be subject to any criminal sanctions—the State will not impose them and the limited

resources of the federal government make it highly unlikely that it would prosecute.

What if the State decides to prohibit only the sorts of distribution of the drug that it

considers most damaging to society?  It could, for instance, prohibit only distribution of

the drug for profit.  Or it could prohibit sales by anyone other than heavily regulated

entities whose owners and managers are subject to stringent background checks to make

sure that they have no ties to smugglers, organized crime, etc.  Such a law could be said

to promote or encourage use of the drug, but only if the State's legal regime were to be

compared to a regime that criminally prohibits all sales of the drug.  Federal law,

however, cannot compel the State to criminally prohibit any sales whatsoever, *see New*

*York*, 505 U.S. at 166, so it would be improper for us to compare the State's legal regime

to such a baseline and conclude that the State's regime unlawfully promotes or

encourages violations of the CSA.

This is not to say, however, that whatever Colorado law is, it could not be

preempted by the CSA.  The anticommandeering principle does not preclude the federal

government from prohibiting States from enacting legislation.  *See NCAA v. Governor of*

*N.J.*, 832 F.3d 389, 398–402 (3d Cir. 2016) (federal statute prohibiting licensing of sports

10

betting).  Some specific provisions of Colorado law may be preempted.  The Colorado

Supreme Court has already held that the CSA preempts a provision requiring "law

enforcement officers to return medical marijuana seized from an individual later

acquitted of a state drug charge."  *People v. Crouse*, 388 P.3d 39, 40 (Colo. 2017).  Or

perhaps state advertising could constitute aiding and abetting violations of the CSA.  The

plaintiffs may have a good claim for injunctive relief against actions by Colorado that

command or exhort violations of the CSA.  But they are seeking to throw out the entire

statutory scheme—without offering any guidance on how a court should draw the line

between violating the CSA and simply failing to enforce it.  Their complaint does not

allege facts showing that they are entitled to the injunctive relief they seek.[2]

Finally, the panel opinion addresses the court's jurisdiction to hear the claims by

the States of Nebraska and Oklahoma as intervenors.  But because the merits of their

claims fall with those of the plaintiffs, I need not address the jurisdictional issue.  *See*

*Carolina Cas. Ins. Co. v. Pinnacol Assur.*, 425 F.3d 921, 927–28 (10th Cir. 2005) (court

need not address constitutional standing of one plaintiff when the merits of an identical

---

[2] I note that the amicus brief of Law Professors in Support of the Respondent State of Colorado and Affirmance suggests that the U.S. Department of Justice (DOJ) has the exclusive authority to initiate preemption challenges under the CSA.  I express no view on the propriety of an injunction sought by the DOJ.  That prospect seems remote, however, since the DOJ could almost certainly accomplish as much by notifying the State that it planned to commence criminal prosecutions of licensed dealers in Colorado unless the State modified its licensing regime or other practices.  *Cf.* James M. Cole, Memorandum for all U.S. Att'ys, Guidance Regarding Marijuana Enforcement (August 29, 2013) (conditioning the DOJ's nonenforcement policy on the "expectation that states and local governments . . . will implement strong and effective regulatory and enforcement systems").

claim have already been resolved against another plaintiff with standing); *Ctr. For Reprod. Law & Policy v. Bush*, 304 F.3d 183, 193–95 (2d Cir. 2002) (Sotomayor, J.).

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

June 07, 2017

Chris Wolpert
Chief Deputy Clerk

Mr. Brian W. Barnes
Mr. Charles Justin Cooper
Mr. Howard C. Nielson Jr.
Mr. Peter A. Patterson
Mr. David H. Thompson
Cooper & Kirk
1523 New Hampshire Avenue, NW
Washington, DC 20036

Ms. Kristen Marie Baylis
Jackson Lewis
950 17th Street, Suite 2600
Denver, CO 80202

Mr. John J. Commisso
Mr. Paul V. Kelly
Ms. Anne E. Selinger
Jackson Lewis
75 Park Plaza, 4th Floor
Boston, MA 02116

Mr. Mark A. de Bernardo
Jackson Lewis
10701 Parkridge Boulevard, Suite 300
Reston, VA 20191

**RE:   16-1048, 16-1095, 16-1266, Safe Streets, et al v. Alternative Holistic, et al**
        Dist/Ag docket: 1:15-CV-00349-REB-CBS

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:     William Allen
        Scott R. Bauer
        James Nicholas Boeving
        Matthew W. Buck
        Douglas J. Cox
        Jeffrey T. Even
        Robert Ferguson
        Michael Francisco
        Claudia Brett Goldin
        Matthew D. Grove
        Sueanna Park Johnson
        Melanie Lewis
        David A Lopez
        Mithun Mansinghani
        Josh Adam Marks
        Michael Lawrence O'Donnell
        Sean Patrick Paris
        James V. Pearson

Ryan Post
Kathryn A. Reilly
Glenn Roper
Gregory J Styduhar
Bruce Turcott
Frederick Richard Yarger

EAS/na