**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

_____

)
SAFE STREETS ALLIANCE, *et al.*,　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　*Plaintiffs*,　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　v.　　　　　　　　　　　　 )　　　No. 15-349-REB-CBS
　　　　　　　　　　　　　　　　　 )
ALTERNATIVE HOLISTIC　　　　　　 )
HEALING, LLC, *et al.*,　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　*Defendants*.　　　　　　　 )
_____ )

## <u>MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND V</u>

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Phillis Windy Hope Reilly and Michael P. Reilly ("Plaintiffs") move for summary judgment as to Counts I and V.[1] When it was filed, this case sought remedies under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and challenged the legal status of Colorado's marijuana regulatory regime under the Supremacy Clause. This Court dismissed the complaint, Plaintiffs appealed, and the Tenth Circuit reversed in part. *Safe Streets*, 859 F.3d at 881-91. In particular, the Tenth Circuit ruled that Plaintiffs' RICO claims could move forward, and the court's opinion did much to clarify application of RICO to state-licensed marijuana businesses. That opinion describes in detail what Plaintiffs must prove to prevail on each

_____

[1] The remaining counts in the Second Amended Complaint relate to legal theories and previous defendants that Plaintiffs are no longer pursuing. In addition, although Safe Streets Alliance was named as a plaintiff in the complaint, that entity is no longer party to this case because it did not appeal with respect to the only claims that the Tenth Circuit remanded. *See Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 881 n.4 (10th Cir. 2017).

of the elements of their RICO claims. Following remand, Defendants stipulated to or otherwise admitted facts that establish most of the elements the Tenth Circuit articulated. Defendants' admissions, together with the opinion of *Defendants' own expert* that the marijuana facility diminishes the value of Plaintiffs' property, leave no room for a genuine material factual dispute as to Defendants' liability. The Court should enter summary judgment in Plaintiffs' favor and enjoin Defendants' ongoing violations of federal law.[2]

## STATEMENT OF UNDISPUTED FACTS

In 2014, Parker Walton, 6480 Pickney, LLC, and Camp Feel Good, LLC ("Defendants")—together with other individuals and entities who are no longer parties to this case—applied for state and county licenses to cultivate recreational marijuana at 6480 Pickney Road in Pueblo County. *See* App. 2-26. Mr. Walton owns and controls 6480 Pickney, LLC—a Colorado legal entity, which in turn owns the cultivation facility. App. 31 (Scheduling Order Stipulations ¶¶ 1-2); App. 47 (Walton RFA No. 10); App. 161 (Walton RFA Resp. No. 10). The facility has been commercially producing recreational marijuana since early 2016, App. 33 (Scheduling Order Stipulations ¶ 8), and each of the Defendants has participated in the facility's operation and management, *see, e.g.*, App. 55 (CannaCraft Lease); App. 82, 84-85 (Walton Tr. 74:17-19, 76:25-77:4). The facility was

---

[2] Plaintiffs respectfully submit that this motion is timely. The dispositive motions deadline in this case was previously March 9, 2018. Courtroom Minutes/Minute Order (Aug. 22, 2017) [#180]. Thereafter, Defendants filed a motion requesting that the Court "extend[ ] all deadlines in this case out 90 days." Defendant's Renewed Motion to Vacate and Re-Set the Trial and Extend the Deadlines Set Forth in the Scheduling Order, at 6 (Feb. 8, 2018) [#210]. The Court granted Defendants' motion on February 21, 2018 [#213], and the parties have since that time proceeded on the understanding that the Court's order extended the dispositive motions deadline by 90 days—to June 7, 2018.

built for and initially leased to Alternative Holistic Healing, LLC, an entity owned by Mr. Walton's business partners—Joseph and Jason Licata. App. 32 (Scheduling Order Stipulations ¶¶ 3, 5-6); App. 64-65 (Walton Tr. 31:24-32:2). In mid-2016, Alternative Holistic Healing's lease was terminated, and the state and local marijuana cultivation licenses for the facility were transferred to CannaCraft, LLC—another entity Mr. Walton controls. App. 93-95 (CannaCraft Ownership Change Application); App. 55-56 (CannaCraft Lease); App. 59-60 (Walton Tr. 24:22-25:6). Defendants and their business partners agreed from the beginning to work together for the purpose of commercially cultivating marijuana, App. 32 (Scheduling Order Stipulations ¶ 5), and "the cultivation and sale of marijuana is part of Defendants' regular way of doing business," App. 47, 52 (Walton RFA No. 9 & Walton RFA Resp. No. 9). Defendants have used the telephone and email in furtherance of their efforts to commercially cultivate marijuana, App. 33 (Scheduling Order Stipulations ¶ 9), and their customers are retail stores that then sell the drug to individuals, including individuals from other states, App. 78-79 (Walton Tr. 70:1-71:5).

Plaintiffs have the misfortune of owning three contiguous parcels of land that are next to the parcel where Defendants decided to construct their facility. *See* App. 111-15 (Lot 1, 2, and 6 Deeds). Defendants' facility is a mere 40 feet from Lot 1 in the Meadows at Legacy Ranch residential property development, App. 87-89 (Walton Tr. 105:22-107:9), a parcel that Plaintiffs purchased for $35,000 in 2014—before Defendants' plans became public, App. 111 (Lot 1 Deed). Defendants' application for a county license to cultivate marijuana was overwhelmingly opposed by surrounding property owners con-

cerned, among other things, about diminished property values. App. 5-8 (emails submitted to Pueblo County); App. 67-68 (Walton Tr. 34:24-35:14). Defendants' own property appraisal expert testified that the "vast majority of people don't want to be next to a marijuana facility." App. 119 (Hill Tr. 137:17-18). Defendants' property appraisal expert determined that as of February 12, 2018, Lot 1 was only worth $31,000, App. 132 (Hill Expert Report), and he attributed the decline in the value of Plaintiffs' property to Defendants' marijuana cultivation facility, App. 129-30 (Hill Tr. 234:3-235:1).

## ARGUMENT

To prevail under RICO, Plaintiffs must make two types of showings: (1) that the Defendants violated 18 U.S.C. § 1962; and (2) that Plaintiffs were injured as a proximate result. *See* 18 U.S.C. § 1964(c). The undisputed facts establish both requirements.

**I.    There Is No Genuine Factual Dispute as to Whether the Defendants Violated 18 U.S.C. § 1962(c).**

Counts I and V both allege violations of 18 U.S.C. § 1962(c). To establish violations of that provision, Plaintiffs must prove that "the defendants each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Safe Streets*, 859 F.3d at 882 (internal quotation marks omitted). Following the structure of the Tenth Circuit's opinion, Plaintiffs in this motion will address these elements out of order "because it better frames [the] discussion." *Id.*

### A.    Racketeering Activity

"[C]ultivating marijuana for sale . . . is by definition racketeering activity," *Safe Streets*, 859 F.3d at 882, and Defendants stipulated to the fact that "[t]he building located at 6480 Pickney Road is currently operational and is being used to cultivate marijuana."

4

App. 33 (Scheduling Order Stipulation ¶ 8). At his deposition, Mr. Walton disclosed several of the stores where the marijuana cultivated at his facility is sold. App. 77-78 (Walton Tr. 69:12-70:10). Furthermore, the Tenth Circuit observed that Defendants previously "admit[ted] they agreed" to cultivate marijuana for sale. *Safe Streets*, 859 F.3d at 882. There is no genuine dispute about whether Defendants engaged in racketeering activity.

### B. Enterprises

RICO defines "enterprise" to include "any . . . corporation . . . or other legal entity." 18 U.S.C. § 1961(4). Count V treats 6480 Pickney, LLC, as the relevant enterprise. Defendants admitted that 6480 Pickney, LLC, is a Colorado LLC, App. 47, 52 (Walton RFA No. 10 & Walton RFA Resp. No. 10), and the same is clear from that entity's Articles of Organization, App. 149. Accordingly, there is no genuine factual dispute about whether 6480 Pickney, LLC, is a "legal entity" and therefore an "enterprise" under RICO. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001).

RICO's definition of "enterprise" also includes "any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).[3] Count I alleges the existence of an association-in-fact enterprise made up of Mr. Walton, 6480 Pickney, LLC, and

---

[3] The existence of an association-in-fact enterprise is only relevant to the liability of 6480 Pickney, LLC. That is because the only material difference between Counts I and V with respect to the defendants who are still part of this case is that Count I alleges the existence of an association-in-fact enterprise and names 6480 Pickney, LLC as a defendant, while Count V treats 6480 Pickney, LLC as the enterprise. Plaintiffs did not name 6480 Pickney, LLC, as a defendant in Count V because the same entity cannot simultaneously be treated as an "enterprise" and as an "individual" that violated Section 1962. *See Cedric Kushner Promotions*, 533 U.S. at 161. Liability is the same under Count I as it would be under Count V for Mr. Walton. In other words, Plaintiffs can prevail against Mr. Walton under Count V without establishing the existence of an association-in-fact enterprise under Count I. Accordingly, Plaintiffs request that the Court enter summary

Camp Feel Good, LLC, as well as other individuals and entities who have been dismissed from this suit—including Alternative Holistic Healing, LLC, Joseph Licata, and Jason Licata. *See* Second Am. Compl. ¶ 95 (Feb. 1, 2016) [#126]. Proving such an enterprise "requires only 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.' " *Safe Streets*, 859 F.3d at 883 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

Defendants have admitted facts that demonstrate the existence of an association-in-fact enterprise with the purpose of cultivating and selling marijuana. Defendants stipulated to the fact that "[b]efore construction began on the 6480 Pickney Road marijuana cultivation facility, Alternative Holistic Healing, Joseph Licata, Jason Licata, Mr. Walton, 6480 Pickney, and Camp Feel Good all understood and agreed that this property would be used to grow recreational marijuana." App. 32 (Scheduling Order Stipulation ¶ 5). This purpose is further confirmed by application materials Defendants submitted to Colorado and Pueblo County seeking licenses to cultivate recreational marijuana and from Mr. Walton's deposition testimony. App. 9; App. 93-95; App. 63 (Walton Tr. 30:3-11) ("It was my goal to build a marijuana cultivation facility that I was going to lease out to somebody that was interested in cultivating marijuana.").

Defendants also stipulated to or otherwise admitted the existence of relationships sufficient to establish an association-in-fact enterprise. Defendants stipulated that "Alternative Holistic Healing, Joseph Licata, Jason Licata, Mr. Walton, 6480 Pickney, and

---

judgment as to Count V even if it determines that the undisputed facts do not establish the existence of an association-in-fact enterprise for purposes of Count I.

Camp Feel Good agreed to work together to develop the property at 6480 Pickney Road for marijuana cultivation." App. 32 (Scheduling Order Stipulations ¶ 6). Defendants' marijuana license application materials likewise demonstrate these relationships. *See* App. 17-18 (email correspondence in which Mr. Walton obtains verification of available water source to support Alternative Holistic Healing's application); App. 19 (signature from Mr. Walton approving use of property for recreational marijuana cultivation on behalf of 6480 Pickney). And Mr. Walton testified that he "work[ed] with the Licatas when they were applying for a license to cultivate marijuana" on his property. App. 63-64 (Walton Tr. 30:24-31:2). Other evidence demonstrates Camp Feel Good's relationship with the other members of the association-in-fact enterprise. *See* App. 84-85 (Walton Tr. 76:25-77:4) (acknowledging that Camp Feel Good received construction deliveries as part of effort to construct 6480 Pickney marijuana cultivation facility).

The undisputed facts also demonstrate that the association-in-fact enterprise has had sufficient longevity to pursue its purpose of cultivating and selling marijuana. *See Safe Streets*, 859 F.3d at 883 (longevity requirement satisfied at motion to dismiss stage where Plaintiffs alleged that Defendants worked "for over a year" to cultivate and sell marijuana). With Defendants' help, Alternative Holistic Healing obtained its license to cultivate recreational marijuana next to Plaintiffs' property on December 29, 2014. *See* App. 3. Defendants spent months constructing a building for cultivating marijuana next to Plaintiffs' land, App. 74-75 (Walton Tr. 42:18-43:6), and Defendants stipulated to the fact that "[m]arijuana has been continuously cultivated [at 6480 Pickney] since early 2016," App. 33 (Scheduling Order Stipulations ¶ 8).

7

A RICO enterprise must also "affect interstate commerce," *Safe Streets*, 859 F.3d at 883, and this requirement is satisfied with respect to both of the enterprises just described. 6480 Pickney, LLC, and the association-in-fact enterprise are both actively engaged in the business of cultivating and selling marijuana, and the Tenth Circuit has already ruled in this case that "cultivating, distributing, and selling marijuana . . . undisputedly affects interstate commerce." *Id.* at 883; *see Gonzales v. Raich*, 545 U.S. 1, 22 (2005). Furthermore, even if this issue were subject to dispute after the Tenth Circuit's ruling, Mr. Walton testified that the retail marijuana stores to which Defendants sell marijuana would in turn "sell marijuana to someone with an out-of-state ID." App. 78-79 (Walton Tr. 70:1-71:5). Mr. Walton also testified that the marijuana cultivated at 6480 Pickney Road is transported to retail marijuana stores over the interstate highways. App. 80 (Walton Tr. 72:13-19). Defendants also stipulated to the fact that they "have used the telephone and email to take steps in furtherance of their joint efforts to cultivate and sell marijuana," App. 33 (Scheduling Order Stipulations ¶ 9), and "[u]se of an instrumentality of commerce, such as telephone lines," is enough to satisfy RICO's interstate commerce requirement, *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008).

## C.    Conducting the Enterprises' Affairs

Anyone who engages in the "operation or management" of an enterprise "participate[s] . . . in the conduct of [its] affairs" for purposes of 18 U.S.C. § 1962(c). *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "[A] plaintiff can easily satisfy *Reves'* operation and management test by showing that an enterprise member played some part—even a bit part—in conducting the enterprise's affairs." *Safe Streets*, 859 F.3d at 884. The Tenth

Circuit observed that Defendants "admit[ted] that they all agreed to grow marijuana for sale at the facility adjacent to the Reillys' property" and concluded that this fact is sufficient to establish that "each conducted the enterprise's affairs." *Id.*

Furthermore, even if the Tenth Circuit had not already resolved this issue, this element would not be subject to a genuine factual dispute. With respect to Count V, for which 6480 Pickney, LLC, is the enterprise, Defendants admitted that Mr. Walton "has a role in the operation or management of 6480 Pickney, LLC," App. 47, 51 (Walton RFA No. 7 & Walton RFA Resp. No. 7). Defendants also stipulated that Mr. Walton and Camp Feel Good, among others, "agreed to work together to develop the property at 6480 Pickney Road for marijuana cultivation." App. 32 (Scheduling Order Stipulations ¶ 6).

With respect to Count I, which uses an association-in-fact enterprise, Mr. Walton signed a document "as the sole member and manager of 6480 Pickney" stating the entity would "allow use of a RMJ (Retail Marijuana) cultivation facility on [its] property," App. 19. Mr. Walton also signed another document submitted to the State of Colorado describing himself as the "General Manager" of Alternative Holistic Healing when it operated the 6480 Pickney marijuana grow facility, describing his duties as "overseeing grow facility." App. 107; *see also* App. 70-71 (Walton Tr. 37:23-38:6). In addition, Mr. Walton signed a lease on behalf of 6480 Pickney, LLC, authorizing CannaCraft, LLC, to cultivate marijuana at the facility. *See* App. 55-56. Mr. Walton also testified that Camp Feel Good, LLC is "the original real estate company that I used to build out the building," App. 82 (Walton Tr. 74:17-19), and Defendants stipulated that Mr. Walton is the "owner and sole manager" of Camp Feel Good, LLC, App. 31 (Scheduling Order Stipulations ¶ 2). The evidence and

admissions leave no room for a genuine factual dispute as to whether Mr. Walton, 6480 Pickney, LLC, and Camp Feel Good have a role in conducting the association-in-fact enterprise's affairs.

### D.   Pattern

A "pattern" of racketeering activity "may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Safe Streets*, 859 F.3d at 884 (internal quotation marks omitted). During discovery, Defendants admitted "that the cultivation and sale of marijuana is part of Defendants' regular way of doing business." App. 47, 52 (Walton RFA No. 9; Walton RFA Resp. No. 9).

Moreover, a "pattern" of racketeering activity may be established by proving "multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237 (1989). Every felony under the CSA is a RICO predicate offense, 18 U.S.C. § 1961(1)(D); *Safe Streets*, 859 F.3d at 882, and Defendants have acknowledged committing numerous federal drug felonies in their efforts to cultivate and sell marijuana. Defendants stipulated to the fact that "[m]arijuana has been continuously cultivated at [the 6480 Pickney facility] since early 2016"—conduct that violates 21 U.S.C. § 841(a). App. 33 (Scheduling Order Stipulations ¶ 8); *see also* App. 79 (Walton Tr. 71:6-10). Leasing property for the purpose of growing or selling marijuana is a felony under 21 U.S.C. § 856(a)(1), and by lease 6480 Pickney, LLC, currently authorizes use of the facility for commercial cultivation of marijuana. App. 54. Defendants also stipulated to the fact that 6480 Pickney, LLC, previously "leased the property to Alternative Holistic Healing, LLC,

which grows and sells recreational marijuana." App. 32 (Scheduling Order Stipulations ¶ 3). It is a federal drug felony to use the telephone or email to take steps in furtherance of a violation of the CSA, 21 U.S.C. § 843(b), and Defendants stipulated to the fact that they "have used the telephone and email to take steps in furtherance of their joint efforts to cultivate and sell marijuana." App. 33 (Scheduling Order Stipulations ¶ 9). It is also a federal drug felony under 21 U.S.C. § 846 to conspire to violate the federal drug laws, and Defendants stipulated to the fact that they "agreed to work together to develop the property at 6480 Pickney Road for marijuana cultivation." App. 32 (Scheduling Order Stipulations ¶ 6).

## II.   There Is No Genuine Factual Dispute as to Whether Defendants' Racketeering Activity Proximately Injured Plaintiffs' Property.

The Tenth Circuit held that the Second Amended Complaint plausibly alleges the following three types of property injuries: (1) "interference with the Reillys' use and enjoyment of their land caused by the noxious odors emanating from [Defendants'] operation"; (2) "diminution in the land's value presently caused by those odors"; and (3) "diminution in the land's value presently caused by the existence of [Defendants'] publicly disclosed, ongoing criminal enterprise adjacent to the Reillys' land." *Safe Streets*, 859 F.3d at 889. Mr. Walton was able to create a genuine dispute of material fact as to the first and second of these categories by testifying at his deposition (contrary to the findings of Defendants' own experts and lay testimony Plaintiffs would present at trial) that no discernable odor emanates from the 6480 Pickney facility. However, with respect to the third type of injury that the Tenth Circuit identified, there is no genuine factual dispute: Defendants' own appraisal expert testified that Defendants' marijuana cultivation facility diminishes the value

Case 1:15-cv-00349-REB-SKC   Document 219   Filed 06/07/18   USDC Colorado   Page 12 of 21

of Plaintiffs' property, and Defendants produced no contrary evidence.

Defendants' property appraisal expert, Ivor Hill, appraised one of the three parcels of land that Plaintiffs allege Defendants injured. Plaintiffs purchased that parcel (Lot 1) for $35,000 in August 2014—before Defendants publicly disclosed their plans to construct a marijuana cultivation facility 40 feet from the property line. App. 111; *see* App. 87-89 (Walton Tr. 105:22-107:9). In his expert report, Mr. Hill expressed the opinion that the market value of this parcel as of February 12, 2018, was $31,000, but he did not explain why the value of the parcel had declined since the Reillys bought it. *See* App. 132 (Hill Expert Report). When asked about this issue at his deposition, Mr. Hill attributed the decrease in market value to Defendants' operation of the 6480 Pickney marijuana facility:

Q: [D]o you have an opinion about whether the 6480 Pickney Road facility has affected the market value of the Reillys' property?

A: I think it has. Okay? But that is reflecting in the appraised value. They paid – in 2014 they paid $35,000 for this property. . . . Four years later in a rising market . . . we're now only worth 30 or 31, I think I said.

Q: Some of that diminishment is probably attributable to the marijuana facility?

A: Yes. Of course it is. It's reflecting in the sale price. So the value has gone down in a potentially rising market. The market's gone up on average . . . roughly 15 percent. But their property's gone down 10, 11 percent.

App. 129-30 (Hill Tr. 234:3-235:1).

Mr. Hill also testified that, at least with the exception of people who themselves commercially distribute marijuana,[4] the "vast majority of people don't want to be next to a

---

[4] Plaintiffs' property is subject to covenants that predate this litigation and that would prohibit an owner of Plaintiffs' property from using it to commercially cultivate marijuana. App. 170 § 2.7 (covenants that apply to Plaintiffs' property that bar commercial

marijuana facility." App. 119 (Hill Tr. 137:17-18). That assessment of the market for prop-

erty like the parcels Plaintiffs own is corroborated by the overwhelming opposition from

property owners that Defendants faced when they applied to Pueblo County for a license

to cultivate marijuana. *See* App. 67-68 (Walton Tr. 34:24-35:14) (acknowledging that

neighbors opposed facility because "[t]hey did not want to be living around a marijuana

cultivation facility"); App. 5-8 (emails sent by property owners to Pueblo County opposing

facility).

Mr. Hill is Defendants' expert, and Defendants produced no evidence rebutting the

deposition testimony just described. Plaintiffs served an interrogatory on Defendants ask-

ing them to identify "every basis for Defendants' contention" that "Plaintiffs' property is

uninjured whatsoever" by Defendants' activities. App. 156 (Interrogatory No. 4). Defend-

ants responded by producing only three documents, which show that the Pueblo County

Tax Assessor valued Lot 1 at $1,522 in 2014, $1,651 in 2015, $1,651 in 2016, and $1,766

in 2017. *See* App. 160 (Interrogatory Response No. 4); App. 164-66 (Pueblo County As-

sessor Valuations). Although it is true that the assessed value of this parcel for tax pur-

poses increased between 2014 and 2017, Mr. Hill stated in his rebuttal report that "the

methodology employed by a local County Assessor when determining property values for

assessment purposes" is "notoriously inaccurate." App. 187. During his deposition, Mr.

Hill further testified that the Pueblo County Tax Assessor *would not have even considered*

the effect of Defendants' marijuana facility when determining the tax assessment value

---

use). Thus, even setting aside the fact that commercial cultivation of marijuana "*remains illegal* in Colorado," *Safe Streets*, 859 F.3d at 876 (emphasis in original), Plaintiffs could not sell their property to a marijuana grower.

of Plaintiffs' property:

> Q: In your knowledge of the way Pueblo County does tax assessments, . . . would the county have tackled this question we've been talking so much about of whether the 6480 Pickney marijuana facility diminishes the value of Lot 1 which the Reillys own?
>
> A: No. . . . I'll tell you now they won't have.

App. 125-26 (Hill Tr. 216:22-217:7). Mr. Walton did not offer contrary testimony, answering "[n]o" when asked if he "know[s] anything about how" the Pueblo County Tax Assessor "go[es] about coming up with these numbers." App. 91 (Walton Tr. 109:10-12).

Finally, the Tenth Circuit's decision disposes of any argument that the injury to property found by Mr. Hill is insufficiently direct to satisfy RICO's proximate causation requirement. "All three plausibly alleged injuries," including the "decline in value stemming from the enterprise's open pursuit of its goals," "were . . . caused by the [Defendants'] criminal cultivation of marijuana *itself.*" *Safe Streets*, 859 F.3d at 891. The undisputed facts show that Defendants' racketeering activities "distinctly affect the land's value, including how prospective buyers would evaluate it today." *Id.* With Defendants' own appraisal expert having testified that their marijuana facility diminishes the market value of Plaintiffs' property and Defendants having failed to produce any evidence to the contrary, the Court should enter summary judgment on this issue.

## III.   The Court Should Enjoin Defendants' Ongoing Racketeering Activity.

If the Court concludes that Plaintiffs are entitled to summary judgment as to liability, the most appropriate remedy is an injunction ordering Defendants to stop engaging in racketeering activity next to Plaintiffs' property. Compelling Defendants to comply with federal law would reverse the diminished market value found by Mr. Hill, and it would also

eliminate the foul odor that Plaintiffs allege is emitted by the facility—thus averting the need for a trial on the injuries with respect to which Defendants were able to create a genuine issue of material fact.

## A.    RICO's Plain Language Makes Permanent Injunctive Relief Available to Private Parties.

This Court recently ruled that equitable relief is available to civil RICO plaintiffs, *CGC Holding Co. v. Hutchens*, 2017 WL 4621094, at \*4 (D. Colo. Sept. 26, 2017), and that decision as well as similar opinions from the Second and Seventh Circuits are correct, *see Chevron Corp. v. Donziger*, 833 F.3d 74, 137-40 (2d Cir. 2016); *National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003).[5]

RICO expressly authorizes district courts "to prevent and restrain violations of [RICO] by issuing appropriate orders," including by "prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in." 18 U.S.C. § 1964(a). Nothing in this provision states or implies that such relief is not available to private RICO Plaintiffs. *See National Org. for Women*, 267 F.3d at 698 ("Congress explicitly provided for injunctive relief in § 1964(a)" and "did not specify in that section which plaintiffs can seek such relief."). By its plain terms, then, Section 1964(a) grants district courts broad power to issue "appropriate orders"—including injunctive relief—in favor of private plaintiffs.[6]

---

[5] The Tenth Circuit has not decided this issue. *See Safe Streets*, 859 F.3d at 891 ("[W]e do not decide what remedies are or are not available under RICO.").

[6] To be sure, Sections 1964(b) and (c) expressly authorize RICO suits by the Government and private plaintiffs, respectively. Rather than limit the broad relief authorized by Section 1964(a), these provisions specify who may seek this broad relief and authorize *additional* relief that would otherwise be unavailable. Section 1964(b) thus authorizes the

This reading of Section 1964(a) is confirmed by Congress's express instruction that RICO must be "liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970); *see also, e.g.*, *Boyle*, 556 U.S. at 944; *Tafflin v. Levitt*, 493 U.S. 455, 467 (1990). This instruction applies with special force here, for "if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 n.10 (1985). This reading also follows from the well-settled understanding that "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction," *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979), as well as the more "general rule . . . that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal stat- ute," *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 70-71 (1992); *see Donziger*, 833 F.3d at 137-38. For all of these reasons, Plaintiffs are entitled to seek an injunction.

Without discussing most of these arguments, a three-decade-old Ninth Circuit de- cision held that private plaintiffs may not sue for equitable relief under RICO. *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986). But *Wollersheim* "relied almost exclusively on the legislative history of RICO to reach its result, as opposed to the actual

---

Attorney General to bring civil RICO actions and to obtain, in addition to the relief author- ized by Section 1964(a), interim equitable relief, despite the traditional equitable rule that the Government, unlike a private plaintiff, may not obtain an injunction against criminal conduct. *See* 2 JOHN NORTON POMEROY, A TREATISE ON EQUITABLE REMEDIES 1042 (3d ed. 1905). And Section 1964(c) allows private plaintiffs to bring civil RICO suits and to obtain, in addition to the relief authorized by Section 1964(a), attorneys' fees and treble damages, despite the traditional unavailability of such remedies at common law.

language of the statute." *National Org. for Women*, 267 F.3d at 695. And the *Wollersheim* court did not have the benefit of the well-reasoned and more recent opinions of the Second and Seventh Circuits, which carefully analyzed the text of RICO, thoroughly rebutted the Ninth Circuit's arguments, and squarely concluded "that the text of the RICO statute, understood in the proper light, itself authorizes private parties to seek injunctive relief." *Id.* at 695; *see generally id.* at 695-700; *Donziger*, 833 F.3d at 137-40.[7]

**B.    Plaintiffs Are Entitled to a Permanent Injunction.**

Because Plaintiffs have established that they are entitled to relief under RICO and ask for an injunction that would only require Defendants to comply with their obligations under that statute, the Court should issue a permanent injunction without applying the traditional equitable standard. "It was plainly the intention of Congress in adopting Section 1964 to provide for injunctive relief against violations of Section 1962 without any requirement of a showing of irreparable injury other than that injury to the public which Congress found to be inherent in the conduct made unlawful by Section 1962." *United States v. Cappetto*, 502 F.2d 1351, 1358-59 (7th Cir. 1974). Applying that rule where a civil RICO plaintiff asks that the defendants be ordered to cease their racketeering activities would serve Congress's purpose in authorizing private plaintiffs to sue, which was "not merely

---

[7] Numerous district courts have written persuasive opinions concluding that equitable relief is available to private plaintiffs under RICO. *See, e.g.*, *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 344 (S.D. Iowa 2013); *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1283 (S.D. Fla. 2003); *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 243-44 (S.D.N.Y. 2002) (Rakoff, J.), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003).

to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557 (2000).

Plaintiffs are also entitled to injunctive relief under the traditional equitable standard, which requires showing: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009). Plaintiffs' success on the merits is demonstrated above.

With respect to the second factor, "[a] district court may find irreparable harm based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer." *Id.* (internal quotation marks omitted); *see Donziger*, 833 F.3d at 140. On this point, Mr. Hill again proves Plaintiffs' case. Although Mr. Hill could say definitively that Defendants' marijuana facility diminished the value of Plaintiffs' property because the property has lost value in a rising market, Hill Tr. 234:3-235:1, he could not say precisely by how much Plaintiffs' property would have otherwise appreciated or exactly quantify how much additional damage Plaintiffs have suffered because their property is adjacent to a marijuana facility rather than a quarter mile away. App. 121-22 (Hill Tr. 211:17-212:14) ("It's impossible to get that from – the MLS system that we've got down here. We can't do that. . . . It's uncertain. Yeah, we don't know. I mean, nobody can tell."). Thus, while Plaintiffs have been harmed *at least* by the amount their property value has declined, it will be difficult to calculate precisely how much additional damage they have

suffered. Moreover, the market for properties that are not stigmatized by a nearby marijuana facility may continue to appreciate in the future, and any award of damages today would not fully compensate Plaintiffs for their injuries if Defendants' racketeering activity continues.

The third and fourth factors likewise favor issuance of a permanent injunction. Against Plaintiffs' interest in having their injuries fully redressed, Defendants have no competing lawful interest in continuing to profit from federal drug crimes. *Cf. Klein-Becker USA, LLC v. Englert*, 2011 WL 147893, at *17 (D. Utah 2011) (defendants "have no legitimate interest to be protected in their actions which have been found to be violation of the Lanham Act"). And in making Defendants' conduct illegal, Congress has already determined that the public interest favors an injunction against that conduct. The Court is obliged to honor that determination: "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. . . . [T]heir choice is not whether enforcement is preferable to no enforcement at all." *United States v. Oakland Cannabis Buyer's Cooperative*, 532 U.S. 483, 498 (2001).

**C.** **In the Alternative, the Court Should Award Plaintiffs $4,000 in Damages for the Diminished Value of Lot 1 and Set the Case for Trial with Respect to Plaintiffs' Other Alleged Injuries.**

If the Court declines to issue an injunction against Defendants' ongoing racketeering activity, it should enter partial summary judgment in Plaintiffs' favor as to liability as well as $4,000 of damages to Lot 1 (an amount that should be trebled under 18 U.S.C. § 1964(c)). These damages are necessary to compensate Plaintiffs for the "diminution in the land's value presently caused by the existence of [Defendants'] publicly disclosed,

ongoing criminal enterprise adjacent to the Reillys' land." *Safe Streets*, 859 F.3d at 889. As discussed above, Mr. Hill found that Lot 1 has lost $4,000 in value in a rising market. Although Plaintiffs believe that they could prove a greater diminishment in property value to Lot 1 at trial, Plaintiffs are willing to accept $4,000 in damages to simplify the proceedings. But because Mr. Hill did not perform an appraisal of the other two lots owned by Plaintiffs that are the subject of this suit, his analysis does not provide a lower bound for Plaintiffs' potential damages for those lots. At trial, Plaintiffs intend to introduce the testimony of their own expert to assist the jury in quantifying damages. Absent an injunction, a trial is also necessary on whether Defendants' marijuana cultivation facility emits a foul odor onto Plaintiffs' property and, if so, to what extent this odor interferes with Plaintiffs' use and enjoyment of their property and reduces its market value.[8]

## CONCLUSION

The Court should enter summary judgment for Plaintiffs and enjoin Defendants' ongoing racketeering activities.

Date:  June 7, 2018                                  Respectfully submitted,

*Of Counsel*:                                          s/ David H. Thompson
Charles J. Cooper                              David H. Thompson
Peter A. Patterson                             *Counsel of Record*
Brian W. Barnes                                 COOPER & KIRK, PLLC
COOPER & KIRK, PLLC                      1523 New Hampshire Avenue, N.W.
1523 New Hampshire Avenue, N.W.      Washington, D.C. 20036
Washington, D.C. 20036                    (202) 220-9600
(202) 220-9600                                  (202) 220-9601 (fax)
(202) 220-9601 (fax)                          dthompson@cooperkirk.com

*Counsel for Plaintiffs*

---

[8] Consistent with the procedure set forth in Fed. R. Civ. P. 54(d), Plaintiffs will move for costs and fees within 14 days if the Court enters judgment in their favor.

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to attorneys for all parties in this case.

s/ David H. Thompson
David H. Thompson